*Cummins Issue*
*MC to cnsi*
*rept 133737*
*Dauphin Co-York*
*Kane*

⓵ 4/20/01 ⓝ

# ORIGINAL

## In the United States District Court for the
## Middle District of Pennsylvania

ERIC JOSEPH EPSTEIN,

v.

**1 : CV** Civ. No. **01 - 0682**

SPENCER ABRAHAM, Secretary, U.S. Department
of Energy;  HERBERT D. WATKINS, Contracting Officer,
United States Department of Energy

FILED
HARRISBURG

APR 1 9 2001

MARY E. D'ANDREA, CLERK
Per _____
DEPUTY CLERK

## COMPLAINT

     The isolation of high level nuclear waste has been exacerbated by decades of production of radioactive waste in the absence of any approved disposal site. High level waste is currently stored on-site at nuclear generating stations around the country.

     On July 19, 2000, as part of a settlement agreement reached between PECO Energy Company and the Department of Energy - to resolve claims arising from the Department's failure to provide a timely disposal site for PECO Energy Company's high level radioactive waste - an Amendment to an existing Contract was agreed to by the parties. That Amendment substantially altered the responsibilities and rights of the United States government and PECO Energy Company. That Amendment also fundamentally impacted third parties and has the potential to cause severe impacts to the natural and human environment.

     The Amendment to the Contract was not published in the Federal Register for public review and comment, nor was the Amendment the subject of an Environmental Impact Statement - a legal requirement for federal actions affecting the human and natural environment..

     This lawsuit has been brought to ensure that the public is alerted and informed concerning this latest agreement - between our national government and a for-profit energy corporation - which significantly alters the methods in which high level radioactive waste is managed and stored in Pennsylvania and across this country.

## I. Parties

1. Plaintiff Eric Epstein resides at 4100 Hillsdale Road in Harrisburg, Pennsylvania 17112. He is proceeding in this case as a Plaintiff in a *pro se* capacity. Plaintiff Epstein is a shareholder in PECO Energy Company, serves as Chairman of Three Mile Island Alert, Inc., is a founding Board member of the Sustainable Energy Fund of Eastern Central Pennsylvania, and is Coordinator of the EFMR Monitoring Group at Peach Bottom and Three Mile Island.

2. Defendant Spencer Abraham is the Secretary of the Department of Energy and is being sued in his official capacity. Defendant Abraham is located at 1000 Independence Avenue, SW, Washington, D.C. 20585.

3. Defendant Herbert D. Watkins is the Contracting Officer for the Office of Headquarters, Procurement Services, United States Department of Energy. He is being sued in his official capacity. Defendant Watkins is located in Room 8702 on the 8th Floor of 1000 Independence Avenue, S.W., Washington, D.C. 20585. Defendant Herbert D. Watkins approved the Amendments to the Contract as the duly authorized representative of the Department of Energy.

4. Plaintiff Eric Epstein has standing to pursue the claims contained herein for all of the foregoing reasons:

   (a) The Plaintiff physically resides and works in close proximity to the Three Mile Island Nuclear Generating Facility and resides and works within a region which is adversely impacted by health and safety risks related to the storage of high level radioactive waste from the Peach Bottom Nuclear Generating Facility and TMI.

   (b) The Plaintiff is a PECO Energy shareholder and the Amendment entered into between the United States government and PECO Energy may adversely impact the Plaintiff's financial interests.

(c) The Plaintiff is the Coordinator of the EFMR Monitoring Group at Peach Bottom and Three Mile Island Atomic Power Stations. As such, he is actively involved with radiation monitoring, nuclear decommissioning, spent fuel isolation and community investment programs. Plaintiff Epstein is legally obligated to inform the public about nuclear waste, nuclear decommissioning and radioactive releases. He also oversees the publication of the "EFMR Monitor" which disseminates information about nuclear power production at Peach Bottom and Three Mile Island to members of the general public.

(d) The Plaintiff is the Chairman of Three Mile Island Alert, Inc., a community-based organization which monitors TMI-1 and TMI-2. Plaintiff Epstein has represented the organization either as Chairman or Spokesperson since 1984. TMI-Alert is the largest and oldest community-based organization charged with monitoring Three Mile Island near Middletown, Pennsylvania; Peach Bottom Atomic Power Station near Delta, Pennsylvania; and the Susquehanna Steam Electric Station near Berwick, Pennsylvania. TMI-Alert, founded in 1977, has been formally recognized for its contributions to the Central Pennsylvania community by the Pennsylvania House of Representatives (1987 and 1999) and the City of Harrisburg (1999).

(e) The Plaintiff is a signatory to the Joint Petition for Full Settlement of Application of PECO Energy Company, Pursuant to Chapters 11, 19, 21, 22, & 28 of the Public Utility Code for Approval of (1) a Plan of Corporation Restructuring, Including the Creation of a Holding Company, and (2) the Merger of the Newly Formed Holding Company and Unicom Corporation; A-110550F0147 Application Docket No., March 24, 2000.

(f) The Plaintiff negotiated Appendix B: Nuclear Monitoring and Waste Storage Agreement to the Joint Petition for Full Settlement.

(g) The Plaintiff possesses over seventeen years of experience in publishing, researching, and promoting active intervention in nuclear decommissioning, nuclear waste isolation, nuclear economics, nuclear safety, and the proposed re-use of radioactive scrap metal.

5. The Plaintiff is adversely impacted and injured by the failure of the Department of Energy (hereinafter "DOE") to prepare an Environmental Impact Statement (hereinafter "EIS") prior to entering into the Amendment to the original contract entered into between the DOE and PECO Energy Company.

6. The Plaintiff is adversely impacted and injured by the failure of the Department of Energy to publish notice of the agreed-to Amendment in the Federal Register and to receive and consider public comment to the Amendment to the contract.

## II. JURISDICTION OF THIS COURT

7. The jurisdiction of this court is conferred by and invoked pursuant to federal question jurisdiction under 28 U.S.C. §1331 as the causes of action contained herein arise under federal statutes.

8. The jurisdiction of this court is also conferred by and invoked pursuant to the Administrative Procedure Act, 5 U.S.C. §702 and §704.

9. The jurisdiction of this court is also conferred by and invoked pursuant to 28 U.S.C. §1346 by virtue of the naming of one agency of the United States Government as defendant to this action.

10. Venue is properly laid in the Middle District in that persons and actions which are the subject matter of the suit, reside and have occurred herein, respectively.

-4-

# III. Statement of the Claim

## A. Background

11. Spent fuel disposal at atomic power stations in the United States is an unresolved and hugely problematic area.

12. Each nuclear reactor produces approximately thirty (30) metric tons of lethal, high-level radioactive waste annually.

13. The technology to safely manage spent fuel for an indefinite period of time does not exist, and there is no present location for the storage of spent nuclear fuel.

14. All operating nuclear power plants are currently forced to store high-level, radioactive waste on-site at the generating facility.

15. The lack of a permanent storage facility for spent fuel has become a significant problem for the nuclear facilities operated by PECO Energy Company, which are rapidly running out of space to safety store spent fuel.

16. Exelon Corporation received permission from the Nuclear Regulatory Commission (NRC) in August of 2000 for the transfer of operating licenses for all PECO and Con Edison plants to Exelon Generation Company.

17. PECO Energy Company plans to deploy dry cask storage at Limerick in 2010 and Oyster Creek in 2010.

18. PECO Energy Company's response to the critical shortage in spent fuel storage capacity has been to increase storage capacity through the use of a nascent commercial, dry cask storage technology in which spent fuel is stored on-site outside of the reactor facility in dry casks.

19. PECO Energy Company installed Trans-Nuclear TN-68 dry casks produced by Raytheon in 2000.

20. Dry Cask storage was implemented at PECO Energy's Peach Bottom facility in June of 2000.

21. Testimony from leading experts in the field supports the contention that long-term storage at the Yucca Mountain facility for spent fuel will not be ready by 2010 to begin accepting spent fuel from utilities.

22. That testimony also supports the contention that the amount of spent fuel generated by 2000 by the United State's nuclear generating facilities will total 40,000 metric tons, which would exceed the capacity of the Yucca Mountain storage facility. The State of Nevada has demonstrated that the Yucca Mountain facility will only hold about 20% of the total spent fuel earmarked for the facility.

23. When the State of Nevada balked at hosting a high-level radioactive waste storage facility, PECO Energy Company promptly poured over $66,000 into a $3.3 million advertising campaign coordinated by the Edison Electric Institute to convince the State to host the nation's spent fuel.

24. PECO Energy Company joined a consortium of thirty-three (33) utilities in 1994 to actively pressure the Mescalero Apaches to host a high-level storage facility.

25. Both initiatives were funded completely by PECO's customers.

26. If high-level radioactive waste storage is unavailable, PECO Energy Company's Peach Bottom facility would continue to store spent fuel on-site.

-6-

27. PECO's decommissioning cost and volume estimates for disposal rely entirely upon the 2010 target date for the completion of the Yucca Mountain storage facility.

28. Nuclear Regulatory Commission standards and regulations preclude implementing immediate decommissioning, i.e. "DECON", with the presence of high level waste and spent fuel on site.

29. On April 18, 1983, the Department of Energy concluded its rule-making process for its "Standard Contract for Disposal of Spent Nuclear Fuel (SNF) and/or High Level Waste (HLW)" and published the Contract in the Federal Register. The Contract was then used as the standard contract between the owners of nuclear generating facilities and the Department of Energy.

30. The contract delineated the rights and responsibilities of the DOE and the owners of nuclear generating facilities and established a timetable for the DOE to take title of SNF/HLW and to dispose of SNF/HLW. (*See* Attachment One to the Complaint)

31. The Department of Energy was unable to comply with the timetable originally established in the original Contract.

32. The owners of several nuclear generating facilities brought suit in 1996 against the Department of Energy in *Northern States Power Co. v. United States Department of Energy*, and the D.C. Circuit Court held that the DOE's delay was avoidable, and therefore, the utilities could pursue requests for monetary adjustments against the Department.

33. On July 19, 2001, the Department entered into an Amendment to the original Contract to dispose of any legal claims that PECO Energy Company could assert against the Department.

34. The Amendment altered the original Contract and changed nine of the Titles of the original Contract. (*See* Attachment Two to the Complaint).

35. The Amendment altered the original duties and responsibilities of both the Department of Energy and PECO Energy Company.

36. The Department of Energy failed to prepare an Environmental Impact Statement prior to entering into the Amendment to the Contract.

37. Instead of treating the Amendment to the Contract as a rule, and proceeding to notice and comment, complete with publication in the Federal Register, the Department of Energy treated the Amendment as a bilateral contract, and failed to comply with the requirements for rule-making required by the Administrative Procedure Act.

## B. Claims

### Count One:
### The U.S. Department of Energy's Failure to Draft and Issue an Environmental Impact Statement Violated the National Environmental Policy Act Because The Contract Amendment Represents a Significant Alteration to the Contract Which Constitutes a Major Federal Action Which Will Significantly Impact the Human and Natural Environment

38. The National Environmental Policy Act, 42 U.S.C. §4321 et seq. requires the preparation of an Environmental Impact Statement for major federal actions which significantly affect the quality of the human environment.

39. The required Environmental Impact Statement is to be used to "identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 CFR §1500.2.

40. The primary purpose of the preparation of an Environmental Impact Statement is to "provide full and fair discussion of significant environmental impacts and [] inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 CFR §1502.1

69. The original contract entered into between DOE and PECO Energy Company's corporate predecessors was promulgated as a rule and notice of the rule-making complied with the Administrative Procedure Act. Amendments to that rule are thus required to comply with the same process, and therefore, the DOE violated the Administrative Procedure Act by failing to treat the Amendments to the contract as a rule, subject to public notice and comment provisions.

## IV. Remedies

Plaintiff respectfully requests that this court grant the following relief:

(a) That this Court declare that the agency decision making failed to comply with the National Environmental Policy Act (NEPA) and the Administrative Policy Act (APA), and rules and policy requiring publication in the Federal Register;

(b) That this Court declare that the Plaintiffs will be adversely affected by the Amendment to the Contract entered into between the Department of Energy and PECO Energy Company;

(c) That this Court remand the matter for the preparation of a properly executed and reviewed Environmental Impact Statement (EIS);

(d) That this Court, in its discretion, award reasonable attorney's fees, expert witness fees and court costs to plaintiff as provided through the Equal Access to Justice Act, 28 U.S.C. §2412 (b), and (d); or 42 U.S.C. §1988; and

(e) Such further and additional relief as this court deems to be appropriate.

41. Agencies are required to prepare supplements to either draft or final environmental impact statements if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 CFR §1502.9.

42. The Amendment to the Contract makes substantial changes in the proposed action that create significant, new impacts to the human and natural environment.

43. The Amendment to the Contract settles all legal claims which could have been asserted by PECO Energy Company against the Department of Energy (DOE) in return for monetary payments by DOE to PECO Energy Company to pay for delays resulting from DOE's failure to accept SNF/HLW from PECO Energy Company.

44. The Amendment to the Contract obligates the DOE to provide additional monetary payments to PECO Energy Company if more favorable agreements are reached with other owners of nuclear plants.

45. The Amendment to the Contract enables exchanges of PECO's Peach Bottom removal allocation credits with other nuclear units or other Purchasers. This part of the Amendment fundamentally alters the original Contract and establishes a complete trading regime of removal allocation rights.

46. The Amendment to the Contract allows the PECO Energy Company to store SNF/HLW produced at plants other than Peach Bottom to be stored at Peach Bottom. This part of the Amendment fundamentally alters the original Contract and enables PECO Energy Company to use the Peach Bottom site to store an unlimited amount of SNF/HLW from other facilities.

47. The Amendment to the Contract specifically establishes Alternative Dispute Resolution (ADR) as a means of resolution for disagreements over the Amendment.

48. The Amendments to the Contract constitute a major federal action.

49. The Amendments to the Contract fundamentally alter the original Contract between the DOE and PECO Energy Company, creating new, significant impacts to the human environment.

50. Changes in the prevailing conditions since the signing of the initial agreement between the owners of Peach Bottom 2 & 3 and the Department of Energy also make any Amendment to the Contract a "major federal action" which "significantly affects the human environment."

51. Those changes in prevailing conditions include:

(1) Peach Bottom 2 & 3 was officially shutdown by order of the Nuclear Regulatory Commission in 1987 and remains the only nuclear plant to be shutdown by the NRC;

(2) The projected cost for nuclear decommissioning of Peach Bottom 2 and Peach Bottom 3 has increased to a range of $452 million;

(3) Deregulation of public utilities was legislated in Pennsylvania in 1998. The NRC substantially modified its oversight program in 1999 and on April 2, 2000, implemented its Risk Informed Approach which is designed to reduce "unnecessary" regulatory burdens on the nuclear industry;

(4) AmerGen purchased Three Mile Island in 1999, thus subjecting that plant to foreign ownership under a corporate entity comprised of British Energy and PECO Energy;

(5) The ownership of Peach Bottom 2 &3 has changed from Philadelphia Electric to PECO Energy Company to Exelon - the product of a merger between Commonwealth Edison and PECO Energy Company;

-10-

(6) The percentage of Peach Bottom owned by Exelon has increased due to the sale of ownership by Atlantic City Electric Company and Delmarva Power and Light Company.

52. Changes in the underlying conditions between the contracting parties to the original Contract make the Amendments to the Contract a major federal action which significantly impacts the human environment.

53. It was unlawful for the DOE to enter into the Amendments to the Contract in the absence of the preparation of an Environmental Impact Statement, because the Amendments to the Contract constitute a major federal action which significantly impacts the human environment.

54. It was unlawful for the DOE to enter into the Amendments to the Contract in the absence of the preparation of an Environmental Impact Statement or a Supplemental Environmental Impact Statement, because the Amendments to the Contract create new obligations and duties on the part of both Parties to the Contract which may cause significant, new impacts to the human and natural environment.

55. It was unlawful for the DOE to enter into the Amendments to the Contract in the absence of environmental documents required under the National Environmental Policy Act because the public notice and commenting requirements of the Act were circumvented, and thus, no opportunity for public comment, challenge, or intervention was created.

**Count Two:**
**The U.S. Department of Energy's Failure to Issue Public Notice of the Contract**
**Amendment for Review and Comment in the Federal Register Violated the**
**Administrative Procedure Act**

56. The impact of the Amendments to the Contract on the Plaintiff - and others similarly situated, and the natural environment, required the DOE to implement a rule making procedure, complete with publication in the Federal Register, to implement the Amendments to the Contract.

57. The original Contract took the form of a final rule published in the Federal Register on April 18, 1983, entitled "Standard Contract for Disposal of SNF and/or HLW".

58. The original Contract required that "any such amendment [to the original Contract] shall be consistent with the DOE final rule."

59. The Amendment to the Contract entered into between the DOE and PECO Energy Company did not comply with rule-making procedures, and was not published in the Federal Register for notice, review and comment.

