

FILED
HARRISBURG

JUL 0 2 2001

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC JOSEPH EPSTEIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 01-0682 |
| | ) | Judge Kane |
| | ) | |
| SPENCER ABRAHAM, Secretary of the | ) | |
| U.S. Department of Energy; HERBERT | ) | |
| WATKINS, Contracting Officer, U.S. | ) | |
| Department of Energy | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

# INTRODUCTION

Plaintiff challenges an amendment to a contract between the Department of Energy ("DOE") and the PECO Energy Company ("PECO") alleging that in taking this action, the agency has violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370d,  and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559.  Plaintiff's claims must fail as a matter of law.

Plaintiff alleges that the APA "required the DOE to implement a rule making procedure, complete with publication in the Federal Register, to implement the Amendments to the Contract."  Complaint ¶ 56.  Plaintiff further alleges that prior to the contract amendment DOE should have prepared an Environmental Impact Statement ("EIS") pursuant to NEPA and its associated regulations.  Id. ¶¶ 52-55. Plaintiff's claims must fail as a matter of law because, as discussed below, neither of the statutes upon which Plaintiff bases his suit can support the claims raised. The APA expressly excludes contractual matters from the notice and comment requirements applicable to agency rule makings.  DOE's own NEPA regulations have categorically excluded contract amendments like the one at issue here from NEPA analysis.  Furthermore, the decision at issue here, which effects no change to the environmental status quo, is not one to which NEPA is applicable.  Plaintiff's claims should be dismissed with prejudice.

1

## PROCEDURAL HISTORY

Plaintiff filed a complaint in this matter on April 19, 2001.  Defendants file

the present Motion pursuant to Federal Rule of Civil Procedure 12(b)(6).

## STATEMENT OF FACTS

The contract amendment at issue here arises from obligations imposed upon

DOE by the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270

("NWPA"), and a contract between DOE and PECO entered into pursuant to the

NWPA.  In the NWPA, Congress sought to address the national problem posed by

the accumulation of spent nuclear fuel and radioactive waste ("SNF") by

establishing a system whereby generators of SNF would pay into a Nuclear Waste

Fund administered by DOE.  DOE would use the Fund to pay for the identification,

development, licensing, construction, operation, decommissioning, and post-

decommissioning monitoring of waste repositories.  Id. § 10222(d).  The statute

authorized DOE to enter into contracts with utilities that generate or hold title to

SNF and nuclear waste.  Congress required that these contracts would have DOE

accept title, transport, and ultimately dispose of such SNF.  Id. § 10222.  Congress

also required that these contracts provide that "in return for the payment of fees

established by this section, the Secretary, beginning not later than January 31,

1998, will dispose of the high-level radioactive waste or spent nuclear fuel

2

involved as provided in this subchapter." Id. § 10222(a)(5)(B).

Pursuant to the NWPA, DOE entered into standard contracts with a number of utilities, including PECO. DOE had proposed these standard provisions and solicited public comment on them prior to their final adoption. 48 Fed. Reg. 5458 (Feb. 4, 1983) (proposed Standard Contract); 48 Fed. Reg. 16,590 (Apr. 18, 1983) (adopting Standard Contract); 10 C.F.R. § 961.11 (text of Standard Contract). Subsequently, DOE and various utilities, including PECO, entered into individual contracts that incorporated the terms of the Standard Contract modified to the particular circumstances of the contracting parties. These contracts were not subject to public notice and comment or published in the Federal Register.

In the original contract, DOE and PECO agreed that DOE would accept SNF from PECO on an agreed upon delivery commitment schedule beginning not later than January 31, 1998, and that PECO would pay fees at a rate established by the NWPA and the contract. 42 U.S.C. § 10222(a)(2); Contract Art. III (Exhibit A to Brownstein Decl.). PECO's fees were based on the amount of electricity generated by the facility. Id. at Art. VIII.

As the 1998 deadline approached, it became apparent that DOE would not be able to take possession of the SNF because the Department did not have a

3

repository for these materials.[1]  Various utilities and state agencies filed civil

actions against DOE, and the Court of Appeals for the District of Columbia Circuit

held that the Act "creates an obligation in DOE, reciprocal to the utilities'

obligation to pay, to start disposing of the SNF no later than January 31, 1998."