60. On October 7, 2000, Plaintiff Epstein sent a communication to the DOE, asking that the DOE follow rule-making procedures and publish the Amendments to the Contract in the Federal Register for notice, review, and comment by the public. [*See* Attachment Three to the Complaint]

61. On December 1, 2000, the Department of Energy responded that "The Department does not believe it would be particularly useful to publish a negotiated contract amendment in the Federal Register." [*See* Attachment Four to the Complaint].

62. In the same letter, the Department stated that "The Department has recognized the interest in making the Amendment available to the public."

-12-

63. The Administrative Procedure Act, 5 U.S.C. §551 et seq. requires that "[e]ach agency shall separately state and currently publish in the Federal Register for the guidance of the public. . .(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and (E) each amendment, revision, or repeal of the foregoing."

64. The Administrative Procedure Act, 5 U.S.C. §551 et seq. requires that "[g]eneral notice of proposed rule making shall be published in the Federal Register. . . . the notice shall include (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."

65. After publication in the Federal Register, the agency must give "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."

66. After public comment, the agency must consider the relevant matter presented, and "incorporate in the rules adopted a concise general statement of their basis and purpose."

67. The Amendments to the original Contract constituted broad and fundamental changes to the original Contract which impacted and infringed upon the rights of the Plaintiff - and others similarly situated - to participate in the making of specific, binding agreements between the DOE and PECO Energy Company.

68. The DOE acted unlawfully in entering into the Amendments to the Contract without treating the Amendments as rules to be promulgated and thus, the DOE violated the Administrative Procedure Act.

-13-

I swear and affirm that the foregoing is true and correct to the best of my knowledge.


Signed,


Eric Joseph Epstein, *pro se*
4100 Hillsdale Road
Harrisburg, Pennsylvania 17112
(717) 540-5773


Dated this ___19___ Day of April, 2001

**Amendment to Contract**
**DE-CR01-83 NE44405 Between U.S. Department of Energy and PECO**
**Energy Company**

This is an Amendment to Contract No. DE-CR01-83NE 44405, as amended, (hereinafter the "44405 Contract"), and is agreed to this ___19___ day of July, 2000 by the United States of America represented by the Department of Energy (DOE) and PECO Energy Company (formerly known as Philadelphia Electric Company) ("PECO Energy"), acting on behalf of itself and Public Service Electric and Gas Company, Delmarva Power and Light Company and Atlantic Electric Company, joint owners of Peach Bottom Atomic Power Station Units 2 and 3, in accordance with the terms and conditions set forth herein.

This Amendment between PECO Energy and DOE amends and supplements the 44405 Contract. Except to the extent provided in this amendment, the prior obligations of PECO Energy and DOE under the 44405 Contract, therefore, remain in effect. DOE remains obligated to transfer Peach Bottom Spent Nuclear Fuel and/or High-Level Radioactive Waste ("SNF/HLW") to a repository per the Removal Allocation as defined in Article I, below, upon initiation of repository operations. Unless otherwise stated or modified herein, the 44405 Contract is incorporated herein by reference. Those Articles of the 44405 Contract not specifically modified by this Amendment remain unchanged.

Notwithstanding subsequent change in law, each term of this Amendment is binding on, and inures to the benefit of, PECO Energy and DOE and their respective successors, transferees, assigns, affiliates, representatives, principals, agents, officers, directors, and employees.

## RECITALS

Whereas, on June 1, 1983 DOE and PECO Energy entered into the 44405 Contract for disposal of SNF/HLW generated by the Peach Bottom Atomic Power Station ("Peach Bottom SNF/HLW"); and

Whereas, DOE has been delayed in beginning the performance of its disposal obligation under that Contract, and DOE and PECO Energy agree that PECO Energy has incurred certain costs resulting from DOE's delay, and that PECO Energy will continue to incur additional costs for ongoing management of this Peach Bottom SNF/HLW; and

Whereas, the U.S. Court of Appeals for the District of Columbia Circuit held in **Northern States Power Co. v. United States Department of Energy,**

160154

128 F. 3d 754 (D.C. Cir. 1997), cert. denied, 119 S. Ct. 540 (1998), that DOE's delay was avoidable, and therefore, PECO Energy would be entitled to pursue a request for equitable adjustment against the United States pursuant to Article IX.B of the 44405 Contract, which expressly allows DOE to adjust charges and schedules to address issues arising from avoidable delays; and

**Whereas,** DOE and PECO Energy hereby agree that settlement of PECO Energy's potential claim, by this Amendment of the 44405 Contract, is in the interest of both parties; and

**Whereas,** DOE plans to design, construct, and operate a repository with an annual acceptance capacity in excess of that stated in the 1995 Annual Capacity Report and, once this facility opens, DOE intends to maximize the annual acceptance rate; and

**Whereas,** after completing site characterization and assuming site recommendation in 2001, DOE currently plans to begin disposal of SNF/HLW at an operational repository in year 2010; and intends to operate the repository at a steady-state capacity of 3,000 MTUs beginning in year 2014, as described in the *Viability Assessment of a Repository at Yucca Mountain,* (DOE/RW-0508), December 1998; and

**Whereas,** DOE agrees to use reasonable efforts to manage the Nuclear Waste Fund to minimize the potential of increasing the one (1) mill per kilowatt hour fee, consistent with current law; and

**Whereas,** DOE represents that all provisions to this Amendment are lawful and enforceable and that it has authority to enter into this Amendment, such authority including the DOE Organization Act, Pub. L. 95-91, 42 U.S.C. 7101. et seq.; and the Nuclear Waste Policy Act of 1982, Pub. L. 97-425, 42 U.S.C. 10101, et seq.; and other statutes; and

**Whereas,** certain conditions, commitments and agreements in this Amendment may also be subject to the Anti-Deficiency Act, 31 U.S.C. 41, et seq.

**NOW, THEREFORE,** in consideration of the promises, mutual covenants and agreements set forth herein, PECO Energy and DOE hereby agree as follows:

### ARTICLE I.  DEFINITIONS

The definitions set forth in the original 44405 Contract remain in effect unless specifically amended herein.  The following definitions are added to Article I of the 44405 Contract:

2

A. **"Acceptance Allocation"** means that portion of the Acceptance Schedule allocated to Peach Bottom SNF/HLW and which provides the basis for any compensation made to PECO by DOE under this Amendment.

B. **"Acceptance Schedule"** means the schedule prepared by DOE for acceptance of financial responsibility for management of commercially-generated SNF/HLW solely for the purposes of this Amendment only that incorporates the schedule for steady state acceptance of 900 MTU/yr. (*Acceptance Priority Ranking and Annual Capacity Report*, DOE/RW - 0457, March 1995) and extended at that constant rate beyond that published schedule.

C. **"Allowable Costs"** means those costs incurred by the Purchaser for managing Peach Bottom SNF/HLW that the Purchaser would not have incurred but for, and are directly related to, DOE's delay in performance of its disposal obligation.

D. **"Allowable and Reasonable Costs"** means those costs that meet both the definitions of "Allowable Costs" and "Reasonable Costs".

E. **"Cost Objective"** means a function, organizational subdivision, contract, or other work unit for which cost data are desired and for which provision is made to accumulate and measure the cost of processes, products, jobs, capitalized projects or other similar tasks or items.

F. **"ISFSI"** means an Independent Spent Fuel Storage Installation that is licensed by the Commission for the dry storage of SNF/HLW.

G. **"Manage Peach Bottom SNF/HLW"** means all of those activities necessary to possess and maintain the Peach Bottom SNF/HLW in accordance with applicable federal, state and local laws and regulations.

H. **"Peach Bottom ISFSI"** means the ISFSI facility, exclusive of any underlying real property, located in Delta, York County, Pennsylvania, constructed by PECO Energy to manage the Peach Bottom SNF/HLW.

I. **"Peach Bottom ISFSI Property"** means the designated portion of the Peach Bottom Atomic Power Station Site in York County, Pennsylvania on which the Peach Bottom ISFSI is located.

3

J. **"Peach Bottom SNF/HLW"** means the SNF/HLW generated in or by the operation of the Peach Bottom Atomic Power Station.

K. **"Purchaser"** refers to PECO Energy Company, formerly known as Philadelphia Electric Company, its successors, transferees, assigns, representatives, affiliates, principals, agents, officers, directors and employees;

L. **"Reasonable Costs"** mean:

1. Those costs that, in their nature and amount, do not exceed those that would be incurred by a prudent person or entity in the conduct of competitive business. What is "reasonable" depends upon a variety of considerations and circumstances, including whether a cost —

   a. is the type generally recognized as ordinary and necessary for the conduct of the Purchaser's business or the contract performance;
   b. is consistent with generally accepted sound business practices, arm's length bargaining, and federal and state laws and regulations;
   c. is part of the Purchaser's responsibilities to the Government, other customers, the owners of the business, employees and the public at large;
   d. is incurred in accordance with the Purchaser's established business practices; and

2. Those costs that are allocable, i.e., assignable or chargeable to one or more cost objectives on the basis of relative benefits received or other equitable relationship, and:

   a. are incurred specifically as a result of the delay in performance; or
   b. are attributable to both the delay in performance and other work, and can be distributed to them in reasonable proportion to the benefits received; or
   c. are necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown; and

4

3. If an initial review of a claim by Purchaser results in a challenge of specific cost by the Contracting Officer, the burden of proof shall be upon the Purchaser to establish that such cost is reasonable.

M. **"Removal"** means to physically take away Peach Bottom SNF/HLW from the Peach Bottom Atomic Power Station or an ISFSI site.

N. **"Removal Allocation"** means that portion of the Removal Schedule that specifies the schedule for the transport of Peach Bottom SNF/HLW to an operational repository.

O. **"Removal Schedule"** means the industry-wide schedule prepared by DOE for the removal of SNF/HLW from commercial sites for transport to an operational repository.

P. **"44405 Contract"** means Contract No. DE-CR01-83NE 44405 between the United States of America represented by the Department of Energy, and Philadelphia Electric Company (now known as PECO Energy Company), acting on behalf of itself and the joint owners of Peach Bottom Atomic Power Station Units 2 and 3, entered into on June 1, 1983, and all subsequent amendments and modifications thereto.

### ARTICLE II.    SCOPE

Except as provided herein, the Scope of the 44405 contract is not amended.

### ARTICLE III.    TERM

Article III of the 44405 Contract is amended by adding at the end the following:

The term of this contract Amendment shall be from execution until completion of all obligations under the Contract, as amended.

### ARTICLE IV.  RESPONSIBILITIES OF THE PARTIES

Article IV Section B of the 44405 Contract, DOE Responsibilities, is amended by adding at the end of Subsection 5 the following:

6. In exchange for Purchaser's release of claims as set forth in Article XI, Section A, DOE shall compensate Purchaser for the Allowable and Reasonable Costs incurred as a result of DOE's delay in performance of its disposal obligation for Peach Bottom SNF/HLW.  DOE shall reimburse the

Purchaser using the Peach Bottom Atomic Power Station's Acceptance Allocation as set forth in Article IX, Section C.1, Acceptance Allocation, of this Amendment to calculate the amount of SNF/HLW that is the financial responsibility of DOE.

7. DOE agrees that if any legal action, claim, lawsuit, or other proceeding, including one before an administrative agency, is initiated by any person involving this Amendment alleging that the Amendment, or any portion of this Amendment is unlawful, DOE shall take all reasonable steps that are necessary to defend this Amendment in its entirety.

8. In the event that a court orders or legislation provides that DOE utilize more beneficial schedules, allocations, or funding sources that are applicable to a group of similarly situated signatories to the Standard Contract than DOE has provided to the Purchaser, DOE shall, at the Purchaser's request, re-negotiate in good faith the terms of this Amendment. If the Purchaser is reimbursed for adjustments to charges already received by DOE from an alternative funding source, the Purchaser agrees to reimburse the Nuclear Waste Fund the amount of the reimbursement.

## ARTICLE V.   DELIVERY OF SNF AND/OR HLW

Article V of the 44405 Contract is amended by adding to the end of Section E, Exchanges, the following:

> Provided that the Purchaser does not significantly increase DOE's costs, or adversely impact other Purchasers, and upon no less than twelve (12) months written notice to DOE, the Purchaser shall be permitted to exchange Peach Bottom Atomic Power Station Removal Allocations with those of other nuclear units or other Purchasers.

## ARTICLE VII.   TITLE

The title of Article VII of the 44405 Contract is amended to read "**TITLE AND POSSESSION**".

Article VII is amended by inserting the letter "A" before the existing Section and adding the title "Disposal" before the text. At the end of Section A, the following sections are added:

> B. Transfer of Title. Subject to the conditions and limitations listed below, DOE shall take title to Peach Bottom SNF/HLW, the storage casks and the Peach Bottom ISFSI in which they are stored in accordance with

6

the Acceptance Allocation in Article IX, Section C.1, Acceptance Allocation, of this Amendment:

1. For dry storage only, DOE shall only take title to Peach Bottom SNF/HLW that is contained in a dual-purpose cask system certified by the Commission for storage and transport under 10 CFR Parts 71 and 72;

2. DOE shall not take title to, or assume any responsibility for, any SNF/HLW storage pools;

3. If DOE takes title to the Peach Bottom SNF/HLW, the storage casks or the Peach Bottom ISFSI in which they are stored, DOE shall not be immediately obligated to take physical possession of any of them. In the event that DOE takes title to the SNF/HLW or SNF/HLW in casks, PECO Energy shall allow such SNF/HLW or SNF/HLW in casks to remain at its then current location until it is removed in accordance with the Removal Schedule;

4. The Purchaser shall provide DOE at least eighteen (18) months written notice of its desire for DOE to take title to the Peach Bottom SNF/HLW, casks or Peach Bottom ISFSI;

5. Upon transfer of title, Peach Bottom's allocation in the Removal Schedule for that SNF/HLW then-titled to DOE shall transfer to DOE. Peach Bottom's SNF/HLW shall retain its position in the Removal Schedule;

6. The Purchaser shall remain the operator and the Commission licensee of the Peach Bottom ISFSI and shall maintain, keep current and comply with applicable federal, state and local licenses, permits, and requirements. As part of this responsibility, the Purchaser shall continue to be responsible for all public and regulatory interactions with respect to issues of compliance with these federal, state and local licenses, permits and requirements;

7. DOE shall not store any SNF/HLW other than Peach Bottom SNF/HLW at the Peach Bottom ISFSI;

8. DOE shall not take title to the Peach Bottom SNF/HLW, the casks or the Peach Bottom ISFSI until DOE and the Purchaser have agreed in writing to the specific terms and conditions of the transfer of title, including but not limited to:

7

a.  The technical and legal description and boundaries of the ISFSI and its contents, as well as an environmental baseline; and

b.  Each party's responsibility for liabilities that may be incurred subsequent to such transfer of title;

9.  In the event DOE takes title to the Peach Bottom ISFSI, the Purchaser shall continue to own the real property upon which the Peach Bottom ISFSI is located.  In that event and intending to be legally bound hereby, DOE shall lease the Peach Bottom ISFSI land from the Purchaser for one dollar ($1.00) as good and valuable consideration;

10.  If DOE determines it does not have legal authority to take title to the Peach Bottom SNF/HLW, casks and/or the Peach Bottom ISFSI, DOE agrees that no later than twelve (12) months following the Purchaser's written request for title transfer, DOE shall request that authority from Congress and make all reasonable efforts to obtain such authority; and

11.  Nothing in this Article shall preclude the Purchaser's storage of other SNF/HLW at the Peach Bottom ISFSI as long as the Purchaser complies with applicable federal, state and local laws and regulations.

C.  Transfer of Physical Possession.

1.  Upon written request by the Purchaser, DOE shall make all reasonable efforts to become the title holder, owner, operator and NRC licensee of the Peach Bottom ISFSI and its contents no later than five (5) years after permanent shutdown of the last operating unit at Peach Bottom Atomic Power Station, but no sooner than five (5) years after the full term of the original forty (40) year operating license (year 2019), contingent upon the following conditions and limitations:

a.  The Purchaser gives DOE at least five (5) years written notice of its intent to transfer to DOE the NRC license, ownership and physical possession of the Peach Bottom SNF/HLW, casks and Peach Bottom ISFSI; and

b.  DOE and the Purchaser agree in writing to the specific terms and conditions of the physical transfer and responsibilities of the parties for future actions, including but not limited to:

8

(1) Actions such as transfer of equipment, personnel, and all other activities inherent in the transfer of physical possession and responsibility for operations of the Peach Bottom ISFSI; and

(2) The technical and legal description and boundaries of the ISFSI and its contents as well as an environmental baseline; and

(3) Each party's responsibility for liabilities that may be incurred subsequent to such transfer of possession; and

(4) Fiscal and operational responsibilities of each party for decontamination and decommissioning of the Peach Bottom ISFSI;

c. The Purchaser agrees to obtain a fully compliant and current Peach Bottom site-specific Commission license under the provision of 10 CFR Part 72. The Purchaser shall assist DOE in obtaining Commission approval for transfer of the site specific 10 CFR Part 72 license to DOE; and

d. Any adjustment to previously authorized adjustments to charges to account for DOE's early acceptance of SNF/HLW when possession is transferred from Purchaser to DOE in advance of the Removal Allocation shall be negotiated and completed before the transfer of possession is made.