Indiana Michigan Power Co. v. U.S. Dep't of Energy, 88 F.3d 1272, 1277 (D.C.

Cir. 1996).  In a subsequent decision, the D.C. Circuit affirmed that the "NWPA

imposes an unconditional obligation on the Department to begin disposal of the

SNF by January 31, 1998," and that if DOE failed to satisfy this obligation, the

utilities could pursue remedies provided by the contracts.  Northern States Power

Co. v. U.S. Dept. of Energy, 128 F.3d 754, 761, 759 (D.C. Cir. 1997); see also

Yankee Atomic Energy Co. v. United States, 42 Fed. Cl. 223, 225-26 (Fed. Cl.

1998), aff'd sub nom Maine Yankee Atomic Power Co. v. United States, 225 F.3d

1336 (Fed. Cir. 2000) (granting power company's partial motion for summary

---

[1]Until DOE takes possession of SNF from PECO, these materials are stored on-site using Nuclear Regulatory Commission ("NRC") certified dry casks.  In 1990 the NRC engaged in NEPA analysis to examine the environmental effects of this storage method as part of the agency's process of developing a rule for the issuance of licenses for dry cask storage of SNF at nuclear power sites.  55 Fed. Reg. 29,181 (Jul. 18, 1990).  The NRC prepared an environmental assessment and issued a finding of no significant impact, satisfying its obligations under NEPA.  Id. at 21,190.  See also 10 C.F.R. § 51.23 (NRC determination that SNF generated from reactors can be stored for 30 years beyond the licensed life of reactor and extensions thereof).

4

judgment finding that "DOE's failure to begin disposal services by January 31, 1998 remains an unauthorized breach" of contract).

In response to these legal developments, DOE entered into negotiations with PECO to make equitable adjustments to the charges that PECO pays into the NWF to resolve any contractual claims PECO might assert against DOE. DOE's contract with PECO allowed for equitable adjustments to PECO's fees in the event that DOE was unable to take possession of waste materials, providing that:

> In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, *the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay*.

Contract Art. IX(B) (emphasis added).

On July 19, 2000, DOE and PECO agreed to a contract amendment that would "compensate [PECO] for the Allowable and Reasonable Costs incurred as a result of DOE's delay in performance of its disposal obligation." Contract Amendment, Art. IV, § 6 (Exhibit B to Brownstein Decl.). The amendment provides PECO with compensation for reasonable costs that would not have been incurred had DOE begun accepting SNF for disposal by January 31, 1998.

5

## QUESTIONS OF LAW

1) Whether the contract amendment constitutes a "rule making" to which the provisions of the Administrative Procedure Act apply.

2) Whether DOE was required to prepare an environmental impact statement prior to modifying its contract with PECO.

## STANDARD OF REVIEW

A Rule 12(b) motion to dismiss is properly granted when, taking all factual allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law.  Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3rd Cir. 1990).  Dismissal for failure to state a claim under Rule 12(b)(6) is appropriate where it is certain as a matter of law that no relief can be granted under any set of facts that could be proved.  Id.  While a court reviewing a 12(b)(6) motion may treat the motion as one for summary judgment if matters outside the pleadings are considered, a court may examine documents integral to or explicitly relied upon in the complaint without converting the motion to a motion for summary judgment. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3rd Cir. 1997).

## ARGUMENT

**I.     The Administrative Procedure Act Does Not Mandate Notice And Comment For A Contract Amendment.**

6

Plaintiff alleges that DOE was required to engage in APA notice and comment rulemaking procedures prior to amending its contract with PECO. Complaint ¶¶ 56-69.  Plaintiff attempts to impose procedural requirements on DOE's contract administration that are not supported by law, however, and this claim must fail as a matter of law.

The APA requires federal agencies to engage in certain procedures when developing rules.  5 U.S.C. § 553.  However, the APA expressly excludes matters relating to "loans, grants, benefits, or contracts" from the requirements of the rule making procedures.  5 U.S.C. § 553(a)(2).