2. DOE and the Purchaser agree that the land on which the Peach Bottom ISFSI is located will be returned to "unrestricted use" in accordance with 10 CFR Part 20 and decontamination and decommissioning will be completed within two (2) years after removal of all Peach Bottom SNF/HLW.

3. DOE's plan to assume operation of the Peach Bottom ISFSI, as described in the Sections above, is contingent upon the availability of funds appropriated for that purpose, and any other conditions or limitations set by law. Upon a timely written request by the Purchaser for DOE to take possession of the Peach Bottom ISFSI, DOE shall request the funds necessary to take possession of the Peach Bottom ISFSI and make all reasonable efforts to obtain such funding.

## ARTICLE VIII.   FEES AND TERMS OF PAYMENTS

9

Article VIII of the 44405 Contract is amended by adding to the end of Section E, Audit, the following paragraph 4, and adding the following Sections F and G:

    4. **Right to Audit Allowable and Reasonable Costs Underlying Applications for Credits.** Notwithstanding any other audit rights provided under the 44405 Contract, DOE or its representative shall have the right at reasonable times and reasonable places to audit any directly pertinent books, documents, papers, and records of the Purchaser related to requests for Allowable and Reasonable Costs that the Purchaser submits for fee credits, and the Purchaser shall retain such cost data for seven (7) years from the date of the submittal.

F.   **Reimbursement of Allowable and Reasonable Costs.** DOE shall compensate the Purchaser for the Allowable and Reasonable Costs incurred to manage Peach Bottom SNF/HLW, according to the following:

    1. **Adjustments to Charges.** Reimbursement by DOE of the Purchaser's Allowable and Reasonable Costs shall be made in the form of adjustments to charges against future fees payable to the Nuclear Waste Fund pursuant to Article VIII Section B.1, Payment, of the 44405 Contract;

    2. **Pooling of Adjustments to Charges and Debits by the Purchaser.** If DOE agrees to other contract amendments that settle or resolve Purchaser's potential claims for Allowable and Reasonable Costs due to DOE's delay in performance of its disposal obligation under other contracts at other Purchaser-affiliated nuclear sites, the adjustments to charges due under this Amendment to the 44405 Contract for Peach Bottom Atomic Power Station may be applied against the total fees due to the Nuclear Waste Fund from all such contract amendments;

    3. **Adjustments to Charges Exceeding Payment Obligations.** If, after permanent shutdown of all Purchaser-affiliated nuclear units for which the Purchaser has executed with DOE a contract Amendment resolving issues arising from DOE's delay in performance of its disposal obligations, DOE owes adjustments to charges to the Purchaser that exceed in dollar value the fees due the Nuclear Waste Fund from the Purchaser or other Purchaser-affiliated nuclear units, but no earlier than the full term of the original forty (40) year operating license for the above-referenced nuclear units, DOE agrees to include a request for those funds necessary to provide for the direct payment of additional credits due to the Purchaser and use all reasonable efforts to obtain such funds; and

10

4.  Adjustment of Adjustments to Charges. Adjustments to Charges shall be modified in accordance with the Consumer Price Index – All Urban Consumers ("CPI") to reflect inflation from the date of expenditure to the date the credit is taken.

G.  Application for Adjustment to Charges. The Purchaser shall submit to DOE a written application for adjustments to charges to its fees due to the Nuclear Waste Fund. The application shall be submitted to the Contracting Officer in the form and format agreed to by the Parties. The application must be signed and certified as per the requirements of Article XVI Section B, Disputes. The Contracting Officer shall make a determination as to the amount of the adjustments to charges authorized no later than 180 days after receipt of a certified application for adjustments to charges.

H.  Allowable Cost Categories. The parties agree that the costs associated with the following categories are Allowable Costs under this Amendment. Any additional Allowable Cost categories shall be mutually agreed to by the parties. A determination of whether such costs are Reasonable Costs will be made by the Contracting Officer after receipt of supporting documentation from the Purchaser. Based on the certified documents submitted on June 26, 2000, by the Purchaser, DOE has determined that the Allowable Cost categories include but are not limited to:

1.  Storage slab, bridge and retaining walls;

2.  Security system at ISFSI;

3.  Security system at Protected Area Boundary;

4.  Unit 1 modifications;

5.  Unit 2 and 3 cask pit modifications;

6.  Inside plant modifications;

7.  ISFSI project access road;

8.  Procurement of spent fuel storage ~~cases~~ and associated equipment; and

9.  Atom Road bridges.

11

## ARTICLE IX. DELAYS

Article IX of the 44405 contract is amended by adding at the end of Section B, the following:

C.  Adjustment of Schedules.

    1.  Acceptance Allocation.  The Acceptance Allocation is hereby adjusted to the following:

        a.  Through the calendar year 2007:  As currently allocated under the 1995 Acceptance Priority Ranking & Annual Capacity Report, Appendix B, Tables B.1 through B.10 (DOE/RW-0457); and

        b.  For calendar years 2008 and continuing until the conditions of Section C.1.c below are satisfied, the Acceptance Allocation for Peach Bottom Atomic Power Station only shall be based upon an Acceptance Schedule of 900 MTU/year utilizing the principle of "Oldest Fuel First" and the Acceptance Priority Ranking as published in Appendix A of the above-referenced Report.  The Acceptance Allocations are:

| Calendar Year | MTUs |
|---|---|
| 2008 | 52.0 |
| 2009 | - |
| 2010 | 53.3 |
| 2011 | - |
| 2012 | 51.7 |
| 2013 | - |
| 2014 | - |
| 2015 | 84.7 |
| 2016 | - |
| 2017 | - |
| 2018 | - |
| 2019 | - |
| 2020 | - |

        Should additional Acceptance Allocations be required under this Amendment, they shall be determined by DOE consistent with the above method.

12

c. The Acceptance Allocations shall continue until the cumulative amount of Peach Bottom SNF/HLW removed by DOE or otherwise utilized by the Purchaser equals the cumulative Peach Bottom Acceptance Allocations as measured in MTUs.

d. These Acceptance Allocations may not be exchanged with acceptance allocations for any other nuclear units.

e. If DOE does not begin removal of fuel from Peach Bottom Atomic Power Station by December 31, 2017, DOE and the Purchaser shall meet as soon as possible to determine what, if any, adjustments to the Acceptance Schedule are warranted.

2. Removal Allocation. The Parties agree that the following Removal Allocations are targets only, and do not create any binding legal obligation upon DOE.

a. Consistent with plans published in the *Viability Assessment of a Repository at Yucca Mountain*, (DOE/RW-0508), December 1998, DOE intends to begin repository operations by 2010 and to operate the repository with the following target annual acceptance capacity:

| | |
|---|---|
| 2010 | 400 MTUs |
| 2011 | 600 MTUs |
| 2012 | 1,200 MTUs |
| 2013 | 2,000 MTUs |
| 2014 and beyond | 3,000 MTUs per year |

b. DOE intends to allocate Removal Allocations to Peach Bottom in accordance with the principle of "Oldest Fuel First," as provided in Article IV.B.5(a), DOE Responsibilities, utilizing the most current industry discharge information available at the time for development of the Acceptance Priority Ranking. This method is consistent with the basis for development of the Acceptance Priority Ranking and the Annual Capacity Report utilized in the 1995 Acceptance Priority Ranking & the Annual Capacity Report (DOE/RW-0457). Application of this method results in the following expected, but not assured Removal Allocations:

| **Calendar Year** | **MTUs** |
|---|---|
| 2010 | |

13

| | |
|---|---|
| 2011 | - |
| 2012 | 36.3 |
| 2013 | 164.4 |
| 2014 | 143.4 |
| 2015 | 102.8 |
| 2016 | 105.0 |
| 2017 | 84.7 |
| 2018 | - |
| 2019 | 29.2 |
| 2020 | 95.7 |

3. If DOE determines that it shall be unable to meet the above Removal Allocation, DOE and the Purchaser shall meet as soon as possible to negotiate a revised Removal Allocation.

4. The SNF/HLW shall be removed from the Peach Bottom spent fuel pools or the Peach Bottom ISFSI, whichever location is, on balance, most beneficial to the parties.

14

## ARTICLE XI.    REMEDIES

Article XI is amended by inserting the letter "B" before the existing Section in that Article and inserting before that Section B the following Section A:

A.  Release of Claims Related to the January 31, 1998 Date.

1.  The Purchaser hereby releases and discharges DOE from any and all claims it may have arising out of the 44405 Contract relating to DOE's delay in performance of its disposal obligations for Peach Bottom SNF/HLW; provided, however, that nothing herein shall release DOE from claims arising from failure to perform or the breach of any other obligation not directly related to the delays in removing SNF/HLW from Peach Bottom Atomic Power Station under the 44405 Contract, or for failure to perform or the breach of any obligation under this Amendment.

2.  The Purchaser agrees that in exchange for reimbursements, adjustments to charges, schedule modifications, payments and any other valuable consideration to be provided by DOE as described in this Amendment, the Purchaser waives any right it may have to submit a claim or file suit for any remedy, either legal or equitable, based upon DOE's delay in performance of its January 31, 1998 disposal obligation.

3.  Nothing in this Amendment shall be construed to affect or abrogate any rights that the Purchaser or DOE may have to seek judicial or other relief regarding any other breach, claim, demand, dispute or any other contractual issue in controversy relating to the 44405 Contract, this Amendment, or any subsequent amendments, nor shall this Amendment be construed to affect or abrogate DOE's and the Purchaser's rights under Article XVI, Disputes, of the 44405 Contract.

## ARTICLE XIII.  REPRESENTATION CONCERNING NUCLEAR HAZARDS INDEMNITY

Article XIII is amended by adding at the end of Section B the following:

C.  DOE shall provide the Purchaser with full and complete coverage and indemnity under the Price Anderson Act, as amended, 42 U.S.C. 2210, et seq. (Section 170(d) of the Atomic Energy Act of 1954, as amended), for activities the Purchaser carries out for DOE under this Amendment if Price Anderson coverage is not provided by the Commission under subsections (b), (c), or (k) of the Act;

15

D.  In consideration of DOE's providing indemnification to the Purchaser under the Price Anderson Act, the Purchaser shall take steps necessary to ensure that DOE is provided copies of all correspondence between the Purchaser and the Commission regarding the ISFSI. In addition, the Purchaser shall notify DOE immediately (in accordance with the time frames required by the Commission) of any situation which the Purchaser determines could trigger an indemnification liability to DOE under the Price Anderson Act.

## ARTICLE XVI.  DISPUTES

Article XVI is amended by re-lettering Section "A" as Section "C", re-lettering subsequent sections accordingly, and inserting before Section C the following:

A.  Consistent with the goals set forth in the Administrative Dispute Resolution Act (5 U.S.C. 571, et seq.), DOE and the Purchaser agree to make reasonable efforts to resolve by mutual agreement all contractual issues in controversy, whether such issues are of law or of fact.

B.  Alternative Methods of Dispute Resolution.  In the event that the parties to this Amendment disagree about the interpretation of this Amendment, including but not limited to whether costs are Allowable and Reasonable, the parties agree to make a good faith effort to resolve their differences informally through non-binding mediation, non-binding arbitration or other non-binding alternative dispute resolution method. Any such facilitation shall be conducted by third party non-governmental mediator(s) or neutral(s) who shall be selected and mutually agreed to by both parties. The facilitation process shall be agreed to by both Parties. Written notice by either party to the other of any such alternative method of dispute resolution process shall toll any applicable appeal periods relating to this Amendment and the 44405 Contract. DOE and the Purchaser shall equally share all alternative dispute resolution costs.

Article XVI is also amended by adding after new Section F the following new sections:

G.  Unless otherwise agreed to by both Purchaser and DOE, the Contracting Officer will render a final decision on any dispute associated with this Amendment within one hundred eighty (180) days from the receipt of written notice of such dispute from the Purchaser.

H.  This Amendment prevails over any prior communications, written or otherwise, regarding the matters contained herein between the Purchaser and DOE or their representatives. This Amendment is an integrated

16

document that amends the 44405 Contract. No representations, warranties, or promises have been made or relied upon by either party other than those set forth herein and in the 44405 Contract. This Amendment may not be altered, supplemented or modified except by a written instrument signed by the duly authorized representatives of the Purchaser and DOE.

I.  Should any portion, or portions, of this Amendment be found or declared unenforceable or void by any court or competent tribunal for any reason, DOE and the Purchaser agree to negotiate in good faith and attempt to reach an enforceable agreement consistent with the spirit and purpose of this Amendment. Should a court or competent tribunal declare a major term or condition of this Amendment void and unenforceable, and DOE and the Purchaser cannot reach a subsequent agreement, this entire Amendment is rendered null and void, the original 44405 Contract remains in effect and the Parties shall return to pre-Amendment status.

### ARTICLE XXII. ENTIRE CONTRACT

Article XXII is amended by adding at the end the following:

C. DOE and the Purchaser agree that the aforementioned provisions constitute the entire terms and conditions of this Contract Amendment.

17

# APPENDICES

## Appendix E – General Specifications

Appendix E, Section B.2, Nonfuel Components, is amended by inserting "control blades," after the phrase "control rod elements".

**IN WITNESS WHEREOF,** DOE and PECO Energy have executed this Agreement by each of their duly authorized respective representatives.

By: _Herbert D. Watkins_ _____

Herbert D. Watkins

Title:   Contracting Officer
Office of Headquarters, Procurement Services
United States Department of Energy

By: _John Doering Jr._ _____

John Doering, Jr.

Title:   Vice President, Peach Bottom Atomic Power Station

Sworn to and subscribed
before me this  19ᵗʰ  day
of July, 2000.

_Janet L. Wiley_ _____

Notary Public

19

STATE OF PENNSYLVANIA ： : SS

COUNTY OF YORK ：

On this the 19th day of July, 2000, before me, the undersigned Notary Public, personally appeared Herbert D. Watkins, who, acknowledged himself to be a Contracting Officer for the U.S. Department of Energy, the government agency named in the foregoing instrument, and that he as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing his name.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_Janet L. Wiley_
Notary Public

```
NOTARIAL SEAL
JANET L. WILEY, NOTARY PUBLIC
PEACH BOTTOM TWP, YORK COUNTY, PA
MY COMMISSION EXPIRES JUNE 17, 2002
```

160927

## U.S. DEPARTMENT OF ENERGY CONTRACT NO.—

*Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste*

THIS CONTRACT, entered into this—day of—
—19—, by and between the UNITED STATES OF AMERICA (hereinafter referred to as the "Government"), represented by the UNITED STATES DEPARTMENT OF ENERGY (hereinafter referred to as the"DOE") and———(hereinafter referred to as the "Purchaser"), a corporation organized and existing under the laws of the State of———
—[add as applicable: "acting on behalf of itself and———."].

Witnesseth that:

Whereas, the DOE has the responsibility for the disposal of spent nuclear fuel and high-level radioactive waste of domestic origin from civilian nuclear power reactors in order to protect the public health and safety, and the environment; and

Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel; and

Whereas, all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel and high-level radioactive waste from civilian nuclear power reactors shall be borne by the owners and generators of such fuel and waste; and

Whereas, the DOE is required to collect a full cost recovery fee from owners and generators delivering to the DOE such spent nuclear fuel and/or high level radioactive waste; and

Whereas, the DOE is authorized to enter into contracts for the permanent disposal of spent nuclear fuel and/or high-level radioactive waste of domestic origin in DOE facilities; and

Whereas, the Purchaser desires to obtain disposal services from DOE; and

Whereas, DOE is obligated and willing to provide such disposal services, under the terms and conditions hereinafter set forth; and

Whereas, this contract is made and entered into under the authority of the DOE Organization Act (Pub. L.95-91, 42 U.S.C. 7101 *et seq.*) and the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425, 42 U.S.C. 10101 *et seq.*)

Now, therefore, the parties hereto do hereby agree as follows:

### ARTICLE I—DEFINITIONS

As used throughout this contract, the following terms shall have the meanings set forth below:

1. The term "assigned three-month period" means the period that each Purchaser will be assigned by DOE, giving due consideration to the Purchaser's assignment preference, for purposes of reporting kilowatt hours generated by the Purchaser's nuclear power reactor and for establishing fees due and payable to DOE.

2. The term "cask" means a container for shipping spent nuclear fuel and/or high-level radioactive waste which meets all applicable regulatory requirements.

3. The term "civilian nuclear power reactor" means a civilian nuclear powerplant required to be licensed under Sections 103 or 104(b) of the Atomic Energy Act of 1954, as amended (42 U.S.C. 2133, 2134(b)).