Plaintiff claims that because DOE afforded the public notice and comment on the original terms of the standard contract applicable to all DOE contracts, the amendment to the PECO contract here should also be subject to notice and comment.  Complaint ¶ 69.  However, federal agencies possess great discretion in procedures related to contractual matters.  As noted by one district court:

> the fact remains that Section 553(a) specifically exempts an agency when making rules regarding public property or contracts.  When the government is dealing with these matters, *Congress affords the government complete discretion to decide what, if any, public rulemaking procedures it should adopt and follow*.

Duke City Lumber Co. v. Butz, 382 F. Supp. 362, 373 (D.D.C. 1974), aff'd 539 F.2d 220 (D.C. Cir. 1976) (emphasis added); see also Thomas v. Network

7

Solutions, 2 F. Supp. 2d 22, 36-37 (D.D.C. 1998), separate portion of order vacated

by 1998 WL 1738180 Civ. No. 97-2412 (D.D.C. Aug. 28, 1998), aff'd 176 F.3d

500 (D.C. Cir. 1999), cert. den. 528 U.S. 1115 (2000) (contract exception to APA

"is intended to grant agencies latitude to engage in contracts; the potential public

impact of a contract does not divest the exception of its force").

     Furthermore, while DOE provided public notice and solicited comment on

the terms of standard contract provisions,[2] that process resulted in contract terms

that applied generally to all contracts between utilities and DOE entered into

pursuant to the NWPA.  Here, however, DOE has not issued an amendment to all

contracts subject to the terms of the standard contract, but rather has modified the

terms of only one contract, and the rule making procedures of the APA are not

mandated.  As the Supreme Court noted in Vermont Yankee Nuclear Power Corp.

v. Natural Resources Defense Council, Inc., the APA

> established the maximum procedural requirements which Congress was
> willing to have the courts impose upon agencies in conducting rulemaking
> procedures.   Agencies are free to grant additional procedural rights in the
> exercise of their discretion, but reviewing courts are generally not free to

---

[2] Defendants note that while DOE developed the terms of the standard contract through a notice and comment rulemaking, the APA does not mandate such procedures in contract matters, as Congress has afforded the agency "complete discretion to decide what, if any, public rulemaking procedures it should adopt and follow."  Duke City Lumber Co., 382 F. Supp. at 373

impose them if the agencies have not chosen to grant them.

435 U.S. 519, 524 (1978).  The APA excludes contractual matters from the notice

and comment requirements of agency rule making, and Plaintiff's attempt to

impose these requirements on the contract amendment here must fail.

II.     **DOE Was Not Required To Prepare An Environmental Impact
        Statement For The Contract Modification Here**.

        Plaintiff claims that DOE was required to prepare an environmental impact

statement ("EIS") pursuant to NEPA prior to modifying its contract with PECO.

However, DOE's NEPA regulations categorically exclude contract modifications

like the one at issue here from NEPA analysis.  Furthermore, the contract

modification at issue here does not change the environmental status quo and

therefore does not represent the type of federal action which would trigger the

procedural requirements of NEPA.  Plaintiff's NEPA claim fails as a matter of law.

        A.     **DOE's NEPA Regulations Categorically Exclude Contract
               Modifications Like The One At Issue Here From NEPA Analysis.**

        Plaintiff's NEPA claim here must fail as a matter of law.  The DOE NEPA

regulations categorically exclude contract amendments like the one at issue here

from NEPA's procedural requirements.  As such, Plaintiff's NEPA claims should

be dismissed with prejudice.

        NEPA mandates procedures by which agencies must consider the

9

environmental impacts of their actions, but does not dictate substantive results.
Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).  NEPA
created the Council on Environmental Quality ("CEQ") to provide guidance for
agency compliance with the Act.  42 U.S.C. §§ 4341-4347.  The CEQ issued
regulations, 40 C.F.R. §§ 1500-1517, for agency implementation of NEPA and
these regulations are entitled to substantial deference.  Robertson, 490 U.S. at 355.