4. The term "Commission" means the United states Nuclear Regulatory Commission.

5. The term "contract" means this agreement and any duly executed amendment or modification thereto.

6. The term "Contracting Officer" means the person executing this contract on behalf of the Government, and any other officer or civilian employee who is a properly designated Contracting Officer of the DOE; and the term includes, except as otherwise provided in this contract, the authorized representative of a Contracting Officer acting within the limits of his authority.

7. The term "delivery" means the transfer of custody, f.o.b. carrier, of spent nuclear fuel or high-level radioactive waste from Purchaser to DOE at the Purchaser's civilian nuclear power reactor or such other domestic site as may be designated by the Purchaser and approved by DOE.

8. The term "disposal" means the emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or other highly radioactive waste with no foreseeable intent of recovery, whether or not such emplacement permits recovery of such waste.

9. The term "DOE" means the United States Department of Energy or any duly authorized representative thereof, including the Contracting Officer.

10. The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.

11. The term "full cost recovery," means the recoupment by DOE, through Purchaser fees and any interest earned, of all direct costs, indirect costs, and all allocable overhead, consistent with generally accepted accounting principles consistently applied, of providing disposal services and conducting activities authorized by the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425). As used herein, the term "cost" includes the application of Nuclear Waste Fund moneys for those uses expressly set forth in section 302 (d) and (e) of the said Act and all other uses specified in the Act.

12. The term "high-level radioactive waste" (HLW) means—

(a) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste

that contains fission products in sufficient concentrations; and

(b) other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation.

13. The term *electricity (kilowatt hours) generated and sold* means gross electrical output produced by a civilian nuclear power reactor measured at the output terminals of the turbine generator minus the normal onsite nuclear station service loads during the time electricity is being generated multiplied by the total energy adjustment factor. For purposes of this provision, the following definition shall apply:

a. The term *Total Energy Adjustment Factor (TEAF)* means the sum of individual owners' weighted energy adjustment factors.

b. The term *Weighted Energy Adjustment Factor (WEAF)* means the product of an owner's energy adjustment factor times the owner's share of the plant.

c. The term *Owner's Energy Adjustment Factor (OEAF)* means the sum of the individual owner's adjustment for sales to ultimate consumers and adjustment for sales for resale.

d. The term *Owner's Share of the plant (OS)* means the owner's fraction of metered electricity sales, the owner's fraction of plant ownership, or the sponsor company's fixed entitlement percentage of the plant's output. This definition includes joint owners of generating companies or participants in a generation and transmission cooperative.

e. The term *Adjustment for Sales to ultimate Consumer (ASC)* means the owner's fraction of sales to the ultimate consumer multiplied by the owner's sales to ultimate consumer adjustment factor.

f. The term *Fraction of Sales to ultimate Consumer (FSC)* means the owner's fractional quantity of electricity sold to the ultimate consumer relative to the total of electricity sales (sales to ultimate consumers plus the sales for resale).

g. The term *Sales to ultimate Consumer Adjustment Factor (SCAF)* means one minus the quotient of all electricity lost or otherwise not sold for each owner divided by the total electricity available for disposition to ultimate consumers. Electricity lost or otherwise not sold includes:

(1) Energy furnished without charge;

(2) Energy used by the company;

(3) Transmission losses;

(4) Distribution losses; and

(5) Other unaccounted losses as reported to the Federal Government "Annual Report of Major Electric Utilities, Licensees and Others," Federal Energy Regulatory Commission (FERC) Form No. 1; Rural Electrification Administration (REA) Forms 7 and 11 if appropriate; or the "Annual Electric Utility Report," Energy Information Administration (EIA) Form EIA-861.

h. The term *Total Electricity Available for Disposition to Ultimate Consumers* means the reporting year's total of all of a utility's electricity supply

which is available for disposition, expressed in kilowatt hours, and is equal to the sum of the energy sources minus the electricity sold for resale by the utility.

i. The term *Adjustment for Sales for Resale (ASR)* means the owner's fraction of sales for resale multiplied by the national average adjustment factor.

j. The term *Fraction of Sales for Resale (FSR)* means the owner's fractional quantity of electricity sold for resale by the utility relative to the total of electricity sales.

k. The term *National Average Adjustment Factor (NAF)* means the ratio of the national total of electricity sold to the national total of electricity available for disposition, based on the most recent 3 years of national data provided to the Federal Government, and will be set by the Contracting Officer. This term will be evaluated annually and revised in increments of .005.

l. Pumped storage losses. If the proportion of nuclear generated electricity consumed by a pumped-storage hydro facility can be measured or estimated and if the electricity losses associated with pumped storage facilities can be documented (e.g. based on routine and uniform records of district power data on contributions from different electricity sources), a prorated nuclear share shall be allowed as an offset to gross electricity generation reported on the annex A of appendix G, NWPA-830G form. Specific methodologies for calculating these offsets must be approved by the Contracting Officer in advance.

Instructions to annex A of appendix G, NWPA-830G provide the necessary information to calculate the energy adjustment factors.

14. The term "metric tons uranium" means that measure of weight, equivalent to 2,204.6 pounds of uranium and other fissile and fertile material that are loaded into a reactor core as fresh fuel.

15. The term "Purchaser's site" means the location of Purchaser's civilian nuclear power reactor or such other location as the Purchaser may designate.

16. The term "quarterly Treasury rate" means the current value of funds rate as specified by the Treasury Fiscal Requirements Manual, Volume 1, Part 6, section 8020.20. This rate is published quarterly in the FEDERAL REGISTER prior to the beginning of the affected quarter.

17. The term "shipping lot" means a specified quantity of spent nuclear fuel or high-level radioactive waste designated by Purchaser for delivery to DOE beginning on a specified date.

18. The term "spent nuclear fuel" (SNF) means fuel that has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing.

19. The term "spent nuclear fuel and high-level radioactive waste of domestic origin" means irradiated fuel material used, and radioactive wastes resulting from such use, in nuclear power reactors located only in the United States.

20. The term "year" means the period which begins on October 1 and ends on September 30.

## ARTICLE II—SCOPE

This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation, and disposal of such SNF and/or HLW and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

## ARTICLE III—TERM

The term of this contract shall be from the date of execution until such time as DOE has accepted, transported from the Purchaser's site(s) and disposed of all SNF and/or HLW of domestic origin from the civilian nuclear power reactor(s) specified in Appendix A.

## ARTICLE IV—RESPONSIBILITIES OF THE PARTIES

### A. Purchaser's Responsibilities

1. *Discharge Information.*

(a) On an annual basis, commencing October 1, 1983, the Purchaser shall provide DOE with information on actual discharges to date and projected discharges for the next ten (10) years in the form and content set forth in Appendix B, annexed hereto and made a part hereof. The information to be provided will include estimates and projections and will not be Purchaser's firm commitment with respect to discharges or deliveries.

(b) No later than October 1, 1983, the Purchaser shall provide DOE with specific information on:

(1) Total spent nuclear fuel inventory as of April 7, 1983;

(2) Total number of fuel assemblies removed from the particular reactor core prior to 12:00 a.m. April 7, 1983 for which there are plans for reinsertion in the core, indicating the current planned dates for reinsertion in the core. Estimates of the burned and unburned portion of each individual assembly are to be provided.

(c) In the event that the Purchaser fails to provide the annual forecast in the form and content required by DOE, DOE may, in its sole discretion, require a rescheduling of any delivery commitment schedule then in effect.

2. *Preparation for Transportation.*

(a) The Purchaser shall arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility. The Purchaser shall notify DOE of such activities sixty (60) days prior to the commencement of such activities. The preparatory activities by the Purchaser shall be made in accordance with all applicable laws and

regulations relating to the Purchaser's responsibilities hereunder. DOE may designate a representative to observe the preparatory activities conducted by the Purchaser at the Purchaser's site, and the Purchaser shall afford access to such representative.

(b) Except as otherwise agreed to by DOE, the Purchaser shall advise DOE, in writing as specified in Appendix F, annexed hereto and made a part hereof, as to the description of the material in each shipping lot sixty (60) days prior to scheduled DOE transportation of that shipping lot.

(c) The Purchaser shall be responsible for incidental maintenance, protection and preservation of any and all shipping casks furnished to the Purchaser by DOE for the performance of this contract. The Purchaser shall be liable for any loss of or damage to such DOE-furnished property, and for expenses incidental to such loss or damage while such casks are in the possession and control of the Purchaser except as otherwise provided for hereunder. Routine cask maintenance, such as scheduled overhauls, shall not be the responsibility of the Purchaser.

### B. DOE Responsibilities

1. DOE shall accept title to all SNF and/or HLW, of domestic origin, generated by the civilian nuclear power reactor(s) specified in Appendix A, provide subsequent transportation for such material to the DOE facility, and dispose of such material in accordance with the terms of this contract.

2. DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility. Such cask(s) shall be furnished sufficiently in advance to accommodate scheduled deliveries. Such cask(s) shall be suitable for use at the Purchaser's site, meet applicable regulatory requirements, and be accompanied by pertinent information including, but not limited to, the following:

(a) Written procedures for cask handling and loading, including specifications on Purchaser-furnished cannisters for containment of failed fuel;

(b) Training for Purchaser's personnel in cask handling and loading, as may be necessary;

(c) Technical information, special tools, equipment, lifting trunnions, spare parts and consumables needed to use and perform incidental maintenance on the cask(s); and

(d) Sufficient documentation on the equipment supplied by DOE.

3. DOE may fulfill any of its obligations, or take any action, under this contract either directly or through contractors.

4. DOE shall annually provide to the Purchaser pertinent information on the waste disposal program including information on cost projections, project plans and progress reports.

5. (a) Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the


highest priority for acceptance, except as provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.

(b) Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

### ARTICLE V—DELIVERY OF SNF AND/OR HLW

#### A. Description of SNF and HLW

The Purchaser shall deliver to DOE and DOE shall, as provided in this contract, accept the SNF and/or HLW which is described in accordance with Article VI.A. of this contract, for disposal thereof.

#### B. Delivery Commitment Schedule

1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.

2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (±) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

#### C. Final Delivery Schedule

Final delivery schedule(s), in the form set forth in Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice

of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

#### D. Emergency Deliveries

Emergency deliveries of SNF and/or HLW may be accepted by DOE before the date provided in the delivery commitment schedule upon prior written approval by DOE.

#### E. Exchanges

Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE: *provided, however,* that Purchaser shall comply with the requirements of this contract. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW: *provided, however,* that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges. Not less than six (6) months prior to the delivery date specified in the Purchaser's approved delivery commitment schedule, the Purchaser shall submit to DOE an exchange request, which states the priority rankings of both the Purchaser hereunder and any other Purchaser with whom the exchange of approved delivery commitment schedules is proposed. DOE shall approve or disapprove the proposed exchange within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval.

### ARTICLE VI—CRITERIA FOR DISPOSAL

#### A. General Requirements

1. *Criteria.*

(a) Except as otherwise provided in this contract, DOE shall accept hereunder only such SNF and/or HLW which meets the General Specifications for such fuel and waste as set forth in Appendix E, annexed hereto and made a part hereof.

(b) Purchaser shall accurately classify SNF and/or HLW prior to delivery in accordance with paragraphs B and D of Appendix E.

2. *Procedures.*

(a) Purchaser shall provide to DOE a detailed description of the SNF and/or HLW to be delivered hereunder in the form and content as set forth in Appendix F, annexed hereto and made a part hereof. Purchaser shall promptly advise DOE of any changes in said SNF and/or HLW as soon as they become known to the purchaser.

(b) DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel; however, for any SNF which has been designated by the Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days after receipt of such confirmation request as to the technical feasibility of

disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services.

### B. Acceptance Procedures

#### 1. Acceptance Priority Ranking.

Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:

(a) Except as may be provided for in subparagraph (b) below and Article V.D. of this contract, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V.

(b) Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

#### 2. Verification of SNF and/or HLW.

During cask loading and prior to acceptance by DOE for transportation to the DOE facility, the SNF and/or HLW description of the shipping lot shall be subject to verification by DOE. To the extent the SNF and/or HLW is consistent with the description submitted and approved, in accordance with Appendices E and F, DOE agrees to accept such SNF and/or HLW for disposal when DOE has verified the SNF and/or HLW description, determined the material is properly loaded, packaged, marked, labeled and ready for transportation, and has taken custody, as evidenced in writing, of the material at the Purchaser's site, f.o.b. carrier. A properly executed off-site radioactive shipment record describing cask contents must be prepared by the Purchaser along with a signed certification which states: "This is to certify that the above-named materials are properly described, classified, packaged, marked and labeled and are in proper condition for transfer according to the applicable regulations of the U.S. Department of Transportation."

#### 3. Improperly Described SNF and/or HLW.

(a) Prior to Acceptance—If SNF and/or HLW is determined by DOE to be improperly described prior to acceptance by DOE at the Purchaser's site, DOE shall promptly notify the Purchaser in writing of such determination. DOE reserves the right, in its sole discretion, to refuse to accept such SNF and/or HLW until the SNF and/or HLW has been properly described. The Purchaser shall not transfer such SNF and/or HLW to DOE unless DOE agrees to accept such SNF and/or HLW under such other arrangements as may be agreed to, in writing, by the parties.

(b) After Acceptance—If subsequent to its acceptance DOE finds that such SNF and/or HLW is improperly described, DOE shall promptly notify the Purchaser, in writing, of such finding. In the

event of such notification, Purchaser shall provide DOE with a proper designation within thirty (30) days. In the event of a failure by the Purchaser to provide such proper designation, DOE may hold in abeyance any and all deliveries scheduled hereunder.

### ARTICLE VII—TITLE

Title to all SNF and/or HLW accepted by DOE for disposal shall pass to DOE at the Purchaser's site as provided for in Article VI hereof. DOE shall be solely responsible for control of all material upon passage of title. DOE shall have the right to dispose as it sees fit of any SNF and/or HLW to which it has taken title. The Purchaser shall have no claim against DOE or the Government with respect to such SNF or HLW nor shall DOE or the Government be obligated to compensate the Purchaser for such material.

### ARTICLE VIII—FEES AND TERMS OF PAYMENT

#### A. Fees

1. Effective April 7, 1983, Purchaser shall be charged a fee in the amount of 1.0 mill per kilowatt hour (1M/kWh) electricity generated and sold.

2. For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was used to generate electricity in a civilian nuclear power reactor prior to April 7, 1983, a one-time fee will be assessed by applying industry-wide average dollar per kilogram charges to four (4) distinct ranges of fuel burnup so that the integrated cost across all discharged (i.e. spent) fuel is equivalent to an industry-wide average charge of 1.0 mill per kilowatt-hour. For purposes of this contract, discharged nuclear fuel is that fuel removed from the reactor core with no plans for reinsertion. In the event that any such fuel withdrawn with plans for reinsertion is not reinserted, then the applicable fee for such fuel shall be calculated as set forth in this paragraph 2. The categories of spent nuclear fuel burnup and the fee schedule are listed below:

[In 1982 dollars]

| Nuclear spent fuel burnup range | Dollars per kilogram |
|---|---|
| 0 to 5,000 MWDT/MTU . . . . . . . . . . . . . . . | $ 80.00 |
| 5,000 to 10,000 MWDT/MTU . . . . . . . . . | 142.00 |
| 10,000 to 20,000 MWDT/MTU . . . . . . . . . | 162.00 |
| Over 20,000 MWDT/MTU . . . . . . . . . . . . . | 184.00 |

This fee shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII.

3. For in-core fuel as of April 7, 1983, that portion of the fuel burned through April 6, 1983 shall be subject to the one-time fee as calculated in accordance with the following methodology: [a] determine the total weight in kilograms of uranium loaded initially in the particular core; [b] determine the total megawatt-days (thermal) which have been gen-

erated by all of the fuel assemblies in the said core as of 12:00 A.M. April 7, 1983; [c] divide the mega-watt-days (thermal) generated in the said core by the total metric tons of initially loaded uranium in that core and multiply the quotient by the conversion factor 0.0078 to obtain a value in dollars per kilogram; and [d] multiply the dollars per kilogram value by the kilograms determined in [a] above to derive the dollars charge for the one-time fee to be paid for the specified in-core fuel as of 12:00 A.M. April 7, 1983. For purposes of this contract, in-core fuel is that fuel in the reactor core as of the date specified, plus any fuel removed from the reactor with plans for reinsertion. That portion of such fuel unburned as of 12:00 A.M. April 7, 1983 shall be subject to the 1.0 mill per kilowatt-hour charge.

4. DOE will annually review the adequacy of the fees and adjust the 1M/KWH fee, if necessary, in order to assure full cost recovery by the Government. Any proposed adjustment to the said fee will be transmitted to Congress and shall be effective after a period of ninety (90) days of continuous session has elapsed following receipt of such transmittal unless either House of Congress adopts a resolution disapproving the proposed adjustment. Any adjustment to the 1M/KWH fee under paragraph A.1. of this Article VIII shall be prospective.