The CEQ regulations recognize that agencies may conduct differing levels of
environmental analysis to determine the environmental impacts of a proposed
action.  State of New Jersey Dept. of Envtl. Protection and Energy v. Long Island
Power Auth., 30 F.3d 403, 409-10 (3rd Cir. 1994).  The CEQ regulations direct
agencies to consider whether a proposed action falls within a class of actions that
normally require an EIS, or whether an action falls within a class of actions
requiring no environmental analysis and may be categorically excluded from
further analysis.  40 C.F.R. § 1501.4(a).  If an action is neither categorically
excluded nor of the type normally requiring an EIS, then the agency is directed to
prepare an environmental assessment ("EA") to determine whether to prepare an
EIS for the proposed action.  Id. § 1501.4(b)(2).

The CEQ regulations further direct agencies to develop procedures to
identify "[s]pecific criteria for and identification of those typical classes of action...

10

[w]hich do not require either an environmental impact statement or an environmental assessment (categorical exclusions)." Id. § 1507.3(b)(2). The Department of Energy adopted regulations setting forth "DOE actions that normally... [d]o not require preparation of either an EIS or an EA (are categorically excluded from preparation of either document)." 10 C.F.R. § 1021.400(a)(1). The list of categorically excluded DOE activities are found in Appendices A and B to the categorical exclusion regulation found at 10 C.F.R. § 1021.410. As described in the declaration of Alan Brownstein,[3] the NEPA Compliance Officer for DOE's Office of Civilian Radioactive Waste Management, agency procedures do not require documentation for the application of the categorical exclusions. Brownstein Decl. ¶ 7 (DOE procedures attached as Exhibit C to Brownstein Decl.).

DOE's categorical exclusion A2 excludes from NEPA analysis, "[c]ontract interpretations, amendments, and modifications that are clarifying or administrative in nature." 10 C.F.R. § 1021.410. Here, DOE's contract amendment clarifies the parties' obligations in light of the agency's inability to take possession of SNF and

---

[3] Defendants recognize that if a reviewing court considering a motion to dismiss relies upon materials outside the pleadings in its decision, then such a motion may be converted into a motion for summary judgment. Fed. R. Civ. Pro. 12(b)(6). If the Court relies on Mr. Brownstein's declaration to reach its finding on Plaintiff's NEPA claim, Defendants respectfully request the Court to consider Defendants' motion as a partial motion for summary judgment on Plaintiff's NEPA claims.

nuclear waste for disposal by January 31, 1998.  Brownstein Decl. ¶ 6.  The

amendment also represents the administration of the original contract's equitable

adjustment clause.  Thus, the amendment falls squarely within the agency's

categorical exclusion and Plaintiff's claim that the agency must prepare an EIS

fails as a matter of law.

> **B.** **The Contract Amendments Effect No Change To The Environmental Status Quo And Therefore Do Not Represent A "Major Federal Action" For NEPA Purposes.**

It is established in NEPA caselaw that where there is no change to the

environmental status quo, there is no "major federal action" to which the

procedural requirements of NEPA would apply.  Here, the contract amendments do

not alter the environmental baseline.  Rather, the PECO facilities at issue here will

continue operation and associated storage of SNF in the same manner as had

occurred prior to the amendments.  In this context there is no change to the

environmental status quo, and Plaintiff's NEPA claim must fail.

Courts have long recognized that "agency decisions that maintain the

substantive status quo do not constitute major federal actions under NEPA."

Alliance for Bio-Integrity v. Shalala, 116 F. Supp. 2d 166, 174 (D.D.C. 2000); see

National Wildlife Federation v. Espy, 45 F.3d 1337, 1343 (9th Cir. 1995) (transfer

of land from federal to private ownership does not trigger NEPA's procedural

requirements where use of land will remain same after transfer); Sabine River Authority v. U.S. Dept. of Interior, 951 F.2d 669, 679-80 (5th Cir. 1992) (recognizing that change to physical environment is trigger for NEPA); Burbank Anti-Noise Group v. Goldschmidt, 623 F.2d 115, 116-17 (9th Cir. 1980) (transfer of airport from private party to municipal authority with the use of federal funds does not trigger NEPA where use as airport will continue after transfer).