### B. Payment

1. For electricity generated and sold by the Purchaser's civilian nuclear power reactor(s) on or after April 7, 1983, fees shall be paid quarterly by the Purchaser and must be received by the DOE not later than the close of the last business day of the month following the end of each assigned 3-month period. The first payment shall be due on July 31, 1983, for the period April 7, 1983, to June 30, 1983. (Add as applicable: A one-time adjustment period payment shall be due on_____ for the period_____ _____to_____.) The assigned 3-month period, for purposes of payment and reporting of electricity generated and sold shall begin_____.

2. For SNF discharged prior to April 7, 1983, and for in-core burned fuel as of 12:00 A.M. April 7, 1983, the Purchaser shall, within two (2) years of contract execution, select one of the following fee payment options:

(a) *Option 1*—The Purchaser's financial obligation for said fuel shall be prorated evenly over forty (40) quarters and will consist of the fee plus interest on the outstanding fee balance. The interest from April 7, 1983, to date of the first payment is to be calculated based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period. Beginning with the first payment, interest is to be calculated on Purchaser's financial obligation plus accrued interest, at the ten-year Treasury note rate in effect on the date of the first payment. In no event shall the end of the forty (40) quarters extend beyond the first scheduled delivery date as reflected in the DOE-approved delivery commitment schedule. All payments shall be made concurrently with the assigned three month period payments. At any time prior to the end of the forty

(40) quarters, Purchaser may, without penalty, make a full or partial lump sum payment at any of the assigned three month period payment dates. Subsequent quarterly payments will be appropriately reduced to reflect the reduction in the remaining balance in the fee due and payable. The remaining financial obligation, if any, will be subject to interest at the same ten-year Treasury note rate over the remainder of the ten year period.

(b) *Option 2*—The Purchaser's financial obligation shall be paid in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the outstanding fee balance. Interest is to be calculated from April 7, 1983, to the date of the payment based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period until payment.

(c) *Option 3*—The Purchaser's financial obligation shall be paid prior to June 30, 1985, or prior to two (2) years after contract execution, whichever comes later, in the form of a single payment and shall consist of all outstanding fees for SNF and in-core fuel burned prior to April 7, 1983. Under this option, no interest shall be due to DOE from April 7, 1983, to the date of full payment on the outstanding fee balance.

### 3. Method of Payment:

(a) Payments shall be made by wire transfer, in accordance with instructions specified by DOE in Appendix G, annexed hereto and made a part hereof, and must be received within the time periods specified in paragraph B.1. of this Article VIII.

(b) The Purchaser will complete a Standard Remittance Advice, as set forth in Appendix G, for each assigned three month period payment, and mail it postmarked no later than the last business day of the month following each assigned three month period to Department of Energy, Office of Controller, Cash Management Division, Box 500, Room D-208, Germantown, Maryland 20874.

4. Any fees not paid on a timely basis or underpaid because of miscalculation will be subject to interest as specified in paragraph C of this Article VIII.

### C. Interest on Late Fees

1. DOE will notify the Purchaser of amounts due only when unpaid or underpaid by the dates specified in paragraph B above. Interest will be levied according to the following formula:

Interest = Unpaid balance due to DOE for assigned three month period × Quarterly Treasury rate plus six percent (6%) × Number of months late including month of payment (fractions rounded up to whole months) ÷ 12

2. Interest is payable at any time prior to the due date for the subsequent assigned three month period fee payment. Nonpayment by the end of the subsequent assigned three month period will result in compounding of interest due. Purchaser shall com-

plete a Standard Remittance Advice of interest payments.

3. Following the assessment of a late fee by DOE, payments will be applied against accrued interest first and the principal thereafter.

### D. Effect of Payment

Upon payment of all applicable fees, interest and penalties on unpaid or underpaid amounts, the Purchaser shall have no further financial obligation to DOE for the disposal of the accepted SNF and/or HLW.

### E. Audit

1. The DOE or its representative shall have the right to perform any audits or inspections necessary to determine whether Purchaser is paying the correct amount under the fee schedule and interest provisions set forth in paragraphs A, B and C above.

2. Nothing in this contract shall be deemed to preclude an audit by the General Accounting Office of any transaction under this contract.

3. The Purchaser shall furnish DOE with such records, reports and data as may be necessary for the determination of quantities delivered hereunder and for final settlement of amounts due under this contract and shall retain and make available to DOE and its authorized representative examination at all reasonable times such records, reports and data for a period of three (3) years from the completion of delivery of all material under this contract.

### ARTICLE IX—DELAYS

#### A. Unavoidable Delays by Purchaser or DOE

Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE—such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather—cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

#### B. Avoidable Delays by Purchaser or DOE

In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

### ARTICLE X—SUSPENSION

A. In addition to any other rights DOE may have hereunder, DOE reserves the right, at no cost to the Government, to suspend this contract or any portion thereof upon written notice to the Purchaser within ninety (90) days of the Purchaser's failure to perform its obligations hereunder, and the Purchaser's failure to take corrective action within thirty (30) days after written notice of such failure to perform as provided above, unless such failure shall arise from causes beyond the control and without the fault or negligence of the Purchaser, its contractors or agents. However, the Purchaser's obligation to pay fees required hereunder shall continue unaffected by any such suspension. Any such suspension shall be rescinded if and when DOE determines that Purchaser has completed corrective action.

B. The DOE reserves the right to suspend any scheduled deliveries in the event that a national emergency requires that priority be given to Government programs to the exclusion of the work under this contract. In the event of such a suspension by the Government, the DOE shall refund that portion of payments representing services not delivered as determined by the Contracting Officer to be an equitable adjustment. Any disagreement arising from the refund payment, if any, shall be resolved as provided in the clause of this contract, entitled "DISPUTES."

### ARTICLE XI—REMEDIES

Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law.

### ARTICLE XII—NOTICES

All notices and communications between the parties under this contract (except notices published in the FEDERAL REGISTER) shall be in writing and shall be sent to the following addressees:

To DOE:——————————————————

To the Purchaser:——————————————

However, the parties may change the addresses or addressees for such notices or communications without formal modification to this contract; *provided, however,* that notice of such changes shall be given by registered mail.

### ARTICLE XIII—REPRESENTATION CONCERNING NUCLEAR HAZARDS INDEMNITY

A. DOE represents that it will include in its contract(s) for the operation of any DOE facility an indemnity agreement based upon Section 170(d) of the Atomic Energy Act of 1954, as amended, a copy of which agreement shall be furnished to the Purchaser; that under said agreement, DOE shall have agreed to indemnify the contractor and other persons indemnified against claims for public liability (as defined in said Act) arising out of or in connection with contractual activities; that the indemnity shall apply to covered nuclear incidents which (1) take place at a contract location; or (2) arise out of or in the course of transportation of source, special nuclear or by-product material to or from a contract location. The obligation of DOE to indemnify shall be subject to the conditions stated in the indemnity agreement.

B. The provisions of this Article XIII shall continue beyond the term of this contract.

### ARTICLE XIV—ASSIGNMENT

The rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW involved: *provided, however,* that notice of any such transfer shall be made to DOE within ninety (90) days of transfer.

### ARTICLE XV—AMENDMENTS

The provisions of this contract have been developed in the light of uncertainties necessarily attendant upon long-term contracts. Accordingly, at the request of either DOE or Purchaser, the parties will negotiate and, to the extent mutually agreed, amend this contract as the parties may deem to be necessary or proper to reflect their respective interests; *provided, however,* that any such amendment shall be consistent with the DOE final rule published in the FEDERAL REGISTER on April 18, 1983 entitled, "Standard Contract for Disposal of SNF and/or HLW", as the same may be amended from time to time.

### ARTICLE XVI—DISPUTES

A. Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). The decision of the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

B. For Purchaser claims of more than $50,000, the Purchaser shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Purchaser's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Purchaser believes the Government is liable. The certification shall be executed by the Purchaser if an individual. When the Purchaser is not an individual, the certification shall be executed by a senior company official in charge at the Purchaser's plant or location involved, or by an officer or general partner of the Purchaser having overall responsibility for the conduct of the Purchaser's affairs.

C. For Purchaser claims of $50,000 or less, the Contracting Officer must render a decision within sixty (60) days. For Purchaser claims in excess of $50,000, the Contracting Officer must decide the claim within sixty (60) days or notify the Purchaser of the date when the decision will be made.

D. This "Disputes" clause does not preclude consideration of law questions in connection with deci-

sions provided for in paragraph A above; *provided, however,* that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

### ARTICLE XVII—OFFICIALS NOT TO BENEFIT

No member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

### ARTICLE XVIII—COVENANT AGAINST CONTINGENT FEES

The Purchaser warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Purchaser for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or in its discretion to increase the contract price or consideration, or otherwise recover, the full amount of such commission, brokerage, or contingent fee.

### ARTICLE XIX—EXAMINATION OF RECORDS

The Purchaser agrees that the Comptroller General of the United States or any of his duly authorized representatives shall have access to and the right to examine any directly pertinent books, documents, papers, and records of the Purchaser involving transactions related to this contract until the expiration of three years after final payment under this contract.

### ARTICLE XX—PERMITS

The Government and the Purchaser shall procure all necessary permits or licenses (including any special nuclear material licenses) and comply with all applicable laws and regulations of the United States, States and municipalities necessary to execute their respective responsibilities and obligations under this contract.

### ARTICLE XXI—RIGHTS IN TECHNICAL DATA

*A. Definitions.*

1. "Technical data" means recorded information regardless of form or characteristic, of a specific or technical nature. It may, for example, document research, experimental, developmental, or demonstration, or engineering work, or be usable or used to define a design or process, or to procure, produce, support, maintain or operate material. The data may be graphic or pictorial delineations in media such as drawings or photographs, text in specifications or related performance or design-type documents or computer software (including computer programs, computer software data bases, and computer software documentation). Examples of technical data include research and engineering data, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identification, and related

information. Technical data as used herein do not include financial reports, cost analyses, and other information incidental to contract administration.

2. "Proprietary data" means technical data which embody trade secrets developed at private expense, such as design procedures or techniques, chemical composition of materials, or manufacturing methods, processes, or treatments, including minor modifications thereof, provided that such data:

(a) Are not generally known or available from other sources without obligation concerning their confidentiality;

(b) Have not been made available by the owner to others without obligation concerning its confidentiality; and

(c) Are not already available to the Government without obligation concerning their confidentiality.

3. "Contract data" means technical data first produced in the performance of the contract, technical data which are specified to be delivered under the contract, or technical data actually delivered in connection with the contract.

4. "Unlimited rights" means rights to use, duplicate, or disclose technical data, in whole or in part, in any manner and for any purpose whatsoever, and to permit others to do so.

*B. Allocation of Rights.*

1. The Government shall have:

(a) Unlimited rights in contract data except as otherwise provided below with respect to proprietary data properly marked as authorized by this clause;

(b) The right to remove, cancel, correct or ignore any marking not authorized by the terms of this contract on any technical data furnished hereunder, if in response to a written inquiry by DOE concerning the proprietary nature of the markings, the Purchaser fails to respond thereto within 60 days or fails to substantiate the proprietary nature of the markings. In either case, DOE will notify the Purchaser of the action taken;

(c) No rights under this contract in any technical data which are not contract data.

2. Subject to the foregoing provisions of this rights in technical data clause, the Purchaser shall have the right to mark proprietary data it furnishes under the contract with the following legend and no other, the terms of which shall be binding on the Government:

LIMITED RIGHTS LEGEND

This "proprietary data," furnished under "Contract No.—" with the U.S. Department of Energy may be duplicated and used by the Government with the express limitations that the "proprietary data" may not be disclosed outside the Government or be used for purposes of manufacture without prior permission of the Purchaser, except that further disclosure or use may be made solely for the following purposes:

(a) This "proprietary data" may be disclosed for evaluation purposes under the restriction that the

"proprietary data" be retained in confidence and not be further disclosed;

(b) This "proprietary data" may be disclosed to contractors participating in the Government's program of which this contract is a part, for information or use in connection with the work performed under their contracts and under the restriction that the "proprietary data" be retained in confidence and not be further disclosed; or

(c) This "proprietary data" may be used by the Government or others on its behalf for emergency work under the restriction that the "proprietary data" be retained in confidence and not be further disclosed. This legend shall be marked on any reproduction of this data in whole or in part.

3. In the event that proprietary data of a third party, with respect to which the Purchaser is subject to restrictions on use or disclosure, is furnished with the Limited Rights Legend above, Purchaser shall secure the agreement of such third party to the rights of the Government as set forth in the Limited Rights Legend. DOE shall upon request furnish the names of those contractors to which proprietary data has been disclosed.

ARTICLE XXII—ENTIRE CONTRACT

A. This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

B. Nothing in this contract is intended to affect in any way the contractual obligation of any other persons with whom the Purchaser may have contracted with respect to assuming some or all disposal costs or to accept title to SNF and/or HLW.

*C. Appendices*

A. Nuclear Power Reactor(s) or Other Facilities Covered
B. Discharge Information (Ten Year; Annual)
C. Delivery Commitment Schedule
D. Final Delivery Schedule
E. General Specifications
F. Detailed Description of Purchaser's Fuel
G. Standard Remittance Advice

In witness whereof, the parties hereto have executed this contract as of the day and year first above written.

United States of America

United States Department of Energy

By: _____

(Contracting Officer)
Witnesses as to Execution on Behalf of Purchaser
(Name) _____
(Address) _____
(Name) _____

(Address) _____
(Purchaser's Company Name)
By: _____
Title: _____

I, (*Name*), certify that I am the (*Title*) of the corporation named as Purchaser herein; that (*Name*) who signed this document on behalf of the Purchaser was then (*Title*) of said corporation; that said document was duly signed for and on behalf of said corporation by authority of its governing body and is within the scope of its corporate powers.

In Witness Whereof, I have hereunto affixed my hand and the seal of said corporation this—day of—, 1983

(Corporate Seal)
(Signature) _____

## APPENDIX A

*Nuclear Power Reactor(s) or Other Facilities Covered*

Purchaser _____
Contract Number/Date/ _____
Reactor/Facility Name _____
Location:
Street _____
City _____
County/State—/ _____
Zip Code
Capacity (MWE)—Gross _____

Reactor Type:
BWR ☐
PWR ☐
Other (Identify) _____
Facility Description _____
Date of Commencement of Operation _____
(actual or estimated)
NRC License #: _____
By Purchaser:
Signature _____
Title _____
Date _____

## APPENDIX B

*Ten Year Discharge Forecast*

To be used for DOE planning purposes only and does not represent a firm commitment by Purchaser.

Purchaser _____
Contract Number/Date—/ _____
Reactor/Facility Name _____
Location:
Street _____
City _____
County/State—/ _____
Zip Code
Type:
BWR ☐
PWR ☐
Other (Identify) _____

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 10 yr total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Discharge date—mo/yr (or refueling shut down date) . . . . . . . | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | .... |
| Metric tons: | | | | | | | | | | | |
| —initial . . . . . . . . . . . . . . . . . . . | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | .... |
| —discharged . . . . . . . . . . . . . | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | .... |
| Number of assemblies discharged (per cycle) . . . | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | .... |

Signature _____
Title _____
Date _____

## APPENDIX B (Enclosure 1)

*Actual Discharges*

Purchaser _____
Contract Number/Date _____
Reactor/Facility Name _____
Location:
Street _____
City _____
County/State _____
Zip Code _____
Type:
BWR ☐
PWR ☐
Other (Identify) _____
Refueling Shutdown Date _____
Metric Tons Uranium (Initial/Discharged);
Initial _____
Discharged _____

Number of Assemblies Discharged: _____

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:
Signature _____
Title _____
Date _____

## APPENDIX C

*Delivery Commitment Schedule*

This delivery commitment schedule shall be submitted by Purchaser to DOE as specified in Article V.B. of this contract.

Purchaser _____
Contract Number/Date _____
Reactor/Facility Name _____
Location:
Street _____
City _____
County/State _____
Zip Code _____

Type Cask Required:_____
Shipping Lot Number _____
(Assigned by DOE)
Proposed Shipping Mode:
   Truck ☐
   Rail ☐
   Barge ☐
DOE Assigned Delivery Commitment Date—Range
of Discharge Date(s) (Earliest to Latest)
   Mo—Day—Yr— to Mo—Day—
   Yr—
   Metric Tons Uranium:
   (Initial) _____
   (Discharged) _____
   Number of Assemblies:
   BWR _____
   PWR _____
   Other _____

Unless otherwise agreed to in writing by DOE, the
Purchaser shall furnish herewith to DOE suitable
proof of ownership of the SNF and/or HLW to be
delivered hereunder. The Purchaser shall notify
DOE in writing at the earliest practicable date of
any change in said ownership.