It is important to recognize what the underlying contract between DOE and PECO does and does not accomplish.  The contract simply provided a means by which DOE receives payments from PECO for the planning, construction, and eventual operation of a nuclear waste repository, and imposed an obligation on DOE to begin disposal of PECO's SNF by January 31, 1998.  Contract Art. II. However, the contract did not spell out how DOE would dispose of such materials,[4] nor did the contract represent an authorization or permit for ongoing PECO operations or disposal.  Indeed, DOE does not have the statutory authority to dictate the terms and conditions for the operations of nuclear power facilities.

---

[4] The NWPA directed DOE to engage in an extensive process for the selection of a repository site, as well as the development of standards and criteria for such a facility.  42 U.S.C. §§ 10132-35, 10141.  This process included specific direction on the level of NEPA analysis Congress expected for particular decisions in this process.  Id. § 10132(b)(1)(D), 10133(d), 10134(f), 10141(c).

13

Rather, the Nuclear Regulatory Commission ("NRC"), an independent federal agency, is the agency with exclusive regulatory authority over the licensing of civilian nuclear power operations. Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 207 (1983) (NRC exercises exclusive regulatory authority over delivery, receipt, acquisition, possession and use of nuclear materials in commercial nuclear power reactors).

The amendment to the contract simply represents an equitable adjustment to the charges PECO would pay to DOE in exchange for PECO's release of claims against DOE. Amendment Art. IV(B)(6). The amendment did not change the operation of the PECO facility, and as discussed above, DOE would not have the authority to impose such changes. Id. at Art. VII(B)(6) (PECO "shall remain the operator and the [Nuclear Regulatory] Commission licensee of the Peach Bottom ISFSI and shall maintain, keep current and comply with the applicable federal, state and local licenses, permits and requirements"). Thus, the amendment at issue here would not (and could not) do anything that would affect the storage of SNF at the PECO facilities, but rather simply provides for the payments into the Nuclear Waste Fund as required by the NWPA.

The challenged DOE action here does not alter the environmental status quo, and therefore does not represent a "major federal action" in the context of NEPA.

14

To the contrary, the contract amendments at issue here arose precisely because DOE was unable to alter the status quo--the existing practices of SNF storage at PECO's facilities--because DOE is unable to take possession of these materials. There is no alteration to the status quo, but rather a continuation of existing practices at the PECO facility, and "[f]ederal actions that maintain the status quo do not trigger NEPA requirements." Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs, 128 F. Supp. 2d 762, 773 (E.D. Penn. 2000); see also Upper Snake River Chapter of Trout Unlimited v. Hodel, 921 F.2d 232, 234-36 (9th Cir. 1990) (continued operation of facility does not represent "major federal action").

## CONCLUSION

Plaintiff's claims here must fail as a matter of law. The APA expressly excludes contract matters from the notice and comment provisions required for informal rule making, thus Plaintiff's APA claim must fail. DOE's own regulations categorically exclude contract modifications like the one at issue here from NEPA analysis. Furthermore, there is no change to the environmental status quo as a result of the contract modification, and therefore there is no "major federal action" to which NEPA procedures would apply. Plaintiff's claims are simply untenable under either statute, and should be dismissed with prejudice.

DATED this 29th day of June, 2001.

Respectfully submitted,

JOHN C. CRUDEN
Acting Assistant Attorney General


*John P. Almeida*

JOHN P. ALMEIDA
Massachusetts State Bar #643441
U.S. Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C. 20044
(202)305-0245 (telephone)
(202)305-0506 (fax)

Attorney for Defendant

16

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 29th day of June, 2001 a copy of the foregoing MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, and NOTICE OF CHANGE OF ADDRESS has been served on Plaintiff by Federal Express Priority Overnight Delivery (Next Business Morning) at the following address:

> Eric Joseph Epstein
> 4100 Hillsdale Road
> Harrisburg, PA 17112

*John P. Almeida*

17