Any false, fictitious or fraudulent statement may
be punishable by fine or imprisonment (U.S. Code,
Title 18, Section 1001).
   By Purchaser:
   Signature _____
   Title _____
   Date _____
   Approved by DOE:
   Technical Representative _____
   Title _____
   Date _____
   Contracting Officer _____
   Date _____

### APPENDIX D

*Final Delivery Schedule*

(To be submitted to DOE by Purchaser for each
designated Purchaser Delivery site not later than
twelve (12) months prior to estimated date of first
delivery)
   Purchaser: _____
   Contract Number/Date _____
   Reactor/Facility Name _____
   Location:
   Street _____
   City _____
   County/State_____
   Zip Code_____
   Type(s) cask(s) required: _____
   No. Assemblies per cask _____
   Shipping Lot Number _____
   Shipping Mode:
   (Assigned by DOE)
   Truck _____
   Rail_____
   Barge _____
   Metric Tons Uranium:

(Initial) _____
(Discharged) _____
Range of Discharge Date(s) (Earliest to Latest)
(From approved commitment schedule)
Mo—Day—Yr— to Mo—Day—
Yr—
Number of Assemblies:
BWR _____
PWR _____
Other _____
Purchaser's Delivery First Estimate
Mo—Day—Yr—last Mo—Day—
Mo—·—

Unless otherwise agreed to in writing by DOE, the
Purchaser shall furnish herewith to DOE suitable
proof of ownership of the SNF and/or HLW to be
delivered hereunder. The Purchaser shall notify
DOE in writing at the earliest practicable date of
any change in said ownership.

To confirm acceptability of delivery date(s):
Purchaser Contact_____
Phone _____
Title _____
DOE Contact _____
Phone _____
Title _____

Any false, fictitious or fraudulent statement may
be punishable by fine or imprisonment (U.S. Code,
Title 18, Section 1001).
By Purchaser:
Signature _____
Title _____
Date _____
Approved by DOE:
Technical Representative _____
Title _____
Date _____
Contracting Officer _____
Date _____

### APPENDIX E

*General Specifications*

#### A. Fuel Category Identification

1. Categories—Purchaser shall use reasonable
efforts, utilizing technology equivalent to and consis-
tent with the commercial practice, to properly clas-
sify Spent Nuclear Fuel (SNF) prior to delivery to
DOE, as follows:

a. "Standard Fuel" means SNF that meets all the
General Specifications therefor set forth in para-
graph B below.

b. "Nonstandard Fuel" means SNF that does not
meet one or more of the General Specifications set
forth in subparagraphs 1 through 5 of paragraph B
below, and which is classified as Nonstandard Fuel
Classes NS-1 through NS-5, pursuant to paragraph
B below.

c. "Failed Fuel" means SNF that meets the speci-
fications set forth in subparagraphs 1 through 3 of
paragraph B below, and which is classified as Failed


Fuel Class F-1 through F-3 pursuant to subparagraph 6 of paragraph B below.

d. Fuel may have "Failed Fuel" and/or several "Nonstandard Fuel" classifications

*B. Fuel Description and Subclassification—General Specifications*

*1. Maximum Nominal Physical Dimensions.*

|  | *Boiling water reactor (BWR)* | *Pressurized water reactor (PWR)* |
|---|---|---|
| Overall Length........... | 14 feet, 11 inches ....... | 14 feet, 10 inches. |
| Active Fuel Length........... | 12 feet, 6 inches ....... | 12 feet, 0 inches. |
| Cross Section [1] ........ | 6 inches × 6 inches ......... | 9 inches × 9 inches. |

[1] The cross section of the fuel assembly shall not include the channel.

**NOTE:** Fuel that does not meet these specifications shall be classified as Nonstandard Fuel—Class NS-1.

*2. Nonfuel Components.* Nonfuel components including, but not limited to, control spiders, burnable poison rod assemblies, control rod elements, thimble plugs, fission chambers, and primary and secondary neutron sources, that are contained within the fuel assembly, or BWR channels that are an integral part of the fuel assembly, which do not require special handling, may be included as part of the spent nuclear fuel delivered for disposal pursuant to this contract.

**NOTE.**—Fuel that does not meet these specifications shall be classified as Nonstandard Fuel—Class NS-2.

*3. Cooling.* The minimum cooling time for fuel is five (5) years.

**NOTE.**—Fuel that does not meet this specification shall be classified as Nonstandard Fuel—Class NS-3.

*4. Non-LWR Fuel.* Fuel from other than LWR power facilities shall be classified as Nonstandard Fuel—Class NS-4. Such fuel may be unique and require special handling, storage, and disposal facilities.

*5. Consolidated Fuel Rods.* Fuel which has been disassembled and stored with the fuel rods in a consolidated manner shall be classified as Nonstandard Fuel Class NS-5.

*6. Failed Fuel.*

a. Visual Inspection.

Assemblies shall be visually inspected for evidence of structural deformity or damage to cladding or spacers which may require special handling. Assemblies which [i] are structurally deformed or have damaged cladding to the extent that special handling may be required or [ii] for any reason cannot be handled with normal fuel handling equipment shall be classified as Failed Fuel—Class F-1.

b. Previously Encapsulated Assemblies.

Assemblies encapsulated by Purchaser prior to classification hereunder shall be classified as Failed Fuel—Class F-3. Purchaser shall advise DOE of the reason for the prior encapsulation of assemblies in sufficient detail so that DOE may plan for appropriate subsequent handling.

c. Regulatory Requirements.

Spent fuel assemblies shall be packaged and placed in casks so that all applicable regulatory requirements are met.

*C. Summary of Fuel Classifications*

1. *Standard Fuel:*
a. Class S-1: PWR
b. Class S-2: BWR
2. *Nonstandard Fuel:*
a. Class NS-1: Physical Dimensions
b. Class NS-2: Non Fuel Components
c. Class NS-3: Short Cooled
d. Class NS-4: Non-LWR
e. Class NS-5: Consolidated Fuel Rods.
3. *Failed Fuel:*
a. Class F-1: Visual Failure or Damage
b. Class F-2: Radioactive "Leakage"
c. Class F-3: Encapsulated

*D. High-Level Radioactive Waste*

The DOE shall accept high-level radioactive waste. Detailed acceptance criteria and general specifications for such waste will be issued by the DOE no later than the date on which DOE submits its license application to the Nuclear Regulatory Commission for the first disposal facility.

**APPENDIX F**

*Detailed Description of Purchaser's Fuel*

This information shall be provided by Purchaser for each distinct fuel type within a Shipping Lot not later than sixty (60) days prior to the schedule transportation date.

Purchaser _____

Contract Number/Date_____/ _____

Reactor/Facility Name _____

_____

_____

I. Drawings included in generic dossier:_____

1. Fuel Assembly DWG#_____

2. Upper & Lower end fittings DWG#_____

Dossier Number:_____

DOE Shipping Lot #:_____

# Assemblies Described:

_____BWR

_____PWR

_____Other

II. *Design Material Descriptions.*

*Fuel Element:*

1. Element type_____(rod, plate, etc.)

**12,666**  ● Related Regulations—Department of Energy    866  2-24-92

NWPA-830G

**U.S. DEPARTMENT OF ENERGY**
Germantown, MD 20875

OMB No.: 1901-0260
Expires: 11/30/92

## Appendix G - Standard Remittance Advice for Payment of Fees

This information is being collected when maintaining authorized based on the U.S. Department of Energy under Public Law 97-425, Late Blay, failure to file in an information comply with the instructions provided they result in criminal penalties as provided by Article VIII C of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste. For information concerning confidentiality or information see item 4 of the instructions. Public reporting burden for this collection of information is estimated to average 40 hours per response requiring the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Assistant Secretary (1-73, then Station 24-467 1000 Independence Ave., S.W., Washington, D.C. 20585, and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

---

### 1.0 IDENTIFICATION INFORMATION

**1.1 Purchaser Information**

(a) Name _____

(b) Address _____

(c) City, State & Zip Code _____

**1.2 Contact Person**

(a) Name _____

(b) Telephone (Include Area Code) _____

**1.3 Standard Contract Identification Number:**
_____

**1.4 Period Covered by this Remittance Advice**

(a) From _____ to _____
(Month/Day/Year)    (Month/Day/Year)

(b) Date of this Payment _____
(Month/Day/Year)

---

### 2.0 SPENT NUCLEAR FUEL (SNF) FEE

2.1 Number of Reactors Covered _____

2.2 Total Purchaser Obligation as of April 7, 1983 $ _____

2.3 Date of First Payment:

| Month | Day | Year |
|-------|-----|------|
|       |     |      |

2.4 10-Year Treasury Note Rate as of the Date of First Payment ─ ─ ─ ─ ─ ─ ─ ─ → _____ %

2.5 Unpaid Balance Prior to this Payment $ _____

2.6 Option Chosen _____

2.7 Fee Data

(a) Principal _____

(b) Interest _____

(c) Total Spent Nuclear Fuel Fee Transmitted with this Payment

$ _____

---

### 3.0 FEE FOR ELECTRICITY GENERATED AND SOLD (MILLS PER KILOWATT HOUR, M/kWH)

3.1 Number of Reactors Covered _____

3.2 Total Electricity Generated and Sold (Megawatt hours) (Sum of Line 4.3 from all Annex A's) _____

3.3 Current Fee Rate _____ (M/kWh)

3.4 Total Fee for Electricity Generated and Sold (M/kWh) Transmitted with this Payment

$ _____

---

### 4.0 UNDERPAYMENT/LATE PAYMENT (As notified by DOE)

| Type of Payment (a) | Date of Notification (Month/Day/Year) (b) | DOE Invoice Number (c) | Date of Payment Transmitted (Month/Day/Year) (d) | Interest Paid (e) | Amount Transmitted (f) |
|---|---|---|---|---|---|
| 4.1 SNF Underpayment |  |  |  |  |  |
| 4.2 Electricity Generation Late Payment |  |  |  |  |  |
| 4.3 TOTAL UNDERPAYMENT |  |  |  |  |  |
| 4.4 SNF Late Payment |  |  |  |  |  |
| 4.5 Electricity Generation Late Payment |  |  |  |  |  |
| 4.6 TOTAL LATE PAYMENT |  |  |  |  |  |

---

### 5.0 OTHER CREDITS CLAIMED (Attach Explanation)

Enter the Total Amount Claimed for All Credits    $ _____

---

### 6.0 TOTAL REMITTANCE

6.1 Total Spent Nuclear Fuel Fee Transmitted (from 2.7(c))    $ _____

6.2 Total Fee for Electricity Generated and Sold (from 3.4)    $ _____

6.3 Total Underpayment (from 4.3(f))    $ _____

6.4 Total Late Payment (from 4.6(f))    $ _____

6.5 Total Credits (from 5.0)    $ _____

6.6 TOTAL REMITTANCE (Sum of 6.1 through 6.4 minus 6.5)    $ _____

---

### 7.0 CERTIFICATION

I certify that the Total Remittance is true and accurate to the best of my knowledge

Name _____    Date _____    Signature _____

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any department or agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

Copy Distribution    White, DOE-Controller.    Canary, DOE-OCRWM    Pink, DOE-EIA.    Goldenrod, Utility Copy

☆ GPO: 183-172

# DEPARTMENT OF ENERGY
## Germantown, MD   20875

# APPENDIX G - STANDARD REMITTANCE ADVICE FOR PAYMENT OF FEES

General Information

1.  **Purpose**
    Standard Remittance Advice (RA) form is designed to serve as the source document for entries into the Department's accounting records to transmit data from Purchasers concerning payment of their contribution to the Nuclear Waste Fund.

2.  **Who Shall Submit**
    The RA must be submitted by Purchasers who signed the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste.  Submit Copy 1, 2, and 3 to DOE, Office of the Controller, Special Accounts and Payroll Division and retain Copy 4.

3.  **Where to Submit**
    Purchasers shall forward completed RA to:

    U.S. Department of Energy
    Office of the Controller
    Special Accounts and Payroll Division (C-216 GTN)
    Box 500
    Germantown, MD  20875-0500
    Request for further information, additional forms, and instructions may be directed in writing to the address above or by telephone at (301) 353-4014.

4.  **When to Submit**
    For electricity generated on or after 4-7-83 fees shall be paid quarterly by the Purchaser and must be received by DOE not later than the close of the last business day of the month following the end of each assigned three month period.  Payment is by electronic wire transfer  only.

5.  **Sanctions**
    The timely submission of RA by a Purchaser is mandatory.  Failure  to file may result in late penalty fees as provided by Article VIII.C of the Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste.

6.  **Provisions Regarding the Confidentiality of Information**
    The information contained in these forms may be (i) information which is exempt from disclosure to the public under the exemption for trade secrets and confidential commercial information specified in the Freedom of Information Act or 5 USC 522(b)(4)(FOIA) or (ii) prohibited from public release by 18 USC 1905.  However, before a determination can be made that particular information is within the coverage of either of these statutory provisions, the person submitting the information must make a showing satisfactory to the Department concerning its confidential nature.

    Therefore, respondents should state briefly and specifically (on an element-for-element basis if possible), in a letter accompanying submission of the form why they consider the information concerned to be a trade secret or other proprietary information, whether such information is customarily treated as confidential information by their companies and the industry, and the type of competitive hardship that would result from disclosure of the information.  In accordance with the provisions of 10 CFR 1004.11 or DOE's FOIA regulations, DOE will determine whether any information submitted should be withheld from public disclosure.

    If DOE receives a response and does not receive a request, with substantive justification, that the information submitted should not be released to the public, DOE may assume that the respondent does not object to disclosure to the public of any information submitted on the form.

    A new written justification need not be submitted each time the NWPA-830G is submitted if:
    a.  views concerning information items identified as privileged or confidential have not changed and
    b.  a written justification setting forth respondent's views in this regard was previously submitted.

    In accordance with the cited statutes and other applicable authority, the information must be made available upon request, to the Congress or any committee of Congress, the General Accounting Office, and other Federal agencies authorized by law to receive such information.

# INSTRUCTIONS FOR COMPLETING STANDARD REMITTANCE ADVICE FOR PAYMENT OF FEES

**Section 1.0**  *Identification Information*
1.1  Name of Purchaser as it appears on the Standard Contract, the mailing address, state, and zip code
1.2  Name and telephone number of person responsible for the completion of this form.
1.3  Standard Contract identification number as assigned by DOE.
1.4  Period covered by this advice and date of this payment.  Any period different from the assigned three month period should be explained on a separate attachment.

**Section 2.0**  *Spent Nuclear Fuel (SNF) Fee*
2.1  Enter the number of reactors for which the Purchaser had irradiated fuel as of midnight between 6/7 April 1983 related to the number of Annex B Forms attached.
2.2  Total amount owed to the Nuclear Waste Fund for spent fuel used to generate  electricity prior to April 7, 1983 (See Annex B for calculation).
2.3  Self explanatory.
2.4  Ten year Treasury Note rate on the date the payment is made, to be used if payments are being made using the 40 quarter option or if lump sum payment is made after June 30, 1985.
2.5  Unpaid balance before this payment is made.
2.6  Enter the payment option (1, 2, or 3) chosen.  The selection of payment option must be made within two years of Standard Contract execution.
2.7  Total payment of fee which this advice represents.  Show principal, interest, and total.

**Section 3.0**  *Fee for Electricity Generated and Sold (MWh)*
3.1  Enter the number of reactors the Purchaser is reporting on during this reporting period.
3.2  Enter total electricity generated and sold during the reporting period from all reactors being reported.  This is the sum of Station Total figures of line 4.2 from all Annex A forms attached, expressed in megawatt hours.
3.3  Current Fee Rate as provided by DOE (initially 1.0 M/kWh which is equal to 1.0 $/MWh)
3.4  Total Fee for Electricity Generated and Sold (MWh) represented by this advice.

**Section 4.0**  *Underpayment, late payment (as notified by DOE)*
4.1 - 4.6 Self Explanatory.

**Section 5.0**  *Other Credits Claimed*
Represents all items for which a Purchaser may receive credit, as specified in the Standard Contract.

**Section 6.0**  *Total Remittance*
6.1 - 6.6  This section is a summary of the payments made in the previously mentioned categories with this remittance.

**Section 7.0**  *Certification*
Enter the name and title of the individual your company has designated to certify the accuracy of the data.  Sign the "Certification" block and enter the current date.

**12,668**   Related Regulations—Department of Energy   866   2-24-92

| U.S. Department of Energy<br>Energy Information Administration<br>Form NWPA-830G | **ANNEX A TO APPENDIX G**<br>Standard Remittance Advice for Payment of Fees | OMB No. 1901-0260<br>(Expires 11/30/93) |
|---|---|---|

Section 1. Identification Information: Please first read the instructions on the back.

**1.1 Purchaser Information:**
  1.11 Name:_____
  1.12 Address:_____
  1.13 Attention:_____
  1.14 City:_____
  1.15 State:_____ 1.16 Zip:_____
  1.17 Utility ID Number: ___ ___
**1.2 Contact Person:**
  1.21 Name:_____
  1.22 Title:_____
  1.23 Phone No.:( )( ) Ext.:_____

**1.3 Station Name:** _____

**1.4 Standard Contract Identification**
  **Number:** _____

**1.5 Period Covered (MM/DD/YY):**

  1.51 From:___/___/___ To:___/___/___

  1.52 Date of This Submission: ___/___/___

Section 2. Net Electricity Generated Calculation

| Item | Unit 1 | Unit 2 | Unit 3 | Station Total* |
|---|---|---|---|---|
| 2.1 Unit ID Code: | | | | |
| 2.2 Gross Thermal Energy Generated (MWh): | | | | |
| 2.3 Gross Electricity Generated (MWh): | | | | |
| 2.4 Nuclear Station Use While At Least One<br>Nuclear Unit Is In Service** (MWh): | | | | |
| 2.5 Nuclear Station Use While All Nuclear<br>Units Are Out Of Service** (MWh): | | | | |
| 2.6 Net Electricity Generated (MWh)<br>(Item 2.3 minus Item 2.4): | | | | |
| 2.7 Footnote (if any): | | | | |

*For a nuclear station with more than one reactor and different ownerships for each reactor, a separate Annex A will be required.
**Utilities unable to meter individual unit use shall report estimated unit use and shall explain in a footnote how the unit data were estimated.

Section 3. Total Energy Adjustment Factor Calculation

| 3.1 Weighted Energy Adjustment<br>Factor Calculation<br><br><br>Name of Nuclear<br>Station Owner(s) | Adj. for Sales to<br>ultimate Consumer<br>(ASC) | | Adjustment for<br>Sales for Resale<br>(ASR) | | | | |
|---|---|---|---|---|---|---|---|
| | Fraction<br>of Sales<br>to ult.<br>Consumer<br>(FSC) | Sales to<br>ultimate<br>Consumer<br>Adj. Factor<br>(SCAF) | Fraction<br>of Sales<br>for<br>Resale<br>(FSR) | National<br>average<br>Adj.<br>Factor<br>(NAF) | Owner's<br>Energy<br>Adj.<br>Factor<br>(OEAF) | Owner's<br>Share<br><br>(OS) | Weighted<br>Energy<br>Adj.<br>Factor<br>(WEAF) |
| 1._____ | . X . | ) + | . X . | ) = | . X . | = . |
| 2._____ | . X . | ) + | . X . | ) = | . X . | = . |
| 3._____ | . X . | ) + | . X . | ) = | . X . | = . |
| 4._____ | . X . | ) + | . X . | ) = | . X . | = . |
| 5._____ | . X . | ) + | . X . | ) = | . X . | = . |
| 6._____ | . X . | ) + | . X . | ) = | . X . | = . |
| 7._____ | . X . | ) + | . X . | ) = | . X . | = . |
| 8._____ | . X . | ) + | . X . | ) = | . X . | = . |
| 9._____ | . X . | ) + | . X . | ) = | . X . | = . |
| 10._____ | . X . | ) + | . X . | ) = | . X . | = . |
| 11._____ | . X . | ) + | . X . | ) = | . X . | = . |
| 12._____ | . X . | ) + | . X . | ) = | . X . | = . |
| 3.2 Total Energy Adjustment Factor (TEAF = Σ WEAF) | | | | | | | . |

Section 4. Fee Calculation for Electricity Generated and Sold

| Item | Unit 1 | Unit 2 | Unit 3 | Station Total* |
|---|---|---|---|---|
| 4.1 Total Energy Adjustment Factor<br>(Enter value from 4.1 above): | | | | |
| 4.2 Electricity Generated and Sold<br>(Items 4.1 times Items in 2.6): | | | | |
| — Current Fee Rate (Dollars): | $1.00/MWh | $1.00/MWh | $1.00/MWh | $1.00/MWh |
| 4.3 Current Fee Due (Dollars):<br>(Transfer Station Total to line 3.4 of Appendix G) | | | | |

Copy Distribution:   White, DOE-Controller.   Canary, DOE-OCRWM.   Pink, DOE-EIA.   Goldenrod, Utility Copy

U.S. Department of Energy
Energy Information Administration
Form NWPA-830G

# Annex A to Appendix G

## Standard Remittance Advice for Payment of Fees

OMB No. 1901-0260
(Expires 11/30/93)

### Annex A Instructions

**0.    General Information**

0.1    **Purpose:** To report the calculations of fees due the Department of Energy's Nuclear Waste Fund.

0.2    **Please read all instructions before completing this form.**

0.3    **Complete a separate Annex A for each nuclear station.** For a nuclear station that has different ownership arrangements for more than one reactor, a separate Annex A will be required for each reactor.

0.4    Submit Annex A Quarterly with Appendix G.

0.5    Where to submit:

> U.S. DOE, Office of the Controller
> Special Accounts & Payroll Division
> (C-216 GTN), Box 500
> Germantown, MD 20875-0500

**Section 1.    Identification Information: (Self explanatory)**

**Section 2.    Net Electricity Generated Calculation**

2.1    **Unit ID Code:** Enter the Reactor Unit Identification (ID) Code as assigned by DOE, for each reactor in the station.

2.2    **Gross Thermal Energy Generated (MWh):** Utility shall report the thermal output of the nuclear steam supply system during the gross hours of the reporting period.

2.3    **Gross Electricity Generated (MWh):** Utility shall report this amount for each unit in the appropriate column, and the total in the column labeled "Station Total." This amount is measured at the output terminals of the generator during the reporting period.

2.4    **Nuclear Station Use While At Least One Nuclear Unit Is In Service (MWh):** Utility shall report the amount for each unit in the appropriate column, and the total in the column called "Station Total." The utility is to report consumption of electricity by the nuclear portion of the station during days in which at least one of the station's nuclear units was on-line and producing electricity. A utility unable to meter an individual unit shall report the estimated unit use, and shall explain in item 2.7 how the unit data were estimated. Note that a utility unable to meter individual unit use will report estimated unit use, and shall explain in item 2.7 how the unit data were estimated.

A.    During days in which nuclear station use exceeds nuclear station generation, the utility shall treat all resulting negative values as zero for fee calculation purposes.

B.    A utility that has multiple nuclear units at one station:

• when at least 1 nuclear unit is operating and when generation from that unit exceeds the nuclear station's use, the utility may assume that the operating unit is supplying electricity for nuclear station use whether or not the electricity has been metered or whether the units terminate to a common electrical busbar; and

• shall report under item 2.5 any electricity use by the nuclear portion of the station during the days in which all nuclear units at the station were out of service simultaneously.

C.    A utility that has a metered transmission line connecting an off-station nuclear reactor with another nuclear station may treat the off-station plant as part of this station for fee calculation purposes if it is not double counted.

D.    Utility may deduct small quantities of unmetered non-nuclear electricity generation  included in  "Gross Electricity Generated," provided that it is identified and explained in item 2.7.

E.    A utility may deduct nuclear electricity generation which is not sold and does not pass the busbar, provided they identify and explain the deduction in item 2.7 and that the deduction is not double counted.

2.5    **Nuclear Station Use While All Nuclear Units Are Out Of Service (MWh):** Utility shall report this amount for each unit in the appropriate column, and the total in the "Station Total" column. In this row, the utility shall report the consumption of electricity by the nuclear portion of the station during days in which total nuclear unit use exceeds nuclear generation (e.g., a day in which all nuclear units at the station were out of service at once). Note that a utility unable to meter individual unit use will report estimated unit use, and shall explain in item 2.7 how the unit data were estimated.

2.6    **Net Electricity Generated (MWh):** The utility shall report this amount for each unit in the appropriate column, and the total in the "Station Total" column. This amount is the result of subtracting items 2.4 from items 2.3.

2.7    **Footnote (if any):** Utilities that are unable to meter individual use shall explain here how the unit data were estimated.

**Section 3.    Total Energy Adjustment Factor Calculation:** The reporting utility shall obtain necessary data from all owners to calculate the Total Energy Adjustment Factor and maintain consistent, accurate, and complete records to support these submissions. The values provided in this section must be accurate to 4 significant digits. If there are more than 12 owners, use a continuation sheet. For a nuclear station with more than one reactor and different ownerships for each reactor, a separate Annex A will be required for each reactor.

3.1    **Weighted Energy Adjustment Factor Calculation:**

*Name of Nuclear Station owner(s):* provide the name(s) in items 1 thru 12 of 3.1. If more than 12 names, use a continuation sheet.

*Adjustment for Sales to ultimate Consumer (ASC):* is the product of Fraction of Sales to ultimate Consumer (FSC) and the Sales to ultimate Consumer Adjustment Factor(SCAF).

*Fraction of Sales to ultimate Consumer (FSC):* is determined by dividing the owner's previous year's annual sales to the ultimate consumer by the sum of the owner's previous year's annual sales to the ultimate consumer plus the owner's previous year's annual sales for resale. These figures can be found on the Energy Information Administration (EIA) Form EIA-861 or the Federal Energy Regulatory Commission (FERC) Form No. 1.

*Sales to ultimate Consumer Adjustment Factor (SCAF):* is equal to one minus the quotient of all electricity lost or otherwise not sold for each owner, divided by the total electricity available for disposition to ultimate consumers. The total electricity available is the reporting year total of all of an owner's electricity supply which is available for disposition, expressed in kilowatt hours. Electricity lost or otherwise not sold includes: (a) energy furnished without charge; (b) energy used by the company; (c) transmission losses; (d) distribution losses; (e) other unaccounted losses as reported on the Form EIA-861 or the FERC Form No. 1.

*Adjustment for Sales for Resale (ASR):* is the product of Fraction of Sales for Resale (FSR) and National average Adjustment Factor (NAF).

*Fraction of Sales for Resale (FSR):* is determined by dividing the owner's previous year's annual sales for resale by the sum of the owner's previous year's annual sales to the ultimate consumer plus the owner's previous year's annual sales for resale. These figures can be found on the Form EIA-861 or the FERC Form No. 1.

*National average Adjustment Factor (NAF):* is the quotient of the national total of electricity sold divided by the national total of electricity available for disposition.

*Owner's Energy Adjustment Factor (OEAF):* is the Owner's fraction of metered electricity.

*Weighted Energy Adjustment Factor (WEAF):* is the product of an Owner's Energy Adjustment Factor (OEAF) times the Owner's Share (OS).

3.2    **Total Energy Adjustment Factor (TEAF):** is the sum of individual owner's Weighted Energy Adjustment Factors (WEAF).

**Section 4.    Fee Calculation for Electricity Generated and Sold:**

4.1    **Total Energy Adjustment Factor:** Enter the value from item 3.2 as appropriate.

4.2    **Electricity Generated and Sold:** Multiply the values in item 4.1 by the "Unit" value in item 2.6. Sum these values and enter in "Station Total".

4.3    **Current Fee Due (Dollars):** Multiply the values in item 4.2 by one (1) dollar/megawatt hour (or 1.0 mil/kWh), which is the current fee. Add this station fee to the current fee due for all other reactors operated by the Purchaser, and then enter the sum on line 3.4 of the Appendix G Remittance Advice.

**ANNEX B TO APPENDIX** ●

*Standard Remittance of Advice (RA) for Payment of Fees*

This Annex should be completed only for SNF burned before midnight between April 6/7, 1983.

I. *Identification*

A. Purchaser: _____

B. Unit identification (Only one unit may be covered in each report.)

II. *Fee Calculation*

1. burnup [1] (MWDT/MTU) ..........................

2. initial loading (KgU) (with indicated burnup) ..........

3. fee rate ($/KgU) .................................

4. fee ($) .........................................

5. total fee (4) ....................................

B. Nuclear fuel in the reactor core as of midnight of 6/7 April 1983.

1. Reactor/Facility Name ● _____

2. Location: _____

3. Type: _____

4. Capacity: _____

5. Date of Commencement of Operations: _____

6. NRC License No.: _____

II. *Fee Calculation*

A. *Discharged nuclear fuel*

| | 0 - 5,000 | 5,000 - 10,000 | 10,000 20,000 | 20,000 up |
|---|---|---|---|---|
| fee rate | 80.00 | 142.00 | 162.00 | 184.00 |

| Assembly identification | Initial loading (KgU) | Burnup [1] as of midnight 6/7 April 1983 (MWDT/MTU) | Fee | Assembly identification | Initial loading (KgU) | Burnup [1] as of midnight 6/7 April 1983 (MWDT/MTU) | Fee |
|---|---|---|---|---|---|---|---|
| 1. | | | | 18. | | | |
| 2. | | | | 19. | | | |
| 3. | | | | 20. | | | |
| 4. | | | | 21. | | | |
| 5. | | | | 22. | | | |
| 6. | | | | 23. | | | |
| 7. | | | | 24. | | | |
| 8. | | | | 25. | | | |
| 9. | | | | | | | |
| 10. | | | | | | | |
| 11. | | | | | | | |
| 12. | | | | | | | |
| 13. | | | | | | | |
| 14. | | | | | | | |
| 15. | | | | | | | |
| 16. | | | | | | | |
| 17. | | | | | | | |

[1] Please provide (as an attachment) a clear reference to the methodolgy used to derive the burnup figures (computer codes, etc.) amd a clear reference to all data used in the derivation of those figures.

C. Total fee.

[48 FR 16599, Apr. 18, 1983; 48 FR 23160, May 24, 1983, as amended at 52 FR 35359, Sept. 18, 1987]

©1992, Commerce Clearing House, Inc.

October 7, 2000

Dave Zabransky, RW 44
United States Department of Energy
Team Leader, Waste Acceptance
Office of Civilian Radioactive Waste Management
1000 Independence Avenue, S.W.
Washington, D.C. 20585

Dear Mr. Zabransky:

This correspondence is a follow up to our telephone conversation on Wednesday, September 27, 2000. On behalf of the EFMR Monitoring Group, (1) I am requesting a posting in the Federal Register (2) of the Department of Energy's Amendment to Contract DE-CRO1-83 NE 44405 (the "Amendment") negotiated between the United States Department of Energy and PECO Energy Company. The Amendment modifies an early Agreement signed between the the Department of Energy (the "Department" or the "DOE") and PECO Energy Company ("PECO" or the "Company") on June 1, 1983. The history of Peach Bottom, the advent of deregulation and foreign ownership of domestic nuclear plants, and the regulatory climate, have drastically changed the prevailing conditions that existed in 1983 when the initial Agreement was signed. A public discussion of numerous issues raised by this Amendment should be addressed in an open forum. Among the issues that need to be discussed, include, but are not limited to: plant history; relationship to the timing of the "back end" nuclear power functions; the "trilateral" nature of this Amendment; logistics of waste management and the impact on local communities; and the imprecise, vague, and ambiguous wording of DOE and PECO's proposed Amendment.

Frankly, based on the DOE's recent and highly publicized efforts to open up agency records, confront past abuses, and make restitution to its workers, this request should be embraced, and viewed as a vehicle for greater public participation in an era of openness.

---

1    Enclosed is a description of the EFMR Monitoring Group as well as copies of the Negotiated Settlements governing the Group's relationship with AmerGen (Three Mile Island Unit 1) and PECO Energy (Peach Bottom 2 & 3).

2    Section 2 Parts: A, B & C of this Amendment clearly make provisions for posting this document in the Federal Register. In addition, Article IV: RESPONSIBILITIES OF THE PARTIES Part 7) specifies the legal obligations assumed by the DOE in the event of "any legal action...initiated by a person involving this Amendment..."

1

This Company, originally known as Philadelphia Electric, is the only Nuclear Regulatory Commission licensee forced to close a nuclear generating station. Due to its unique operating history, Peach Bottom 2 & 3's operating record has been closely scrutinized (3). Peach Bottom, which initially cost $700 million to construct, has projected cleanup costs in the range of $452 million (1995 dollars.) Moreover, Peach Bottom and Three Mile Island-1 (TMI) share staffing  (4), operating histories, and an ignoble place in American nuclear history. (5)

---

3       PECO was ordered by the Nuclear Regulatory Commission (NRC) to shutdown Peach Bottom-2 and -3 on **March 31, 1987** due to operator misconduct, corporate malfeasance, and blatant disregard for the health and safety of area residents. Operators were found sleeping on the job, playing video games, engaging in rubber band and paper ball fights, and reading unauthorized material, i.e "girly magazines." Zack Pate, President of the Institute for Nuclear Power Operations, (INPO) declared that Peach Bottom "was an embarrassment to the industry and to the nation...The grossly unprofessional behavior by a wide range of shift personnel...reflects a major breakdown in the management of a nuclear facility." In **October 1987**, the Institute for Nuclear Power Operations (INPO) conducted a site visit and found that since the March shutdown, "little clearly demonstrable  action has been taken regarding corporate management's accountability for conditions at the station."
    On **January 11, 1988**,  INPO's President Zack Pate strongly criticized Philadelphia Electric's management and their revised reorganization plan.Pate noted that, "The fundamental approach to nuclear operational management at Philadelphia Electric Company has not changed and is unlikely to change noticeably in the foreseeable future." He added, "success ultimately depends on the individual managers in key line positions. Since for the most part, the same managers who have been ineffective in this area for years are in the key line positions in the new organization, substantial improvement is unlikely." Pate concluded, "Major changes in the corporate culture at PECO are required. The recently announced reorganization plan will not achieve this" .

    The NRC's forced shutdown of Peach Bottom and INPO's critical analyses of PECO occurred **four years after** the Department's initial Agreement with Philadelphia Electric.

4    The Original Agreement specifically raises the issue of improperly classified waste (**ARTICLE  VI CRITERIA FOR DISPOSAL** , B. Acceptance Procedures. 2. Verification of SNF and/or HLW; and , 3. Improperly DESCRIBED SNF and/or HLW.) Waste classification has been a perennial problem at Three Mile Island-1 since **1991**.  Radioactive waste has either been misclassified or returned to TMI-1 on July 3, July 17 to  August 30, October 7-11 and October 8, 1991; April 6 to 10 and August 21, 1992; and,  August 9 and December 1994.

    On August 3, 2000, the NRC issued a Violation to PECO regarding "the improper classification of radioactive waste shipped for disposal..." (NRC, Hubert J. Miller, Regional Administrator, Inspection Report 05000277 & 278/2000-002, Peach Bottom.)

5    Problems at Peach Bottom from 1974 through 2000 are documented in the enclosure entitled "Chronology of Problems at Peach Bottom." A similar chronology of problems at TMI since 1985, i.e., "Problems Since the TMI-1 Restart" has also been provided. Both documents rely heavily on cited NRC Inspection Reports, Notice of Violations, and Systematic Assessment of License Performance as well PECO Energy and General Public Utilities (GPU) publications.

Philadelphia Electric is now PECO Energy and AmerGen (British Energy and PECO Energy), and soon to be Exelon/Unicom (Commonwealth Edison and PECO Energy.) (6) At the time of the initial Contract, (June 1, 1983), foreign ownership of domestic nuclear generating stations had not been discussed or implemented. AmerGen acquired Three Mile Island Unit-1 in **1999**. Additionally, PECO's acrimonious and litigious relationship with its nuclear partners manifested in **1988**. (7) This type of behavior has a

---

6    "Limerick Peach Bottom and Salem Stations - Orders Approving Transfer of License From PECO Energy to Exelon Generating Company, LLC & Approving Conforming Amendments," (NRC, Bartholomew Buckley, August 3, 2000.)

7    - On **July 27, 1988**, Public Service Enterprise Group Incorporated and its subsidiary Public Service Electric and Gas Company filed and action in the United States District Court to recover damages resulting for the NRC's **shutdown of Peach Bottom**. On the same in the same court, Atlantic City Electric Company and Delmarva Power and Light Company filed similar suits against Philadelphia Electric. The suits allege that PECO breached its contract under the Owners Agreement. Several tort claims were also filed, however no dollar amounts were specified. (Based on information from Philadelphia Electric Company's "Report to Shareholders Third Quarter 1988.") On April 2, 1992, a settlement was announced on the two lawsuits brought against PECO by Peach Bottom's co-owners: Public Service Electric and Gas Company, Delmarva Power and Light Company and Atlantic City Electric Company. The suits were related to the NRC shutdown of Peach Bottom on March 31, 1987."As part of the settlement, Philadelphia Electric will pay $130,985,000 on October 1, 1992 to resolve all pending litigation" (Joseph Paquette, Chairman of the Board, PECO, April 8, 1982.)
    - On **May 9, 1997**, PECO entered into an agreement with Delmarva Power & Light Company and Public Service Electric and Gas Company (PSE&G) regarding the shut down of the **Salem nuclear power plant.** "Under the terms of the settlement, PSE&G will pay the Company [PECO] $69.8 million and Delmarva $12.1 million. The settlement also provides that if the current outage exceeds 64 reactor unit months, PSE&G will pay the two companies an additional $1.4 million per reactor unit month, up to an aggregate of $17 million, to be divided proportionately. A reactor unit month is a month during the current outage in which a unit is off-line. (J. F. Paquette, Jr., Chairman of the Board, "Report to Shareholders," June 1997.)
    - On **March 11, 1998**, PECO Energy Company announced it was counter suing Great Bay Power Corporation "to prevent it from ending a power marketing agreement.
    "PECO, which is seeking more than five million in damages for breach of contract and for the loss of goodwill and harm to its reputation, filed the suit in the U.S. District Court of New Hampshire.
    "This suit comes a week after Great Bay sought to end the exclusive marketing agreement to sell Great Bay power generated at the **Seabrook 1 Nuclear Power Plan**t in Seabrook, N.H. [Great Bay owns 12.1% of Seabrook.]
    " (*Reuters*, March 11, 1998.))
    On **June 3, 1998**, Great Bay Power Corporation withdrew its lawsuit against PECO.   John A. Tillinghast, Great Bay's Chairman said, "We believe PECO acted properly as our marketing agent. And seems clear that the judge in our case is inclined to find that PECO did not breach the marketing agreement....PECO's acceptance of our proposal lets us get started on our own marketing strategy. We appreciate the value PECO has provide Great Bay over the past two years and wish them well in the future." (PECO Energy, Press Release, June 3, 1998.)

clear cut impact on the pending Amendment. PECO can unilaterally decide to actuate the financial incentive contained in ARTICLE FIVE : (Amendment, p. 6), and "sell" or trade its "place" in the High Level Waste (HLW) and Spent Nuclear Fuel (SNF) disposal line. If the DOE opposes the transaction, PECO has historically demonstrated that it will legally contest the decision or mount a lobbying campaign to undermine the DOE's position (8).

Unfortunately, the Department of Energy's underlying premise, as outlined by Secretary Bill Richardson, has been routinely flouted by PECO Energy. The Secretary stated:

> Today's agreement demonstrates that the department and the utilities can reach a resolution regarding our delay without resorting to costly and protracted litigation, and I hope it will be a precedent for additional settlement negotiations with other utilities." (Reuters, July 20, 2000)

In fact, two months after the DOE and PECO Energy negotiated this proposed Amendment, the United States Department of Justice, "filed an action (May 27, 2000) claiming breach of contract against the Company in the United States Middle District of Louisiana arising out of the Company's termination of the contract to purchase Cajun's 30% interest in the River Bend nuclear power plant. (9)

Any agreement with a "Purchaser" to "sell" or "trade" Peach Bottom or Three Mile Island -1's  "place" in the High Level Radioactive Waste and Spent Fuel Nuclear disposal line, impacts rate payers, local communities, and the nuclear industry. Clearly, this **proposed Amendment is not a "bilateral" agreement**.

The safety net of retail rate recovery through rate payers began was eliminated by Pennsylvania's Competition Act in **1998**. Financial obligations for the Nuclear Waste Policy Act now fall on the shoulders of Pennsylvania's GENCOs and shareholder contributions. Therefore, there is no flow through mechanism that would allow hostage PECO customers benefit from contributions they made based on provisions contained in the  Nuclear Waste Policy Act. Pennsylvania rate payers and consumers have already "contributed" over $6.5 billion to underwrite PECO and GPU's "stranded investments" in nuclear power

---

8    PECO was among a consortium of 33 utilities actively pressuring, through rate payer "contributions",  the Mescalero Apaches to build a high-level radioactive waste facility on Native American grounds. (December 12, 1994).

9    The action seeks the full purchase price of the 30% interest in the **River Bend nuclear power plant**, $50 million, plus interest and consequential damages. While the Company cannot predict the outcome of this matter, the Company believes that it validly exercised its right of termination and did not breach the contract." (PECO Energy Company **1999** Annual Report, p. 46).

investments. PECO and the DOE owe these stake holders an open forum to discuss the economic and social impacts of the proposed Amendment.

If PECO/AmerGen/Exelon should enter into a paper shuffling settlement with another utility, this unilateral decision would impact numerous communities across the country. Radioactive decontamination and decommissioning, as well as restoring a site to "Free -Release", can *not* occur while HLW and SNF remain on-site. For example, TMI-2 is currently owned by General Public Utilities. GPU is in the process of merging with FirstEnergy. Obviously, GPU and FirstEnergy, and the communities living around TMI, should have the ability to comment on actions that would affect their property, possessions, and quality of life. PECO's maneuvering may make fiduciary sense, but the Company's "bottom line" also postpones site decommissioning which impacts **local communities, taxing authorities, state regulatory agencies,** and **local, state, and federal law enforcement agencies**. All affected stake holders deserve, not only the right to comment on the proposed Amendment, but also the opportunity to request an Environmental Impact Statement regarding the creation of nuclear waste sites at nuclear generating stations.

The logic of PECO and the DOE contradicts and undermines earlier positions staked out by the respective signatories. PECO negotiated the proposed amendment based on delays associated with DOE's siting process. Yet the Company wants the right to profit from creating artificial and "unreasonable" delays. This a paradoxical and puzzling stand for a PECO to advocate, According to the Department of Energy, PECO Energy's Chairman and CEO, Corbin A. McNeill, stated: "While it is unfortunate that there is not yet a permanent solution for spent nuclear fuel, we remain optimistic that the government will fulfill its long term obligation." (DOE News Release, July 20, 2000.)

In other words, it is unacceptable for the Department to fall behind schedule in constructing and operating Yucca Mountain; but once operational, PECO wants to auction off its Yucca Mountain privileges. By not sending its High Level Waste or Spent Nuclear Fuel to Yucca Mountain in a timely fashion, the Department would allow PECO Energy to profit from creating a High Level Radioactive waste facility on an island that feeds into the Chesapeake Bay.

The Department of Energy's "Annual Acceptance Capacity Allocations For The Disposal of Spent Nuclear Fuel, Appendix B," has ranked the following nuclear stations owned by PECO/Exelon/Unicom, in an advantageous position: Oyster Creek, Peach Bottom 2 & 3 (B 3 through B 10), Salem 1, Three Mile Island 1(B 3 through 7) and Three Mile Island 2 (B 6 & 7), Dresden 2 & 3, Quad Cities 1 & 2, Vermont Yankee and Zion 1 & 2 have **priority rankings**.

If PECO/Exelon/Unicom agreed to trade only within it's nuclear fleet, delays for the above mentioned generating stations would necessarily follow since the Company's other stations rank in the second tier or below of DOE's "waiting list": Limerick 1 & 2 (1986 and 1990), Braidenwood 1 & 2 (1988), Byron 1 & 2 (1885 and 1987), Clinton (1987),  La Salle County 1 & 2 (1984), and Salem 2 (1981) were entered into operation between 1981 and 1990 and their **ranking** is in the **rear** of the DOE line. Exchanges between "younger" Exelon family members and Peach Bottom and Three Mile Island would postpone nuclear decommissioning and decontamination, non-nuclear decommissioning, and 'Free Release". Moreover, the fate of TMI-2 (10) is directly linked to the operation of TMI-1. Therefore, if TMI-1 can not be decommissioned, it necessarily postpones the cleanup of TMI-2. PECO and the DOE do not posses the statutory authority to unilaterally, or bilaterally, commit unspecified nuclear generating stations to the terms of this proposed Amendment.

Moreover, the designated radioactive waste repository at Yucca Mountain does **not have enough storage capacity to accommodate nuclear generating stations ranked on, or below, the second tier**.

The Department of Energy, which was sued by a consortium of nuclear utilities over delays in siting a high-level radioactive waste repository, argued that delays in siting a HLW were  "unavoidable. The District of Columbia's Circuit Court concluded that the Nuclear Waste Policy Act was conferred an "unconditional obligation" on the Department to find a HLW/SNF facility.

---

10   "The TMI site is not suitable as a permanent repository for radioactive wastes generated by the accident." (Dr. Bernard J. Snyder, "Answers to Questions About Updated Estimates of Occupational Radiation Doses  at Three Mile Island, Unit 2", U.S. NRC, Office of Nuclear Reactor Regulation, TMI Program Office, December, 1983, p. 5.)

Dr. Michio Kaku, internationally recognized author on theoretical physics and the environment, evaluated remaining fuel estimate studies at Three Mile Island Unit-2. Dr. Kaku holds the Henry Semat Professorship in Theoretical Physics at the City College and the Graduate Center of the City University of New York.
   Dr.Kaku concluded:"It appears that every few months, since 1990, a new estimate is made of the core debris, often with little relationship to the previous estimate...estimates range from **608.8 kg to 1322 kg**...This is rather unsettling, because there is significantly more than enough uranium debris to give critical mass. The still **unanswered questions** are therefore: precisely how much uranium is left in the core, and how much uranium can collect in the bottom of the reactor to initiate re-criticality."

6

However, the Court stated, "On the other hand, the Court acknowledged that the law itself **did not require performance, and so the court had no power to enforce the law.**" (**Bold face type added**). (11) DOE's financial concessions to PECO are inexplicable; unless, one reasons that the Department is simply rewarding PECO for not suing the Department.

PECO could also profit from this proposed Amendment when the DOE takes title of the HLW/SNF. Since the Department would not have physical possession of the waste, they would hire PECO to serves as a "contractor" for the waste the Company leased, sold and created.

Nothing in the proposed Amendment explicitly precludes the Department of Energy from importing mixed oxide, low-level radioactive waste, mixed waste or hazardous waste onto Peach Bottom's Independent Spent Fuel Storage Installation. And since the "'environmental baseline" was intentionally undefined, both the Company and the Department could exploit contradictions and disputes between federal agencies as well as any future weakening in environmental statutes.

Also problematic is the vague and general language that permeates this proposed Amendment. For example, "liability" and "indemnification" responsibilities are unclear. "Unrestricted use" now includes the Peach Bottom Atomic Power Station and the Independent Spent Fuel Storage Installation, but standards for "unrestricted use" have not been defined. "Environmental baseline" has no meaning. "Pudency" reviews have been introduced for a corporate entity that has historically rejected any form of performance analyses. The ability to enforce this proposed Amendment is contingent upon adequate federal funding. Availability of funds, and the machinations of Congress may affect the timing of this transaction, yet here is no fall back plan to implement the proposed Amendment if Congress fails to act.

---

11    Washington, D.C. Circuit Court, Wisconsin Electric Power Company v. DOE, No. 99-1342, May 19, 2000. ("Public Utilities Fortnightly", July 1, 2000.)

Based on issues raised in this correspondence, I am formally requesting that the Department of Energy's publish Amendment to Contract DE-CRO1-83 NE 44405 negotiated between the United States Department of Energy and PECO Energy Company in the Federal Register.

Sincerely,

Eric Joseph Epstein, Coordinator
EFMR Monitoring Group
4100 Hillsdale Road
Harrisburg, PA 17112

**Enclosures**

cc: Herbert  D. Watkins, Contracting Officer, Office of Headquarters, Procurement Services, United States Department of Energy

State of Pennsylvania
County of Dauphin
Sworn and subscribed before me this
..7th.... day of .October..... 20.00.
Megan T. McClain

_____

**NOTARY**

NOTARIAL SEAL
Megan T. McClain, Notary Public
City of Harrisburg, Dauphin County
My commission expires November 18, 2002



# Department of Energy

Washington, DC 20585

DEC 0 1 2000

Mr. Eric Joseph Epstein
Coordinator
EFMR Monitoring Group
4100 Hillsdale Road
Harrisburg, PA 17112

Dear Mr. Epstein:

This letter responds to your October 7, 2000 letter regarding your concerns related to the Amendment to the Standard Contract for Disposal of High Level Waste/Spent Nuclear Fuel agreed to by PECO Energy (now known as Exelon Generation Company) and the Department of Energy (DOE) on July 19, 2000. The Amendment was negotiated in accordance with Article XV (Amendments) of the Standard Contract, and signed by PECO Energy and DOE. Both parties provided input to the Amendment through their negotiators. The Department does not believe it would be particularly useful to publish a negotiated contract amendment in the Federal Register.

However, the Department has recognized the interest in making the Amendment available to the public. In fact, within days of the signing of the Amendment, a copy of the signed document was placed on the website for DOE's Office of Civilian Radioactive Waste Management. The Amendment remains on the website at **www.rw.doe.gov** under the menu option "Waste Acceptance and Transportation."

You have raised concerns about PECO Energy's trading of Spent Nuclear Fuel/High Level Waste (SNF/HLW) allocations. PECO Energy, as well as all other Standard Contract holders, have had such a right since they signed the Standard Contract in 1983. Article V E. (Exchanges) of this Contract provides for exchanges of allocations of SNF//HLW among Contract holders with the approval of DOE. Thus, no new trading rights were created by the Amendment.

Your letter raises several other concerns such as the operation of the Peach Bottom Atomic Power Station, the effect of electricity deregulation on the ratepayers in Pennsylvania, and the impact of PECO Energy's recent merger with Unicom Corporation. The Department has no authority to address these concerns directly, and believes that they have no substantive effect on the Amendment. You may wish to raise these issues with the entities that have cognizance over them.

Thank you for your interest in this matter.

Sincerely,

David Zabransky
Team Leader
Waste Acceptance Division

Printed with soy ink on recycled paper