IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ERIC JOSEPH EPSTEIN,<br>    Plaintiff,<br><br>    v.<br><br>SPENCER ABRAHAM, Secretary of the<br>U.S. Department of Energy; HERBERT<br>WATKINS, Contracting Officer, U.S.<br>Department of Energy,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. No. 01-0682<br>Judge Kane |

**FILED**
**HARRISBURG**

JUL 0 2 2001

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

Declaration of Alan B. Brownstein

I, Alan B. Brownstein, hereby declare under penalty of perjury that:

1. I am the National Environmental Policy Act ("NEPA") Compliance Officer for the Office of Civilian Radioactive Waste Management at the Department of Energy ("DOE"). I have held this position since 1995.

2. In that capacity, I am responsible for, among other things, advising on NEPA-related matters and making categorical exclusion determinations for actions specifically listed in Appendix A or B to Subpart D of the DOE NEPA Regulations, 10 C.F.R. § 1021.410. I make this declaration based upon information provided to me in my official capacity.

3. This declaration addresses the allegations made in Eric Joseph Epstein's complaint that DOE has violated NEPA, 42 U.S.C. §§ 4321-4370d. Plaintiff claims that prior to amending DOE's contract with PECO Energy Company ("PECO"), DOE should have prepared an environmental impact statement pursuant to NEPA and its associated regulations.

4.  On June 1, 1983, DOE and PECO entered into Contract No. DE-CR01-83NE 44405 ("Contract") for disposal of spent nuclear fuel and/or high-level radioactive waste ("SNF/HLW") generated by the Peach Bottom Atomic Power Station. A true and correct copy of the Contract is attached as Exhibit A to this Declaration. The Contract allowed for equitable adjustments to PECO's charges in the event that DOE was unable to begin disposing of SNF by January 31, 1998.  Contract Art. IX(B) specifically provides that:

> In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

5. DOE and PECO, in accordance with the Contract's equitable adjustment provisions, agreed to contract modifications that would "compensate [PECO] for the Allowable and Reasonable Costs incurred as a result of DOE's delay in performance of its disposal obligation." Amendment to Contract, Art. IV, Section 6.  A true and correct copy of this contract amendment is attached as Exhibit B to this Declaration. The contract amendment provides PECO with compensation for reasonable costs that would not have been incurred had DOE begun disposing of SNF generated by Peach Bottom by January 31, 1998.

6.  For the following reasons, the Contract amendment of July 19, 2000 fulfills the requirements of 10 C.F.R. § 1021.410(b) to be considered categorically excluded from the classes of actions that require the preparation of an environmental impact statement:

Categorical exclusion A2 applies to "[c]ontract interpretations, amendments, and amendments that are clarifying or administrative in nature."  The Contract amendment interprets, clarifies, and administratively amends the parties'

obligations regarding charges and schedules, and therefore fits squarely within categorical exclusion A2.

·   There are no extraordinary circumstances related to the Contract amendment that may significantly affect the quality of the human environment. Because of its administrative nature, the Contract amendment does not involve any federal action regarding the PECO facility or its SNF, nor does it in any way affect the operation of the PECO facility or PECO's storage or management of its SNF.

·   The Contract amendment is not "connected" to other actions with potentially significant impacts and is not related to other proposed actions with cumulative significant impacts.

7.   DOE Order 451.1A, National Environmental Policy Act Compliance Program, sets forth the responsibilities of various DOE officials and personnel for insuring implementation of NEPA requirements. A true and correct copy of DOE Order 451.1A is attached as Exhibit C to this Declaration. The Order does not require documentation of categorical exclusion determinations.

I hereby declare under penalty of perjury under the laws of the United States of America in accordance with 28 U.S.C. § 1746 that the foregoing information is true and correct to the best of my knowledge.

Alan B. Brownstein

Dated this _29_ day of _June_, 2001 in Washington, D.C.

*Exhibit A*

U. S. DEPARTMENT OF ENERGY CONTRACT NO.  DE-CR01-83NE44405

## CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL

## RADIOACTIVE WASTE.

THIS CONTRACT, entered into this __1st__ day of __June__ 19 __83__,

by and between the UNITED STATES OF AMERICA (hereinafter referred to as

the "Government"), represented by the UNITED STATES DEPARTMENT OF ENERGY

(hereafter referred to as "DOE") and __PHILADELPHIA ELECTRIC COMPANY__,

(hereinafter referred to as the "Purchaser"), a corporation organized and

existing under the laws of the State of __Pennsylvania__

acting on behalf of itself and Public Service Electric and Gas Company,
Delmarva Power and Light Company and Atlantic Electric Company, joint
owners of Peach Bottom Atomic Power Station, Units 2 & 3.

### WITNESSETH THAT:

WHEREAS, the DOE has the responsibility for the disposal of spent nuclear

fuel and high-level radioactive waste of domestic origin from civilian nuclear

power reactors in order to protect the public health and safety, and the

environment; and

WHEREAS, the DOE has the responsibility, following commencement of operation

of a repository, to take title to the spent nuclear fuel or high-level

radioactive waste involved as expeditiously as practicable upon the request

of the generator or owner of such waste or spent nuclear fuel; and

WHEREAS, all costs associated with the preparation, transportation, and

the disposal of spent nuclear fuel and high-level radioactive waste from

civilian nuclear power reactors shall be borne by the owners and generators

of such fuel and waste; and

WHEREAS, the DOE is required to collect a full cost recovery fee from owners and generators delivering to the DOE such spent nuclear fuel and/or high level radioactive waste; and

WHEREAS, the DOE is authorized to enter into contracts for the permanent disposal of spent nuclear fuel and/or high-level radioactive waste of domestic origin in DOE facilities; and

WHEREAS, the Purchaser desires to obtain disposal services from DOE; and

WHEREAS, DOE is obligated and willing to provide such disposal services, under the terms and conditions hereinafter set forth; and

WHEREAS this contract is made and entered into under the authority of the DOE Organization Act (Pub. L. 95-91, 42 U.S.C. 7101 <u>et seq.</u>) and the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425, 42 U.S.C. 10101 <u>et seq.</u>)

NOW, THEREFORE, the parties hereto do hereby agree as follows:

ARTICLE I - <u>DEFINITIONS</u>

As used throughout this contract, the following terms shall have the meanings set forth below:

1.  The term "assigned three-month period" means the period that each Purchaser will be assigned by DOE, giving due consideration to the Purchaser's assignment preference, for purposes of reporting kilowatt hours generated by the Purchaser's nuclear power reactor and for establishing fees due and payable to DOE.

2.  The term "cask" means a container for shipping spent nuclear fuel and/or high-level radioactive waste which meets all applicable regulatory requirements.

2

3. The term "civilian nuclear power reactor" means a civilian nuclear powerplant required to be licensed under Sections 103 or 104(h) of the Atomic Energy Act of 1954, as amended (42 U.S.C. 2133, 2134(b)).

4. The term "Commission" means the United States Nuclear Regulatory Commission.

5 The term "contract" means this agreement and any duly executed amendment or modification thereto.

6. The term "Contracting Officer" means the person executing this contract on behalf of the Government, and any other officer or civilian employee who is a properly designated Contracting Officer of the DOE; and the term includes, except as otherwise provided in this contract, the authorized representative of a Contracting Officer acting within the limits of his authority.

7. The term "delivery" means the transfer of custody, f.o.b. carrier, of spent nuclear fuel or high-level radioactive waste from Purchaser to DOE at the Purchaser's civilian nuclear power reactor or such other domestic site as may be designated by the Purchaser and approved by DOE.

8. The term "disposal" means the emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or other highly radioactive waste with no foreseeable intent of recovery, whether or not such emplacement permits recovery of such waste.

3

9.  The term "DOE" means the United States Department of Energy or any duly authorized representative thereof, including the Contracting Officer.

10. The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.

11. The term "full cost recovery," means the recoupment by DOE, through Purchaser fees and any interest earned, of all direct costs, indirect costs, and all allocable overhead, consistent with generally accepted accounting principles consistently applied, of providing disposal services and conducting activities authorized by the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425). As used herein, the term "cost" includes the application of Nuclear Waste Fund monies for those uses expressly set forth in section 302(d) and (e) of the said Act and all other uses specified in the Act.

12. The term "high-level radioactive waste" (HLW) means –

    (a) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and

    (b) other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation.

4

13. The term "kilowatt-hours generated" means electricity generated by nuclear fuel at a civilian nuclear power reactor specified in Appendix A hereto as measured at the output terminals of the turbine generator, including an equivalent amount of electricity for any process heat generated by the reactor and used other than at the reactor.

14. The term "metric tons uranium" means that measure of weight equivalent to 2,204.6 pounds of uranium and other fissile and fertile material that are loaded into a reactor core as fresh fuel.

15. The term "Purchaser's site" means the location of Purchaser's civilian nuclear power reactor or such other location as the Purchaser may designate.

16. The term "quarterly Treasury rate" means the current value of funds rate as specified by the Treasury Fiscal Requirements Manual, Volume 1, Part 6, section 8020.20. This rate is published quarterly in the Federal Register prior to the beginning of the affected quarter.

17. The term "shipping lot" means a specified quantity of spent nuclear fuel or high-level radioactive waste designated by Purchaser for delivery to DOE beginning on a specified date.

18. The term "spent nuclear fuel" (SNF) means fuel that has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing.

19. The term "spent nuclear fuel and high-level radioactive waste of domestic origin" means irradiated fuel material used, and radioactive wastes resulting from such use, in nuclear power reactors located only in the United States.

20. The term "year" means the period which begins on October 1 and ends on September 30.

5

## ARTICLE II - <u>SCOPE</u>

This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation, and disposal of such SNF and/or HLW and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

## ARTICLE III - <u>TERM</u>

The term of this contract shall be from the date of execution until such time as DOE has accepted, transported from the Purchaser's site(s) and disposed of all SNF and/or HLW of domestic origin from the civilian nuclear power reactors specified in Appendix A.

## ARTICLE IV - <u>RESPONSIBILITIES OF THE PARTIES</u>

### A. Purchaser's Responsibilities

#### 1. Discharge Information

(a) On an annual basis, commencing October 1, 1983, the Purchaser shall provide DOE with information on actual discharges to date and projected discharges for the next

6

ten (10) years in the form and content set forth in
Appendix B, annexed hereto and made a part hereof.  The
information to be provided will include estimates and
projections and will not be Purchaser's firm commitment
with respect to discharges or deliveries.

(b) No later than October 1, 1983, the Purchaser shall provide
DOE with specific information on:

    (1)  Total spent nuclear fuel inventory as of April 7, 1983;

    (2)  Total number of fuel assemblies removed from the
particular reactor core prior to 12:00 A.M. April 7,
1983 for which there are plans for reinsertion in
the core, indicating the current planned dates for
reinsertion in the core.  Estimates of the burned and
unburned portion of each individual assembly are to be
provided.

(c) In the event that the Purchaser fails to provide the
annual forecast in the form and content required by DOE,
DOE may, in its sole discretion, require a rescheduling
of any delivery commitment schedule then in effect.

7

2. <u>Preparation for Transportation</u>

(a)  The Purchaser shall arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility. The Purchaser shall notify DOE of such activities sixty (60) days prior to the commencement of such activities.  The preparatory activities by the Purchaser shall be made in accordance with all applicable laws and regulations relating to the Purchaser's responsibilities hereunder.  DOE may designate a representative to observe the preparatory activities conducted by the Purchaser at the Purchaser's site, and the Purchaser shall afford access to such representative.

(b)  Except as otherwise agreed to by DOE, the Purchaser shall advise DOE, in writing as specified in Appendix F, annexed hereto and made a part hereof, as to the description of the material in each shipping lot sixty (60) days prior to scheduled DOE transportation of that shipping lot

(c)  The Purchaser shall be responsible for incidental maintenance, protection and preservation of any and all shipping casks furnished to the Purchaser by DOE for the performance of this contract.  The Purchaser shall be liable for any loss of or damage to such DOE-furnished property, and for expenses incidental to such loss or damage while such casks are in the possession and control of the Purchaser except as otherwise provided for hereunder.  Routine cask maintenance, such as scheduled overhauls, shall not be the responsibility of the Purchaser.

8

B.  DOE Responsibilities

1.  DOE shall accept title to all SNF and/or HLW, of domestic origin, generated by the civilian nuclear power reactor(s) specified in Appendix A, provide subsequent transportation for such material to the DOE facility, and dispose of such material in accordance with the terms of this contract.

2.  DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility.  Such cask(s) shall be furnished sufficiently in advance to accommodate scheduled deliveries. Such casks(s) shall be suitable for use at the Purchaser's site, meet applicable regulatory requirements, and be accompanied by pertinent information including, but not limited to, the following:

    (a)  written procedures for cask handling and loading, including specifications on Purchaser-furnished cannisters for containment of failed fuel;

    (b)  training for Purchaser's personnel in cask handling and loading, as may be necessary;

    (c)  technical information, special tools, equipment, lifting trunnions, spare parts and consumables needed to use and perform incidental maintenance on the cask(s); and

    (d)  sufficient documentation on the equipment supplied by DOE.

3.  DOE may fulfill any of its obligations, or take any action, under this contract either directly or through contractors.

9

4.  DOE shall annually provide to the Purchaser pertinent information on the waste disposal program including information on cost projections, project plans and progress reports.

5.(a) Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository.  This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor.  The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.

(b) Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes.  This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

ARTICLE V - <u>DELIVERY OF SNF AND/OR HLW</u>

A.  <u>Description of SNF and HLW</u>

The Purchaser shall deliver to DOE and DOE shall, as provided in this contract, accept the SNF and/or HLW which is described in accordance with Article VI.A. of this contract, for disposal thereof.

10

**B.** **Delivery Commitment Schedule**

1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV. hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.

2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (±) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

**C.** **Final Delivery Schedule**

Final delivery schedule(s), in the form set forth in Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an

11

approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

### D. Emergency Deliveries

Emergency deliveries of SNF and/or HLW may be accepted by DOE before the date provided in the delivery commitment schedule upon prior written approval by DOE.

### E. Exchanges

Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE; provided, however, that Purchaser shall comply with the requirements of this contract. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; provided, however, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges. Not less than six (6) months prior to the delivery date

12

specified in the Purchaser's approved delivery commitment schedule, the Purchaser shall submit to DOE an exchange request, which states the priority rankings of both the Purchaser hereunder and any other Purchaser with whom the exchange of approved delivery commitment schedules is proposed.  DOE shall approve or disapprove the proposed exchange within thirty (30) days after receipt.  In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval.

ARTICLE VI - <u>CRITERIA FOR DISPOSAL</u>

A. <u>General Requirements</u>

   1. <u>Criteria</u>

      (a) Except as otherwise provided in this contract, DOE shall accept hereunder only such SNF and/or HLW which meets the General Specifications for such fuel and waste as set forth in Appendix E, annexed hereto and made a part hereof.

      (b) Purchaser shall accurately classify SNF and/or HLW prior to delivery in accordance with paragraphs B and D of Appendix E.

   2. <u>Procedures</u>

      (a) Purchaser shall provide to DOE a detailed description of the SNF and/or HLW to be delivered hereunder in the form and content as set forth in Appendix F, annexed hereto and made a part hereof.  Purchaser shall promptly advise DOE of any changes in said SNF and/or HLW as soon as they

13

3. <u>Improperly Described SNF and/or HLW</u>

   (a) <u>Prior to Acceptance</u> - If SNF and/or HLW is determined by DOE
       to be improperly described prior to acceptance by DOE at the
       Purchaser's site, DOE shall promptly notify the Purchaser in
       writing of such determination.  DOE reserves the right, in its
       sole discretion, to refuse to accept such SNF and/or HLW until
       the SNF and/or HLW has been properly described.  The Purchaser
       shall not transfer such SNF and/or HLW to DOE unless DOE agrees
       to accept such SNF and/or HLW under such other arrangements as
       may be agreed to, in writing, by the parties.

   (b) <u>After Acceptance</u> - If subsequent to its acceptance DOE finds
       that such SNF and/or HLW is improperly described, DOE shall
       promptly notify the Purchaser, in writing, of such finding.  In
       the event of such notification, Purchaser shall provide DOE
       with a proper designation within thirty (30) days.  In the event
       of a failure by the Purchaser to provide such proper designation,
       DOE may hold in abeyance any and all deliveries scheduled
       hereunder.

ARTICLE VII - <u>TITLE</u>

Title to all SNF and/or HLW accepted by DOE for disposal shall pass to DOE at
the Purchaser's site as provided for in Article VI hereof.  DOE shall be

16

solely responsible for control of all material upon passage of title.  DOE shall have the right to dispose as it sees fit of any SNF and/or HLW to which it has taken title.  The Purchaser shall have no claim against DOE or the Government with respect to such SNF or HLW nor shall DOE or the Government be obligated to compensate the Purchaser for such material.

ARTICLE VIII - FEES AND TERMS OF PAYMENT

A. Fees

1. Effective April 7, 1983 Purchaser shall be charged a fee in the amount of 1.0 mill per kilowatt-hour (1M/KWH) on electricity generated by Purchaser's nuclear power reactor(s).  The said fee shall be paid as specified in paragraph B of this Article VIII.

2. For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was used to generate electricity in a civilian nuclear power reactor prior to April 7, 1983, a one-time fee will be assessed by applying industry-wide average dollar per kilogram charges to four (4) distinct ranges of fuel burnup so that the integrated cost across all discharged (i.e. spent) fuel is equivalent to an industry-wide average charge of 1.0 mill per kilowatt-hour.  For purposes of this contract, discharged nuclear fuel is that fuel removed from the reactor core with no plans for reinsertion.  In the event that any such fuel withdrawn with plans for reinsertion is not reinserted, then the applicable fee for such fuel shall be calculated as set forth in this paragraph 2. The categories of spent nuclear fuel burnup and the fee schedule

17

are listed below:

| Nuclear Spent Fuel Burnup Range | Dollars per Kilogram (1982 Dollars) |
|---|---|
| 0 - 5,000 MWDT/MTU | $ 80.00 |
| 5,000 - 10,000 MWDT/MTU | $ 142.00 |
| 10,000 - 20,000 MWDT/MTU | $ 162.00 |
| over 20,000 MWDT/MTU | $ 184.00 |

This fee shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII.

3. For in-core fuel as of April 7, 1983, that portion of the fuel burned through April 6, 1983 shall be subject to the one-time fee as calculated in accordance with the following methodology: [a] determine the total weight in kilograms of uranium loaded initially in the particular core; [b] determine the total megawatt-days (thermal) which have been generated by all of the fuel assemblies in the said core as of 12:00 A.M. April 7, 1983; [c] divide the megawatt-days (thermal) generated in the said core by the total metric tons of initially loaded uranium in that core and multiply the quotient by the conversion factor 0.0078 to obtain a value in dollars per kilogram; and [d] multiply the dollars per kilogram value by the kilograms determined in [a] above to derive the dollar charge for the one-time fee to be paid for the specified in-core fuel as of 12:00 A.M. April 7, 1983. For purposes of this contract, in-core fuel is that fuel in the reactor core as of the date specified, plus any fuel removed from the reactor with plans to reinsert. That portion of such fuel unburned as of 12:00 A.M. April 7, 1983 shall be subject to the 1.0 mill per kilowatt-hour charge.

4.  DOE will annually review the adequacy of ⬤ fees and adjust
the 1M/KWH fee, if necessary, in order to assure full cost
recovery by the Government. Any proposed adjustment to the said
fee will be transmitted to Congress and shall be effective after
a period of ninety (90) days of continuous session has elapsed
following receipt of such transmittal unless either House of
Congress adopts a resolution disapproving the proposed adjustment.
Any adjustment to the 1M/KWH fee under paragraph A.1. of this
Article VIII shall be prospective.

B.  Payment

1.  For electricity generated by the Purchaser's civilian nuclear
power reactor(s) on or after April 7, 1983, fees shall be paid quarterly by
the Purchaser and must be received by DOE not later than the close of business
on the last business day of the month following the end of each assigned three
month period.  The first payment shall be due on July 31, 1983, for the period
April 7, 1983 to June 30, 1983.  A one time adjustment period payment shall be
due on August 31,1983, for the period July 1, 1983 to July 31,1983.
The assigned three month period, for purposes of payment
and reporting of kilowatt hours, shall begin Aug. 1,1983.

2.  For SNF discharged prior to April 7, 1983, and for in-core burned
fuel as of 12:00 A.M. April 7, 1983, the Purchaser shall, within two (2) years
of contract execution, select one of the following fee payment options:

(a)  OPTION 1 -  The Purchaser's financial obligation for said fuel
shall be prorated evenly over forty (40) quarters and will
consist of the fee plus interest on the outstanding fee

19

balance.  The interest from April 7, 1983, to date of the
first payment is to be calculated based upon the 13-week Treasury
bill rate, as reported on the first such issuance following
April 7, 1983, and compounded quarterly thereafter by the
13-week Treasury bill rates as reported on the first such
issuance of each succeeding assigned three-month period.
Beginning with the first payment, interest is to be calculated
on Purchaser's financial obligation plus accrued interest, at
the ten-year Treasury note rate in effect on the date of the
first payment.  In no event shall the end of the forty (40)
quarters extend beyond the first scheduled delivery date as
reflected in the DOE-approved delivery commitment schedule.  All
payments shall be made concurrently with the assigned three
month period payments. At any time prior to the end of the forty
(40) quarters, Purchaser may, without penalty, make a full or
partial lump sum payment at any of the assigned three month
period payment dates.  Subsequent quarterly payments will be
appropriately reduced to reflect the reduction in the remaining
balance in the fee due and payable.  The remaining financial
obligation, if any, will be subject to interest at the same
ten-year Treasury note rate over the remainder of the ten year
period.

(b)  OPTION 2 - The Purchaser's financial obligation shall be paid
     in the form of a single payment anytime prior to the first
     delivery, as reflected in the DOE approved delivery commitment
     schedule, and shall consist of the fee plus interest on the

20

outstanding fee balance. Interest is to be calculated from
April 7, 1983, to the date of the payment based upon the 13-week
Treasury bill rate, as reported on the first such issuance
following April 7, 1983, and compounded quarterly thereafter
by the 13-week Treasury bill rates as reported on the first
such issuance of each succeeding assigned three-month period
until payment.

(c)  OPTION 3 - The Purchaser's financial obligation shall be paid
prior to June 30, 1985, or prior to two (2) years after contract
execution, whichever comes later, in the form of a single
payment and shall consist of all outstanding fees for SNF and
in-core fuel burned prior to April 7, 1983.  Under this option,
no interest shall be due to DOE from April 7, 1983, to the date
of full payment on the outstanding fee balance.

3.  Method of Payment

(a)  Payments shall be made by wire transfer, in accordance with
instructions specified by DOE in Appendix G, annexed hereto and made
a part hereof, and must be received within the time periods specified
in paragraph B.1. of this Article VIII.

(b)  The Purchaser will complete a Standard Remittance Advice, as
set forth in Appendix G, for each assigned three month period payment
and mail it postmarked no later than the last business day of the month
following each assigned three month period to "Department of Energy,
Office of Controller, Cash Management Division, Box 500, Room D-208,
Germantown, Maryland 20874.

21

4. Any fees not paid on a timely basis or underpaid because of mis-
   calculation will be subject to interest as specified in paragraph C
   of this Article VIII.

## C. Interest on Late Fees

1. DOE will notify the Purchaser of amounts due only when unpaid or
underpaid by the dates specified in paragraph B above.  Interest will be levied
according to the following formula:

|  |  |  | Number of |
|---|---|---|---|
| Interest = Unpaid Balance Due | Quarterly | | Months Late Including |
| To DOE For | X | Treasury | X | Month Of Payment (Fract |
| Assigned Three | | Rate Plus | | Rounded Up to Whole Mon |
| Month Period | | Six Percent | | 12 |
| | | (6%) | | |

2. Interest is payable at any time prior to the due date for the subsequent
assigned three month period fee payment.  Nonpayment by the end of the subsequent
assigned three month period will result in compounding of interest due.  Purchase
shall complete a Standard Remittance Advice for interest payments.

3. Following the assessment of a late fee by DOE, payments will be applied
against accrued interest first and the principal thereafter.

## D. Effect of Payment

Upon payment of all applicable fees, interest and penalties on unpaid or
underpaid amounts, the Purchaser shall have no further financial obligation
DOE for the disposal of the accepted SNF and/or HLW.

22

E. Audit

1. The DOE or its representative shall have the right to perform any audits or inspections necessary to determine whether Purchaser is paying the correct amount under the fee schedule and interest provisions set forth in paragraphs A, B and C above.

2. Nothing in this contract shall be deemed to preclude an audit by the General Accounting Office of any transaction under this contract.

3. The Purchaser shall furnish DOE with such records, reports and data as may be necessary for the determination of quantities delivered hereunder and for final settlement of amounts due under this contract and shall retain and make available to DOE and its authorized representative for examination at all reasonable times such records, reports and data for a period of three (3) years from the completion of delivery of all material under this contract.

ARTICLE IX - DELAYS

A. Unavoidable Delays by Purchaser or DOE

Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform.  In the event circumstances beyond the reasonable control of the Purchaser or DOE -- such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather--- cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

**B.** Avoidable Delays by Purchaser or DOE

In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

ARTICLE X - SUSPENSION

**A.** In addition to any other rights DOE may have hereunder, DOE reserves the right, at no cost to the Government, to suspend this contract or any portion thereof upon written notice to the Purchaser within ninety (90) days of the Purchaser's failure to perform its obligations hereunder, and the Purchaser's failure to take corrective action within thirty (30) days after written notice of such failure to perform as provided above, unless such failure shall arise from causes beyond the control and without the fault or negligence of the Purchaser, its contractors or agents. However, the Purchaser's obligation to pay fees required hereunder shall continue unaffected by any suspension. Any such suspension shall be rescinded if and when DOE determines that Purchaser has completed corrective action.

**B.** The DOE reserves the right to suspend any scheduled deliveries in the event that a national emergency requires that priority be given to Government programs to the exclusion of the work under this contract. In the event of such a suspension by the Government, the DOE shall refund that portion

24

of payments representing services not delivered as determined by the Contracting Officer to be an equitable adjustment. Any disagreement arising from the refund payment, if any, shall be resolved as provided in the clause of this contract, entitled "DISPUTES."

ARTICLE XI - REMEDIES

Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law.

ARTICLE XII - NOTICES

All notices and communications between the parties under this contract (except notices published in the Federal Register) shall be in writing and shall be sent to the following addressees:

To DOE:

U.S. Department of Energy
Procurement and Assistance Management
Directorate
Office of Procurement Operations
Washington, D.C. 20585
Attention:
  Thomas S. Keefe

  Contracting Officer

To the Purchaser:

P. X. English, Manager

Fuel Procurement Department (S18-3)
Philadelphia Electric Company

2301 Market Street
P.O. Box 8699

Philadelphia, PA  19101

However, the parties may change the addresses or addressees for such notices or communications without formal modification to this contract; provided, however, that notice of such changes shall be given by registered mail.

25

ARTICLE XIII  - REPRESENTATION CONCERNING NUCLEAR HAZARDS INDEMNITY

A.  DOE represents that it will include in its contract(s) for the operation of a DOE facility an indemnity agreement based upon Section 170(d) of the Atomic Energy Act of 1954, as amended, a copy of which agreement shall be furnished to the Purchaser; that under said agreement, DOE shall have agreed to indemnify the contractor and other persons indemnified against claims for public liability (as defined in said Act) arising out of or in connection with contractual activities; that the indemnity shall apply to covered nuclear incidents which (1) take place at a contract location; or (2) arise out of or in the course of transportation of source, special nuclear or by-product material to or from a contract location. The obligation of DOE to indemnify shall be subject to the conditions stated in the indemnity agreement.

B.  The provisions of this Article XIII shall continue beyond the term of this contract.

ARTICLE XIV - ASSIGNMENT

The rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW involved; provided, however, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer.

26

ARTICLE XV  - <u>AMENDMENTS</u> .

The provisions of this contract have been developed in the light of uncertainties necessarily attendant upon long-term contracts.  Accordingly, at the request of either DOE or Purchaser, the parties will negotiate and, to the extent mutually agreed, amend this contract as the parties may deem to be necessary or proper to reflect their respective interests; <u>provided</u>, <u>however</u>, that any such amendment shall be consistent with the DOE final rule published in the Federal Register on April <u>18</u>, 1983 entitled, "Standard Contract for Disposal of SNF and/or HLW", as the same may be amended from time to time.

ARTICLE XVI - <u>DISPUTES</u>

A.  Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser.  The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board).  The decision of the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessary to imply bad faith or not supported by substantial evidence.  In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

B.  For Purchaser claims of more than $50,000, the Purchaser shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Purchaser's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Purchaser believes the Government is liable.  The certification shall be executed by the Purchaser if an individual.  When the Purchaser is not an individual, the certification shall be executed by a senior company official in charge at the Purchaser's plant or location involved, or by an officer or general partner of the Purchaser having overall responsibility for the conduct of the Purchaser's affairs.

C.  For Purchaser claims of $50,000 or less, the Contracting Officer must render a decision within sixty (60) days.  For Purchaser claims in excess of $50,000, the Contracting Officer must decide the claim within sixty (60) days or notify the Purchaser of the date when the decision will be made.

D.  This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph A above; provided, however, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

ARTICLE XVII - OFFICIALS NOT TO BENEFIT

No member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

28

## ARTICLE XVIII - COVENANT AGAINST CONTINGENT FEES

The Purchaser warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Purchaser for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or in its discretion to increase the contract price or consideration, or otherwise recover, the full amount of such commission, brokerage, or contingent fee.

## ARTICLE XIX - EXAMINATION OF RECORDS

The Purchaser agrees that the Comptroller General of the United States or any of his duly authorized representatives shall have access to and the right to examine any directly pertinent books, documents, papers and records of the Purchaser involving transactions related to this contract until the expiration of three years after final payment under this contract.

## ARTICLE XX - PERMITS

The Government and the Purchaser shall procure all necessary permits or licenses (including any special nuclear material licenses) and comply with all applicable laws and regulations of the United States, States and municipalities necessary to execute their respective responsibilities and obligations under this contract.

29

ARTICLE XXI - <u>RIGHTS IN TECHNICAL DATA</u>

   A. <u>Definitions</u>.

    1. "Technical data" means recorded information regardless of form or characteristic, of a specific or technical nature. It may, for example, document research, experimental, developmental, or demonstration, or engineering work, or be usable or used to define a design or process, or to procure, produce, support, maintain, or operate material. The data may be graphic or pictorial delineations in media such as drawings or photographs, text in specifications or related performance or design-type documents or computer software (including computer programs, computer software data bases, and computer software documentation. Examples of technical data include research and engineering data, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identification, and related information. Technical data as used herein do not include financial reports, cost analyses, and other information incidental to contract administration.

    2. "Proprietary data" means technical data which embody trade secrets developed at private expense, such as design procedures or techniques, chemical composition of materials, or manufacturing methods, processes, or treatments, including minor modifications thereof, provided that such data:

        (a) Are not generally known or available from other sources without obligation concerning their confidentiality;

        (b) Have not been made available by the owner to others without obligation concerning its confidentiality; and

30

(c)  Are not already available to the Government without obligation concerning their confidentiality.

3.  "Contract data" means technical data first produced in the performance of the contract, technical data which are specified to be delivered under the contract, or technical data actually delivered in connection with the contract.

4.  "Unlimited rights" means rights to use, duplicate, or disclose technical data, in whole or in part, in any manner and for any purpose whatsoever, and to permit others to do so.

B.  Allocation of rights.

1.  The Government shall have:

(a)  Unlimited rights in contract data except as otherwise provided below with respect to proprietary data properly marked as authorized by this clause;

(b)  The right to remove, cancel, correct or ignore any marking not authorized by the terms of this contract on any technical data furnished hereunder, if in response to a written inquiry by DOE concerning the proprietary nature of the markings, the Purchaser fails to respond thereto within 60 days or fails to substantiate the proprietary nature of the markings.  In either case, DOE will notify the Purchaser of the action taken;

(c)  No rights under this contract in any technical data which are not contract data.

31

2. Subject to the foregoing provisions of this rights in technical data clause, the Purchaser shall have the right to mark proprietary data it furnishes under the contract with the following legend and no other, the terms of which shall be binding on the Government:

## LIMITED RIGHTS LEGEND

This "proprietary data," furnished under "Contract No. _____" with the U. S. Department of Energy may be duplicated and used by the Government with the express limitations that the "proprietary data" may not be disclosed outside the Government or be used for purposes of manufacture without prior permission of the Purchaser, except that further disclosure or use may be made solely for the following purposes:

(a) This "proprietary data" may be disclosed for evaluation purposes under the restriction that the "proprietary data" be retained in confidence and not be further disclosed;

(b) This "proprietary data" may be disclosed to contractors participating in the Government's program of which this contract is a part, for information or use in connection with the work performed under their contracts and under the restriction that the "proprietary data" be retained in confidence and not be further disclosed; or

(c) This "proprietary data" may be used by the Government or others on its behalf for emergency work under the restriction that the "proprietary data" be retained in confidence and not be further disclosed. This legend shall be marked on any reproduction of this data in whole or in part.

32

Enclosure A

Guide for Funds Transfer
Messages to Treasury

The following instructions provide specific information which is
required so that a funds (wire) transfer message can be
transmitted to the Department of the Treasury.  The funds
transfer message format is shown in Exhibit 1.  A narrative
description of each item on the funds transfer message follows:

Line 1

Item 1 - Priority Code - The priority code will be provided
by the sending bank.  (Note:  Some Federal Reserve district
banks may not require this item.)

Line 2

Item 2 - Treasury Department Code - The nine-digit
identifier "021030004" is the routing symbol of the
Treasury.  This item is a constant and is required for all
funds transfer messages sent to Treasury.

Item 3 - Type Code - The type code, 10, identifies funds
transfer messages.  This item is a constant and is required
for all funds transfer messages sent to Treasury.

**Line 3**

Item 4 – <u>Sending Bank Code</u> – This nine-digit identifier will be provided by the sending bank.

Item 5 – <u>Class</u> – The class field may be used at the option of the sending bank. (Note: Some Federal Reserve Districts prohibit use of this class/field.)

Item 6 – <u>Reference Number</u> – The reference number will be inserted by the sending bank to identify the transaction.

Item 7 – <u>Amount</u> – The amount must include the dollar sign and the appropriate punctuation including cents digits. This item will be provided by the Purchaser.

**Line 4**

Item 8 – <u>Sending Bank Name</u> – The telegraphic abbreviation which corresponds to item 4 will be provided by the sending bank.

**Line 5**

Item 9 – <u>Treasury Department Name</u> – This item is of critical importance. It must appear on the funds transfer message in the precise manner as stated to allow for the automated processing and classification of the funds transfer message to Treasury for credit to the Department of Energy. This item is comprised of a rigidly formatted, nonvariable sequence of 28 characters as follows:

TREAS NYC/(89000903) DOE NWF

EXHIBIT 1



| ① | ② | ③ | ⑤ ⑥ | ⑦ |
|---|---|---|---|---|

**TO**
021030004    **TYPE** 10

**FROM**
④ 021000021    **REF** 3004    **AMOUNT** $1,305,500.00

ORDERING BANK AND RELATED DATA

⑧ CHASE NYC

⑨ TREAS NYC/(29000003) DOE-NWF

⑩ DOE- NUCLEAR WASTE FEE

⑪ MAY 80/ABC PURCHASER    ⑫

## Line 6, 7, and 8

Payment Identification - The payment identification should be furnished by the remitter in the following manner:

Item 10 - The constant "DOE NUCWASTE FEE" will be inserted.

Item 11 - The month and year the fees were incurred (i.e.; May 80) followed by a slash (/).

Item 12 - The company name is inserted following the slash.

TRANSFER OF FUNDS MESSAGE FORM                    ENCLOSURE C

| TO 021030004 | TYPE 10 | | REF | $ | AMOUNT |
|---|---|---|---|---|---|
| FROM | | | | | |

ENCLOSING BANK AND RELATED DATA

TREAS NYC/(89000003) DOE - NWF

DOE

/

# TRANSFER OF FUNDS MESSAGE F. M
## (COMPLETED SAMPLE)

```
                                    (A)

  TO                  TYPE
  021030004           10
  FROM          REF        Amount
                          $1,305,500.00
  ORDERING BANK AND RELATED DATA

  TREAS NYC/(89000003) DOE-NWF

  DOE NUCLEAR WASTE FEE

(B) MAY 80/ABC PURCHASER          (C)
```

The above example is a completed transfer of funds message form
detailing those items (A thru C) filled in by the remitting company.

| Item | DESCRIPTION |
|------|-------------|
| A | Amount-must be properly punctuated to include cents digits. |
| B | Date - month and year followed by a slash(/) |
| C | Company Name. |

Annex A to Appendix G

STANDARD REMITTANCE OF ADVICE (RA) FOR PAYMENT OF FEES

This Annex should be completed to compute the MKWH fee for SNF burned on or after April 7, 1983.

I.   Identification

   A.  Purchaser: _____

   B.  Period Covered

|  | Last report | This report | Next report |
|---|---|---|---|

   1.  date submitted: _____
   2.  period covered: Start date: _____
                       Finish date: _____
   3.  length of period covered (days): _____

   C.  Unit identification (Only one unit may be covered in each report.)

   1.  Reactor/Facility Name: _____
   2.  Location: _____
   3.  Type: _____
   4.  Capacity: _____
   5.  Date of Commencement of Operations: _____
   6.  NRC License No.: _____

II. Fee Calculation

|  | Prior Period | This Period |
|---|---|---|
| 1. Gross Thermal Energy produced (MWH) | ____ | ____ |
| 2. Gross Electrical Energy produced (MWH) | ____ | ____ |
| 3. Gross Thermal Energy not used to generate electrical output (MWH) | ____ | ____ |
| 4. Gross electrical equivalent of thermal electricity (MWH) | ____ | · |
| 5. Net electrical energy produced (MWH) | ____ | ____ |
| 6. Electricity consumed/lost on site (MWH) | ____ | ____ |
| 7. Current fee rate: _____ mill/kWh | | |
| 8. Current fee due: | | ____ $ |

Prepared by: _____
Phone number: _____
Date: _____

Annex B to Appendix G

STANDARD REMITTANCE OF ADVICE (RA) FOR PAYMENT OF FEES

This Annex should be completed only for SNF burned before midnight between April 6/7, 1983.

## I. Identification

A. Purchaser: _____

B. Unit identification (Only one unit may be covered in each report.)

1. Reactor/Facility Name: _____
2. Location: _____
3. Type: _____
4. Capacity: _____
5. Date of Commencement of Operations: _____
6. NRC License No.: _____

## II. Fee Calculation

A. Discharged nuclear fuel

| | 0-5000 | 5000-10000 | 10000 20000 | 20000 up |
|---|---|---|---|---|
| 1. burnup[1] (MWDT/MTU) | | | | |
| 2. initial loading (KgU) (with indicated burnup) | | | | |
| 3. fee rate ($/KgU) | 80.00 | 142.00 | 162.00 | 184.00 |
| 4. fee ($) | | | | |
| 5. total fee (4) | | | | |

3.  In the event that proprietary data of a third party, with respect to which the Purchaser is subject to restrictions on use or disclosure, is furnished with the Limited Rights Legend above, Purchaser shall secure the agreement of such third party to the rights of the Government as set forth in the Limited Rights Legend.  DOE shall upon request furnish the names of those contractors to which proprietary data has been disclosed.

ARTICLE XXII - ENTIRE CONTRACT

A.  This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof.  Any representation, promise, or condition not incorporated in this contract shall not be binding on either party.  No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

B.  Nothing in this contract is intended to affect in any way the contractual obligation of any other persons with whom the Purchaser may have contracted with respect to assuming some or all disposal costs or to accept title to SNF and/or HLW.

C. Appendices:

   A.  Nuclear Power Reactor(s) or Other Facilities Covered

   B.  Discharge Information (Ten Year; Annual)

   C.  Delivery Commitment Schedule

   D.  Final Delivery Schedule

   E.  General Specifications

   F.  Detailed Description of Purchaser's Fuel

   G.  Standard Remittance Advice

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the day and year first above written.

UNITED STATES OF AMERICA

UNITED STATES DEPARTMENT OF ENERGY

BY: _____
(Contracting Officer)
Thomas S. Keefe

WITNESSES AS TO EXECUTION ON BEHALF
OF PURCHASER
_____
P. X. English
(Name)

(Purchaser's Company Name)

2301 Market St., Phila., PA 19101
(Address)

BY: _____
C. V. Myers

Mrs. A. Klopf
(Name)

Title: Vice President
Purchasing & General Services

2301 Market St., Phila., PA 19101
(Address)

I, J. D. Lynch , certify that I am the Assistant Secretary of the corporation named
Purchaser herein; that    C. V. Myers        who signed this document on behalf of
Purchaser was then   Vice President    of said corporation; that said document was duly
signed for and on behalf of said corporation by authority of its governing body
and is within the scope of its corporate powers.

IN WITNESS WHEREOF, I have hereunto affixed my hand and the seal of said
corporation this   1st   day of June , 1983

(Corporate Seal)

_____
Assistant Secretary
(Signature)

34

## APPENDIX A

## NUCLEAR POWER REACTOR(S) OR OTHER FACILITIES COVERED

Purchaser  PHILADELPHIA ELECTRIC COMPANY

Contract Number/Date  DE-CR01-83NE44405  /  June 1 , 1983

Reactor/Facility Name  Peach Bottom Atomic Power Station-Unit 2

Location:

Street  R.D. #1

City  Delta

County/State  York  &  Lancaster  /  Pennsylvania

Zip Code  17314

Capacity (MWE) - Gross  1098

Reactor Type:

BWR  [X]

PWR  [ ]

Other (Identify) _____

Facility Description  Commercial electric generating unit which is rated

at 3293 Megawatts Thermal and 1051 Megawatts Net Electrical.

Date of Commencement of Operation  July 5, 1974  (Commercial Operation-Actual)
   (actual or estimated)

NRC License #:  DPR-44

By Purchaser:

Signature
C. V. Myers

Vice President
Title

June 1, 1983
Date

## APPENDIX A

### NUCLEAR POWER REACTOR(S) OR OTHER FACILITIES COVERED

**Purchaser** PHILADELPHIA ELECTRIC COMPANY

**Contract Number/Date** DE-CR01-83NE44405 / 6/1/83

**Reactor/Facility Name** Peach Bottom Atomic Power Station-Unit 3

**Location:**

**Street** R.D. #1

**City** Delta

**County/State** York & Lancaster / Pennsylvania

**Zip Code** 17314

**Capacity (MWE) - Gross** 1098

**Reactor Type:**

BWR [x]

PWR [ ]

Other (Identify) _____

**Facility Description** Commercial electric generating unit which is rated at 3293 Megawatts Thermal and 1035 Megawatts Net Electrical

**Date of Commencement of Operation** December 23, 1974 (Commercial Operation-Actual
(actual or estimated)

**NRC License #:** DPR-56

**By Purchaser:**

_C. V. Myers_ (Signature)
C. V. Myers

Vice President
Title

June 1, 1983
Date

## APPENDIX B

### TEN YEAR DISCHARGE FORECAST

To be used for DOE planning purposes only and does not represent a firm commitment by Purchaser.

Purchaser _____

Contract Number/Date _____ / _____

Reactor/Facility Name _____

Location:

Street _____

City _____

County/State _____ / _____

Zip Code                                        _____

Type:   BWR ☐

PWR ☐

Other  (Identify) _____

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 10 yr Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Discharge date – mo/yr (or refueling shut down date) | | | | | | | | | | | |
| Metric tons – initial | | | | | | | | | | | |
| – discharged | | | | | | | | | | | |
| Number of assemblies discharged (per cycle) | | | | | | | | | | | |

By Purchaser:                                        _____

_____        _____        _____
Signature                        Title                        Date

APPENDIX B
(Enclosure 1)

## ACTUAL DISCHARGES

Purchaser _____

Contract Number/Date _____ / _____

Reactor/Facility Name _____

Location:

        Street _____

        City _____

      County/State _____ / _____

       Zip Code _____

Type:

    BWR ☐

    PWR ☐

    Other  (Identify) _____

Refueling Shutdown Date _____

Metric Tons Uranium (Initial/Discharged);  _____ / _____
                                    Initial      Discharged

Number of Assemblies Discharged: _____

Any false, fictitious or fraudulent statement may be punishable by fine or
imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

_____    _____    _____
    Signature               Title              Date

## APPENDIX C

### DELIVERY COMMITMENT SCHEDULE

This delivery commitment schedule shall be submitted by Purchaser to DOE as specified in Article V.B. of this contract.

Purchaser _____

Contract Number/Date _____ / _____

Reactor/Facility Name _____

Location:

        Street _____

        City _____

   County/State _____ / _____

        Zip Code _____

Type Cask Required: _____

Shipping Lot Number _____  Proposed
 (Assigned by DOE)                Shipping Mode:  Truck ☐

Proposed Delivery Date _____          Rail ☐

DOE Assigned Delivery
Commitment Date _____           Barge ☐

Range of Discharge
Date(s) (Earliest    ____ / ____ / ____ To ____ / ____ / ____
to Latest)            Mo    Day    Yr      Mo    Day    Yr

Metric Tons Uranium:  (Initial) _____
           (Discharged) _____

Number of Assemblies:

      BWR _____

      PWR _____

      Other _____

## APPENDIX C

Unless otherwise agreed to in writing by DOE, the Purchaser shall furnish
herewith to DOE suitable proof of ownership of the SNF and/or HLW to be delivered
hereunder. The Purchaser shall notify DOE in writing at the earliest practicable
date of any change in said ownership.

Any false, fictitious or fraudulent statement may be punishable by fine or
imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

_____          _____          _____
        Signature                     Title               Date

Approved by DOE:

_____          _____          _____
   Technical Representative           Title               Date


_____                             _____
     Contracting Officer                                  Date

B. Nuclear fuel in the reactor core as of midnight of 6/7 April 1983

| Assembly Identification | Initial loading (KgU) | burnup[1] as of midnight 6/7 April 1983 (MWDT/MTU) | fee |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |
| 11. | | | |
| 12. | | | |
| 13. | | | |
| 14. | | | |
| 15. | | | |
| 16. | | | |
| 12. | | | |
| 13. | | | |
| 14. | | | |
| 15. | | | |
| 16. | | | |
| 17. | | | |
| 18. | | | |
| 19. | | | |
| 20. | | | |
| 21. | | | |
| 22. | | | |
| 23. | | | |
| 24. | | | |
| 25. | | | |

C. Total fee

[1]Please provide (as an attachment) a clear reference to the methodology used to derive the burnup figures (computer codes, etc.) and a clear reference to all data used in the derivation of those figures.

## APPENDIX D

### FINAL DELIVERY SCHEDULE

(To be submitted to DOE by Purchaser for each designated Purchaser
Delivery site not later than twelve (12) months prior to estimated date
of first delivery.)

Purchaser: _____

Contract Number/Date _____ / _____

Reactor/Facility Name _____

Location:

        Street _____

        City _____

    County/State _____ / _____

        Zip Code            _____

Type(s) cask(s) required: _____ # Assembilies per cask ___

Shipping Lot Number _____    Shipping Mode:   Truck ___
(Assigned by DOE)

                                         Rail ___

                                     Barge ___

Metric Tons Urainum: (Initial) _____
               (Discharged) _____

Range of Discharge ___ / ___ / ___ To ___ / ___ / ___
Date(s) (Earliest   Mo   Day   Yr     Mo   Day   Yr
to Latest)       (From approved commitment schedule)

Number of Assemblies:

    BWR _____

    PWR _____

    Other _____

Purchaser's Delivery   First ___ / ___ / ___   Last ___ / ___ / ___
Estimate              Mo   Day   Yr       Mo   Day   Mo

## APPENDIX D

Unless otherwise agreed to in writing by DOE, the Purchaser shall furnish herewith to DOE suitable proof of ownership of the SNF and/or HLW to be delivered hereunder. The Purchaser shall notify DOE in writing at the earliest practicable date of any change in said ownership.

To confirm acceptability of delivery date(s):

Purchaser Contact _____ Title _____
              Phone _____

DOE Contact _____ Title _____
          Phone _____

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

_____      _____      _____
      Signature                  Title                    Date


Approved by DOE:

_____      _____      _____
Technical Representative          Title                    Date

_____                                _____
 Contracting Officer                                      Date

## APPENDIX E

### GENERAL SPECIFICATIONS

A. **Fuel Category Identification.**

1. Categories--Purchaser shall use reasonable efforts, utilizing technology equivalent to and consistent with the commercial practice, to properly classify Spent Nuclear Fuel (SNF) prior to delivery to DOE, as follows:

   a. "Standard Fuel" means SNF that meets all the General Specifications therefor set forth in paragraph B below.

   b. "Nonstandard Fuel" means SNF that does not meet one or more of the General Specifications set forth in subparagraphs 1 through 5 of paragraph B below, and which is classified as Nonstandard Fuel Classes NS-1 through NS-5, pursuant to paragraph B below.

   c. "Failed Fuel" means SNF that meets the specifications set forth in subparagraphs 1 through 3 of paragraph B below, and which is classified as Failed Fuel Class F-1 through F-3 pursuant to subparagraph 6 of paragraph B below.

   d. Fuel may have "Failed Fuel" and/or several "Nonstandard Fuel" classifications

B. **Fuel Description and Subclassification--General Specifications.**

1. **Maximum Nominal Physical Dimensions.**

|  | Boiling Water Reactor (BWR) | Pressurized Water Reactor (PWR) |
|---|---|---|
| Overall Length | 14 feet, 11 inches | 14 feet, 10 inches |
| Active Fuel Length | 12 feet, 6 inches | 12 feet, 0 inches |
| Cross Section* | 6 inches x 6 inches | 9 inches x 9 inches |

*The cross section of the fuel assembly shall not include the channel.

NOTE: Fuel that does not meet these specifications shall be classified as Nonstandard Fuel--Class NS-1.

# APPENDIX E

2. <u>Nonfuel Components</u>. Nonfuel components including, but not limited to, control spiders, burnable poison rod assemblies, control rod elements, thimble plugs, fission chambers, and primary and secondary neutron sources, that are contained within the fuel assembly, or BWR channels that are an integral part of the fuel assembly, which do not require special handling, may be included as part of the spent nuclear fuel delivered for disposal pursuant to this contract.

   NOTE: Fuel that does not meet these specifications shall be classified as Nonstandard Fuel--Class NS-2.

3. <u>Cooling</u>. The minimum cooling time for fuel is five (5) years.

   NOTE: Fuel that does not meet this specification shall be classified as Nonstandard Fuel--Class NS-3.

4. <u>Non-LWR Fuel</u>. Fuel from other than LWR power facilities shall be classified as Nonstandard Fuel--Class NS-4. Such fuel may be unique and require special handling, storage, and disposal facilities.

5. <u>Consolidated Fuel Rods</u>. Fuel which has been disassembled and stored with the fuel rods in a consolidated manner shall be classified as Nonstandard Fuel Class NS-5.

6. <u>Failed Fuel</u>

   a. Visual Inspection.

      Assemblies shall be visually inspected for evidence of structural deformity or damage to cladding or spacers which may require special handling. Assemblies which [i] are structurally deformed or have damaged cladding to the extent that special handling may be required or [ii] for any reason cannot be handled with normal fuel handling equipment shall be classified as Failed Fuel--Class F-1.

   b. Previously Encapsulated Assemblies.

      Assemblies encapsulated by Purchaser prior to classification hereunder shall be classified as Failed Fuel--Class F-3. Purchaser shall advise DOE of the reason for the prior encapsulation of assemblies in sufficient detail so that DOE may plan for appropriate subsequent handling.

   c. Regulatory Requirements.

      Spent fuel assemblies shall be packaged and placed in casks so that all applicable regulatory requirements are met.

## APPENDIX E

**C. Summary of Fuel Classifications.**

    **1. Standard Fuel:**

        a.  Class S-1: PWR
        b.  Class S-2: BWR

    **2. Nonstandard Fuel:**

        a.  Class NS-1: Physical Dimensions
        b.  Class NS-2: Non Fuel Components
        c.  Class NS-3: Short Cooled
        d.  Class NS-4: Non-LWR
        e.  Class NS-5: Consolidated Fuel Rods.

    **3. Failed Fuel:**

        a.  Class F-1: Visual Failure or Damage
        b.  Class F-2: Radioactive "Leakage"
        c.  Class F-3: Encapsulated

**D. High-Level Radioactive Waste.**

The DOE shall accept high-level radioactive waste. Detailed acceptance criteria and general specifications for such waste will be issued by the DOE no later than the date on which DOE submits its license application to the Nuclear Regulatory Commission for the first disposal facility.

## APPENDIX F

### DETAILED DESCRIPTION OF PURCHASER'S FUEL

This information shall be provided by Purchaser for each distinct fuel
type within a Shipping Lot not later than sixty (60) days prior to the
schedule transportation date.

Purchaser _____

Contract Number/Date _____ / _____

Reactor/Facility Name _____

_____

_____

I.  Drawings included in generic dossier: _____

   1.  Fuel Assembly        Dossier Number: _____
       DWG# _____

                               DOE Shipping Lot #: _____

                               # Assemblies Described: _____ BWR

                                               _____ PWR

   2.  Upper & Lower end fittings
       DWG# _____                    _____ Other

_____

II.  DESIGN MATERIAL DESCRIPTIONS

    Fuel Element                            Assembly Description

   1.  Element type _____          1.  Number of Elements _____
       (rod, plate, etc.)

                                        2.  Overall dimensions
   2.  Total length _____ (in.)         _____ / _____ (in.)
                                           length / cross section

   3.  Active length _____ (in.)       3.  Overall weight _____

   4.  Cladding material _____
       (Zr, s.s., etc.)

_____

_____

III.  Describe any distortions, cladding damage or other damage to the
     spent fuel, or nonfuel components within this Shipping Lot which will
     require special handling procedures.  (Attach additional pages if
     needed.)

_____

_____

_____

## APPENDIX F

IV.  Assembly Number _____

     Shipping Lot # _____

IRRADIATION HISTORY

CYCLE NUMBER

|   | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| 1. Startup date (mo/day/yr) | | | | | |
| 2. Shutdown date (mo/day/yr) | | | | | |
| 3. Cumulative fuel exposure (mwd/mtu) | | | | | |
| 4. Avg. reactor power (mwth) | | | | | |

5.  Total heat output/assembly in watts, using an approved calcu-
    lational method: _____ as of _____
                                                      Date

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

_____          _____          _____
Signature                 Title                     Date

## APPENDIX G

### Standard Remittance of Advice (RA) for Payment of Fees

Assigned Three-Month

Period Covered:

from _____ to _____

I.   A.  Purchaser (Utility name and address)

_____

_____

     B.  Contract Number _____

II.   Payment for Spent Nuclear Fuel                   $_____

     A.  Financial Obligation as of April 7, 1983 _____

     B.  Financial Obligation as of Date of First/Single Payment _____

     C.  Date of First/Single Payment _____

     D.  Unpaid Balance to Date _____

     E.  Date of This Payment _____

     F.  Ten Year Treasury Note Rate _____

III.  Payment for M/KWH Fee                              $_____

     A.  Total Nuclear KWH Generated During Assigned
         Three Month Period Covered _____

     B.  Date of This Payment _____

     C.  M/KWH Fee Schedule Rate _____

IV.   Underpaymnet (as notified by DOE)      _____

    A.  Date of Notification _____

    B.  DOE Invoice Number _____

    C.  Interest Paid _____

V.   Late Payments (as notified by DOE)      _____

    A.  Date of Notification _____

    B.  DOE Invoice Number _____

    C.  Interest Paid _____

VI.   Other Credits Claimed (Explain      $ (_____).

VII.  Total Remittance      $ _____

Prepared by:

Title: _

Phone Number:

Date:

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001.)

By Purchaser:

_____    _____    _____
     Signature              Title              Date

FOR DOE USE ONLY BELOW THIS LINE

1. Deposit to Account 89-5227 _____

2. Receipt of Payment Verification _____

    a. Date Payment Received _____

    b. Verification Performed by _____

3. Posted to Cumulative Remitter Ledger:

   a. Date Posted _____

   b. Posted by _____

4. Late Payments:

   a. Calculation of late charge (attach schedule) _____

   b. Billing date _____

5. After processing RA furnish copy to OCRWM

## INSTRUCTIONS FOR COMPLETING DOE REMITTANCE ADVICE

Upon completion, this form must be mailed on the last workday of the month following each assigned three-month period.

### SECTION I:

Name & Address (self explanatory)

Contract Number will be the identification number assigned by DOE upon execution.

### SECTION II:

Based upon permanently discharged inventory of spent fuel and HLW amassed prior to April 7, 1983, and that portion of the in-core fuel burned through April 6, 1983. Under either payment option 1 or 2, interest will accrue and be compounded at 13-week Treasury bill rates until the first/single payment is made. If the 10 year option is selected, purchaser's financial obligation will be paid in level payment of principal and interest over the first payment. Payments will be made in quarterly installments concurrently with the normal three month assigned period. If option 2 is selected, purchaser will liquidate its total financial obligation, consisting of the fee plus accrued interest, in the form of a single payment. If option 3 is selected, no interest will accrue and lines A and E only must be filled out. This section of the Remittance Advice should be completed for each payment under the 10 year option and only once with either single payment option. (See Annex B, to be completed only once.)

a. Self explanatory

b. Fee obligation plus accrued interest

c. Self explanatory

d. Self explanatory

f. Ten year Treasury Note rate in effect at first/single payment

$ Amount paid

SECTION III:

Based upon electricity generated on or after April 7, 1983, a schedule should be attached specifying the gross power generated by each plant during the assigned three-month period as measured at the output terminals of the turbine generator.  (See Annex A, to be completed with each submission of the remittance advice.)

a.  Total of power generation from attached schedules

b.  Self explanatory

c.  Fee schedule rate in effect at time of payment

SECTIONS IV & V:

(Same instructions as above)  DOE will invoice purchasers when underpayments or late payments occur, reference a particular payment, and state the reason for the invoice.

A.  The date the purchaser received DOE invoice

B.  DOE's invoice #

C.  Interest paid

$.  Consists of interest if late payment or fees plus interest if under payment

SECTION VI:

Explain on an attached sheet of paper, if necessary, why DOE has been overpaid and the proposed disposition of the payment, e.g., apply credit against this payment or send refund.

$   If applied against this payment, this number is negative.  If refund desired, leave blank and pay gross amount due from Sections II through V.

SECTION VII:

The sum of Sections II through VI.

Enclosure C shows a transfer of funds message form that may be photocopied and used each time a transfer of funds must be made.  Constant information has been preprinted on the form. Only that information applicable to that particular monthly remittance (i.e., amount, date, company name) must be filled in prior to submitting the form to your bank.

If additional information is required, contact DOE representatives <u>Mark Looo or Joe Startari</u> on (301) 353-4899 or 353-5857).

APPENDIX "G" (Continued)


Instruction Guide for Remittance of
Nuclear Waste Disposal Fees to
Department of Energy Via Wire Transfer


Payments made to the Department of Energy (DOE) for Nuclear
Waste Disposal Fees will be affected by the Purchaser's
commercial bank via the Federal Reserve Communications System
(also known as Fedwire) to the Department of Treasury.  If the
Purchaser's commercial bank is not a Federal Reserve member,
then the Purchaser's bank will use a correspondent member bank
to effect the transfer of funds.


Purchaser must provide specific information to its bank so that
the transfer of funds can take place.  Failure to correctly
provide the information could result in delay crediting of the
remittance to DOE and could subject the purchaser to late
charges.


A wire transfer of funds message with descriptions of specific
date elements is provided in Enclosure A.  Enclosure B contains
instructions and a sample form of a transfer of funds that shows
the specific information to be supplied by the Purchaser when
requesting its commercial bank to initiate a transfer of funds.

Exhibit B

# Amendment to Contract
## DE-CR01-83 NE44405 Between U.S. Department of Energy and PECO Energy Company

This is an Amendment to Contract No. DE-CR01-83NE 44405, as amended, (hereinafter the "44405 Contract"), and is agreed to this ___19___ day of July, 2000 by the United States of America represented by the Department of Energy (DOE) and PECO Energy Company (formerly known as Philadelphia Electric Company) ("PECO Energy"), acting on behalf of itself and Public Service Electric and Gas Company, Delmarva Power and Light Company and Atlantic Electric Company, joint owners of Peach Bottom Atomic Power Station Units 2 and 3, in accordance with the terms and conditions set forth herein.

This Amendment between PECO Energy and DOE amends and supplements the 44405 Contract. Except to the extent provided in this amendment, the prior obligations of PECO Energy and DOE under the 44405 Contract, therefore, remain in effect. DOE remains obligated to transfer Peach Bottom Spent Nuclear Fuel and/or High-Level Radioactive Waste ("SNF/HLW") to a repository per the Removal Allocation as defined in Article I, below, upon initiation of repository operations. Unless otherwise stated or modified herein, the 44405 Contract is incorporated herein by reference. Those Articles of the 44405 Contract not specifically modified by this Amendment remain unchanged.

Notwithstanding subsequent change in law, each term of this Amendment is binding on, and inures to the benefit of, PECO Energy and DOE and their respective successors, transferees, assigns, affiliates, representatives, principals, agents, officers, directors, and employees.

## RECITALS

**Whereas,** on June 1, 1983 DOE and PECO Energy entered into the 44405 Contract for disposal of SNF/HLW generated by the Peach Bottom Atomic Power Station ("Peach Bottom SNF/HLW"); and

**Whereas,** DOE has been delayed in beginning the performance of its disposal obligation under that Contract, and DOE and PECO Energy agree that PECO Energy has incurred certain costs resulting from DOE's delay, and that PECO Energy will continue to incur additional costs for ongoing management of this Peach Bottom SNF/HLW; and

**Whereas,** the U.S. Court of Appeals for the District of Columbia Circuit held in **Northern States Power Co. v. United States Department of Energy**,

160154

128 F. 3d 754 (D.C. Cir. 1997), <u>cert. denied</u>, 119 S. Ct. 540 (1998), that DOE's delay was avoidable, and therefore, PECO Energy would be entitled to pursue a request for equitable adjustment against the United States pursuant to Article IX.B of the 44405 Contract, which expressly allows DOE to adjust charges and schedules to address issues arising from avoidable delays; and

**Whereas,** DOE and PECO Energy hereby agree that settlement of PECO Energy's potential claim, by this Amendment of the 44405 Contract, is in the interest of both parties; and

**Whereas,** DOE plans to design, construct, and operate a repository with an annual acceptance capacity in excess of that stated in the 1995 Annual Capacity Report and, once this facility opens, DOE intends to maximize the annual acceptance rate; and

**Whereas,** after completing site characterization and assuming site recommendation in 2001, DOE currently plans to begin disposal of SNF/HLW at an operational repository in year 2010; and intends to operate the repository at a steady-state capacity of 3,000 MTUs beginning in year 2014, as described in the *Viability Assessment of a Repository at Yucca Mountain*, (DOE/RW-0508), December 1998; and

**Whereas,** DOE agrees to use reasonable efforts to manage the Nuclear Waste Fund to minimize the potential of increasing the one (1) mill per kilowatt hour fee, consistent with current law; and

**Whereas,** DOE represents that all provisions to this Amendment are lawful and enforceable and that it has authority to enter into this Amendment, such authority including the DOE Organization Act, Pub. L. 95-91, 42 U.S.C. 7101, <u>et seq.</u>; and the Nuclear Waste Policy Act of 1982, Pub. L. 97-425, 42 U.S.C. 10101, <u>et seq.</u>; and other statutes; and

**Whereas,** certain conditions, commitments and agreements in this Amendment may also be subject to the Anti-Deficiency Act, 31 U.S.C. 41, <u>et seq.</u>

**NOW, THEREFORE,** in consideration of the promises, mutual covenants and agreements set forth herein, PECO Energy and DOE hereby agree as follows:

### ARTICLE I.  DEFINITIONS

The definitions set forth in the original 44405 Contract remain in effect unless specifically amended herein.  The following definitions are added to Article I of the 44405 Contract:

A. **"Acceptance Allocation"** means that portion of the Acceptance Schedule allocated to Peach Bottom SNF/HLW and which provides the basis for any compensation made to PECO by DOE under this Amendment.

B. **"Acceptance Schedule"** means the schedule prepared by DOE for acceptance of financial responsibility for management of commercially-generated SNF/HLW solely for the purposes of this Amendment only that incorporates the schedule for steady state acceptance of 900 MTU/yr. (*Acceptance Priority Ranking and Annual Capacity Report*, DOE/RW – 0457, March 1995) and extended at that constant rate beyond that published schedule.

C. **"Allowable Costs"** means those costs incurred by the Purchaser for managing Peach Bottom SNF/HLW that the Purchaser would not have incurred but for, and are directly related to, DOE's delay in performance of its disposal obligation.

D. **"Allowable and Reasonable Costs"** means those costs that meet both the definitions of "Allowable Costs" and "Reasonable Costs".

E. **"Cost Objective"** means a function, organizational subdivision, contract, or other work unit for which cost data are desired and for which provision is made to accumulate and measure the cost of processes, products, jobs, capitalized projects or other similar tasks or items.

F. **"ISFSI"** means an Independent Spent Fuel Storage Installation that is licensed by the Commission for the dry storage of SNF/HLW.

G. **"Manage Peach Bottom SNF/HLW"** means all of those activities necessary to possess and maintain the Peach Bottom SNF/HLW in accordance with applicable federal, state and local laws and regulations.

H. **"Peach Bottom ISFSI"** means the ISFSI facility, exclusive of any underlying real property, located in Delta, York County, Pennsylvania, constructed by PECO Energy to manage the Peach Bottom SNF/HLW.

I. **"Peach Bottom ISFSI Property"** means the designated portion of the Peach Bottom Atomic Power Station Site in York County, Pennsylvania on which the Peach Bottom ISFSI is located.

3

J. **"Peach Bottom SNF/HLW"** means the SNF/HLW generated in or by the operation of the Peach Bottom Atomic Power Station.

K. **"Purchaser"** refers to PECO Energy Company, formerly known as Philadelphia Electric Company, its successors, transferees, assigns, representatives, affiliates, principals, agents, officers, directors and employees;

L. **"Reasonable Costs"** mean:

1. Those costs that, in their nature and amount, do not exceed those that would be incurred by a prudent person or entity in the conduct of competitive business. What is "reasonable" depends upon a variety of considerations and circumstances, including whether a cost --

   a. is the type generally recognized as ordinary and necessary for the conduct of the Purchaser's business or the contract performance;
   b. is consistent with generally accepted sound business practices, arm's length bargaining, and federal and state laws and regulations;
   c. is part of the Purchaser's responsibilities to the Government, other customers, the owners of the business, employees and the public at large;
   d. is incurred in accordance with the Purchaser's established business practices; and

2. Those costs that are allocable, i.e., assignable or chargeable to one or more cost objectives on the basis of relative benefits received or other equitable relationship, and:

   a. are incurred specifically as a result of the delay in performance; or
   b. are attributable to both the delay in performance and other work, and can be distributed to them in reasonable proportion to the benefits received; or
   c. are necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown; and

4

3. If an initial review of a claim by Purchaser results in a challenge of specific cost by the Contracting Officer, the burden of proof shall be upon the Purchaser to establish that such cost is reasonable.

M. **"Removal"** means to physically take away Peach Bottom SNF/HLW from the Peach Bottom Atomic Power Station or an ISFSI site.

N. **"Removal Allocation"** means that portion of the Removal Schedule that specifies the schedule for the transport of Peach Bottom SNF/HLW to an operational repository.

O. **"Removal Schedule"** means the industry-wide schedule prepared by DOE for the removal of SNF/HLW from commercial sites for transport to an operational repository.

P. **"44405 Contract"** means Contract No. DE-CR01-83NE 44405 between the United States of America represented by the Department of Energy, and Philadelphia Electric Company (now known as PECO Energy Company), acting on behalf of itself and the joint owners of Peach Bottom Atomic Power Station Units 2 and 3, entered into on June 1, 1983, and all subsequent amendments and modifications thereto.

## ARTICLE II.    SCOPE

Except as provided herein, the Scope of the 44405 contract is not amended.

## ARTICLE III.    TERM

Article III of the 44405 Contract is amended by adding at the end the following:

The term of this contract Amendment shall be from execution until completion of all obligations under the Contract, as amended.

## ARTICLE IV.  RESPONSIBILITIES OF THE PARTIES

Article IV Section B of the 44405 Contract, DOE Responsibilities, is amended by adding at the end of Subsection 5 the following:

6. In exchange for Purchaser's release of claims as set forth in Article XI, Section A, DOE shall compensate Purchaser for the Allowable and Reasonable Costs incurred as a result of DOE's delay in performance of its disposal obligation for Peach Bottom SNF/HLW.  DOE shall reimburse the

5

Purchaser using the Peach Bottom Atomic Power Station's Acceptance Allocation as set forth in Article IX, Section C.1, Acceptance Allocation, of this Amendment to calculate the amount of SNF/HLW that is the financial responsibility of DOE.

7. DOE agrees that if any legal action, claim, lawsuit, or other proceeding, including one before an administrative agency, is initiated by any person involving this Amendment alleging that the Amendment, or any portion of this Amendment is unlawful, DOE shall take all reasonable steps that are necessary to defend this Amendment in its entirety.

8. In the event that a court orders or legislation provides that DOE utilize more beneficial schedules, allocations, or funding sources that are applicable to a group of similarly situated signatories to the Standard Contract than DOE has provided to the Purchaser, DOE shall, at the Purchaser's request, re-negotiate in good faith the terms of this Amendment. If the Purchaser is reimbursed for adjustments to charges already received by DOE from an alternative funding source, the Purchaser agrees to reimburse the Nuclear Waste Fund the amount of the reimbursement.

## ARTICLE V.  DELIVERY OF SNF AND/OR HLW

Article V of the 44405 Contract is amended by adding to the end of Section E, Exchanges, the following:

Provided that the Purchaser does not significantly increase DOE's costs, or adversely impact other Purchasers, and upon no less than twelve (12) months written notice to DOE, the Purchaser shall be permitted to exchange Peach Bottom Atomic Power Station Removal Allocations with those of other nuclear units or other Purchasers.

## ARTICLE VII.  TITLE

The title of Article VII of the 44405 Contract is amended to read "TITLE AND POSSESSION".

Article VII is amended by inserting the letter "A" before the existing Section and adding the title "Disposal" before the text. At the end of Section A, the following sections are added:

B. Transfer of Title.  Subject to the conditions and limitations listed below, DOE shall take title to Peach Bottom SNF/HLW, the storage casks and the Peach Bottom ISFSI in which they are stored in accordance with

6

the Acceptance Allocation in Article IX, Section C. Acceptance Allocation, of this Amendment:

1. For dry storage only, DOE shall only take title to Peach Bottom SNF/HLW that is contained in a dual-purpose cask system certified by the Commission for storage and transport under 10 CFR Parts 71 and 72;

2. DOE shall not take title to, or assume any responsibility for, any SNF/HLW storage pools;

3. If DOE takes title to the Peach Bottom SNF/HLW, the storage casks or the Peach Bottom ISFSI in which they are stored, DOE shall not be immediately obligated to take physical possession of any of them. In the event that DOE takes title to the SNF/HLW or SNF/HLW in casks, PECO Energy shall allow such SNF/HLW or SNF/HLW in casks to remain at its then current location until it is removed in accordance with the Removal Schedule;

4. The Purchaser shall provide DOE at least eighteen (18) months written notice of its desire for DOE to take title to the Peach Bottom SNF/HLW, casks or Peach Bottom ISFSI;

5. Upon transfer of title, Peach Bottom's allocation in the Removal Schedule for that SNF/HLW then-titled to DOE shall transfer to DOE. Peach Bottom's SNF/HLW shall retain its position in the Removal Schedule;

6. The Purchaser shall remain the operator and the Commission licensee of the Peach Bottom ISFSI and shall maintain, keep current and comply with applicable federal, state and local licenses, permits, and requirements. As part of this responsibility, the Purchaser shall continue to be responsible for all public and regulatory interactions with respect to issues of compliance with these federal, state and local licenses, permits and requirements;

7. DOE shall not store any SNF/HLW other than Peach Bottom SNF/HLW at the Peach Bottom ISFSI;

8. DOE shall not take title to the Peach Bottom SNF/HLW, the casks or the Peach Bottom ISFSI until DOE and the Purchaser have agreed in writing to the specific terms and conditions of the transfer of title, including but not limited to:

7

    a. The technical and legal description and boundaries of the ISFSI and its contents, as well as an environmental baseline; and

    b. Each party's responsibility for liabilities that may be incurred subsequent to such transfer of title;

9. In the event DOE takes title to the Peach Bottom ISFSI, the Purchaser shall continue to own the real property upon which the Peach Bottom ISFSI is located. In that event and intending to be legally bound hereby, DOE shall lease the Peach Bottom ISFSI land from the Purchaser for one dollar ($1.00) as good and valuable consideration;

10. If DOE determines it does not have legal authority to take title to the Peach Bottom SNF/HLW, casks and/or the Peach Bottom ISFSI, DOE agrees that no later than twelve (12) months following the Purchaser's written request for title transfer, DOE shall request that authority from Congress and make all reasonable efforts to obtain such authority; and

11. Nothing in this Article shall preclude the Purchaser's storage of other SNF/HLW at the Peach Bottom ISFSI as long as the Purchaser complies with applicable federal, state and local laws and regulations.

C. Transfer of Physical Possession.

1. Upon written request by the Purchaser, DOE shall make all reasonable efforts to become the title holder, owner, operator and NRC licensee of the Peach Bottom ISFSI and its contents no later than five (5) years after permanent shutdown of the last operating unit at Peach Bottom Atomic Power Station, but no sooner than five (5) years after the full term of the original forty (40) year operating license (year 2019), contingent upon the following conditions and limitations:

    a. The Purchaser gives DOE at least five (5) years written notice of its intent to transfer to DOE the NRC license, ownership and physical possession of the Peach Bottom SNF/HLW, casks and Peach Bottom ISFSI; and

    b. DOE and the Purchaser agree in writing to the specific terms and conditions of the physical transfer and responsibilities of the parties for future actions, including but not limited to:

8

(1) Actions such as transfer of equipment, personnel, and all other activities inherent in the transfer of physical possession and responsibility for operations of the Peach Bottom ISFSI; and

(2) The technical and legal description and boundaries of the ISFSI and its contents as well as an environmental baseline; and

(3) Each party's responsibility for liabilities that may be incurred subsequent to such transfer of possession; and

(4) Fiscal and operational responsibilities of each party for decontamination and decommissioning of the Peach Bottom ISFSI;

c. The Purchaser agrees to obtain a fully compliant and current Peach Bottom site-specific Commission license under the provision of 10 CFR Part 72. The Purchaser shall assist DOE in obtaining Commission approval for transfer of the site specific 10 CFR Part 72 license to DOE; and

d. Any adjustment to previously authorized adjustments to charges to account for DOE's early acceptance of SNF/HLW when possession is transferred from Purchaser to DOE in advance of the Removal Allocation shall be negotiated and completed before the transfer of possession is made.

2. DOE and the Purchaser agree that the land on which the Peach Bottom ISFSI is located will be returned to "unrestricted use" in accordance with 10 CFR Part 20 and decontamination and decommissioning will be completed within two (2) years after removal of all Peach Bottom SNF/HLW.

3. DOE's plan to assume operation of the Peach Bottom ISFSI, as described in the Sections above, is contingent upon the availability of funds appropriated for that purpose, and any other conditions or limitations set by law. Upon a timely written request by the Purchaser for DOE to take possession of the Peach Bottom ISFSI, DOE shall request the funds necessary to take possession of the Peach Bottom ISFSI and make all reasonable efforts to obtain such funding.

### ARTICLE VIII.   FEES AND TERMS OF PAYMENTS

9

Article VIII of the 44405 Contract is amended by adding to the end of Section E, Audit, the following paragraph 4, and adding the following Sections F and G:

    4. Right to Audit Allowable and Reasonable Costs Underlying Applications for Credits.   Notwithstanding any other audit rights provided under the 44405 Contract, DOE or its representative shall have the right at reasonable times and reasonable places to audit any directly pertinent books, documents, papers, and records of the Purchaser related to requests for Allowable and Reasonable Costs that the Purchaser submits for fee credits, and the Purchaser shall retain such cost data for seven (7) years from the date of the submittal.

F.   Reimbursement of Allowable and Reasonable Costs. DOE shall compensate the Purchaser for the Allowable and Reasonable Costs incurred to manage Peach Bottom SNF/HLW, according to the following:

    1. Adjustments to Charges.  Reimbursement by DOE of the Purchaser's Allowable and Reasonable Costs shall be made in the form of adjustments to charges against future fees payable to the Nuclear Waste Fund pursuant to Article VIII Section B.1, Payment, of the 44405 Contract;

    2. Pooling of Adjustments to Charges and Debits by the Purchaser. If DOE agrees to other contract amendments that settle or resolve Purchaser's potential claims for Allowable and Reasonable Costs due to DOE's delay in performance of its disposal obligation under other contracts at other Purchaser-affiliated nuclear sites, the adjustments to charges due under this Amendment to the 44405 Contract for Peach Bottom Atomic Power Station may be applied against the total fees due to the Nuclear Waste Fund from all such contract amendments;

    3. Adjustments to Charges Exceeding Payment Obligations.  If, after permanent shutdown of all Purchaser-affiliated nuclear units for which the Purchaser has executed with DOE a contract Amendment resolving issues arising from DOE's delay in performance of its disposal obligations, DOE owes adjustments to charges to the Purchaser that exceed in dollar value the fees due the Nuclear Waste Fund from the Purchaser or other Purchaser-affiliated nuclear units, but no earlier than the full term of the original forty (40) year operating license for the above-referenced nuclear units, DOE agrees to include a request for those funds necessary to provide for the direct payment of additional credits due to the Purchaser and use all reasonable efforts to obtain such funds; and

10

4. **Adjustment of Adjustments to Charges.** Adjustments to Charges shall be modified in accordance with the Consumer Price Index - All Urban Consumers ("CPI") to reflect inflation from the date of expenditure to the date the credit is taken.

G. **Application for Adjustment to Charges.** The Purchaser shall submit to DOE a written application for adjustments to charges to its fees due to the Nuclear Waste Fund. The application shall be submitted to the Contracting Officer in the form and format agreed to by the Parties. The application must be signed and certified as per the requirements of Article XVI Section B, Disputes. The Contracting Officer shall make a determination as to the amount of the adjustments to charges authorized no later than 180 days after receipt of a certified application for adjustments to charges.

H. **Allowable Cost Categories.** The parties agree that the costs associated with the following categories are Allowable Costs under this Amendment. Any additional Allowable Cost categories shall be mutually agreed to by the parties. A determination of whether such costs are Reasonable Costs will be made by the Contracting Officer after receipt of supporting documentation from the Purchaser. Based on the certified documents submitted on June 26, 2000, by the Purchaser, DOE has determined that the Allowable Cost categories include but are not limited to:

1. Storage slab, bridge and retaining walls;

2. Security system at ISFSI;

3. Security system at Protected Area Boundary;

4. Unit 1 modifications;

5. Unit 2 and 3 cask pit modifications;

6. Inside plant modifications; Unit 2 + 3 NBW

7. ISFSI project access road;

8. Procurement of spent fuel storage ~~cases~~ casks and associated equipment; and NBW

9. Atom Road bridges.

11

 **ARTICLE IX.  DELAYS**

Article IX of the 44405 contract is amended by adding at the end of Section B, the following:

C.  Adjustment of Schedules.

    1.  Acceptance Allocation.  The Acceptance Allocation is hereby adjusted to the following:

        a.  Through the calendar year 2007:  As currently allocated under the 1995 Acceptance Priority Ranking & Annual Capacity Report, Appendix B, Tables B.1 through B.10 (DOE/RW-0457); and

        b.  For calendar years 2008 and continuing until the conditions of Section C.1.c below are satisfied, the Acceptance Allocation for Peach Bottom Atomic Power Station only shall be based upon an Acceptance Schedule of 900 MTU/year utilizing the principle of "Oldest Fuel First" and the Acceptance Priority Ranking as published in Appendix A of the above-referenced Report.  The Acceptance Allocations are:

| Calendar Year | MTUs |
|---------------|------|
| 2008 | 52.0 |
| 2009 | - |
| 2010 | 53.3 |
| 2011 | - |
| 2012 | 51.7 |
| 2013 | - |
| 2014 | - |
| 2015 | 84.7 |
| 2016 | - |
| 2017 | - |
| 2018 | - |
| 2019 | - |
| 2020 | - |

Should additional Acceptance Allocations be required under this Amendment, they shall be determined by DOE consistent with the above method.

12

c.  The Acceptance Allocations shall continue until the cumulative amount of Peach Bottom SNF/HLW removed by DOE or otherwise utilized by the Purchaser equals the cumulative Peach Bottom Acceptance Allocations as measured in MTUs.

d.  These Acceptance Allocations may not be exchanged with acceptance allocations for any other nuclear units.

e.  If DOE does not begin removal of fuel from Peach Bottom Atomic Power Station by December 31, 2017, DOE and the Purchaser shall meet as soon as possible to determine what, if any, adjustments to the Acceptance Schedule are warranted.

2.  Removal Allocation. The Parties agree that the following Removal Allocations are targets only, and do not create any binding legal obligation upon DOE.

a.  Consistent with plans published in the *Viability Assessment of a Repository at Yucca Mountain*, (DOE/RW-0508), December 1998, DOE intends to begin repository operations by 2010 and to operate the repository with the following target annual acceptance capacity:

| | |
|---|---|
| 2010 | 400 MTUs |
| 2011 | 600 MTUs |
| 2012 | 1,200 MTUs |
| 2013 | 2,000 MTUs |
| 2014 and beyond | 3,000 MTUs per year |

b.  DOE intends to allocate Removal Allocations to Peach Bottom in accordance with the principle of "Oldest Fuel First," as provided in Article IV.B.5(a), DOE Responsibilities, utilizing the most current industry discharge information available at the time for development of the Acceptance Priority Ranking. This method is consistent with the basis for development of the Acceptance Priority Ranking and the Annual Capacity Report utilized in the 1995 Acceptance Priority Ranking & the Annual Capacity Report (DOE/RW-0457). Application of this method results in the following expected, but not assured Removal Allocations:

| Calendar Year | MTUs |
|---|---|
| 2010 | - |

13

| | |
|---|---|
| 2011 | - |
| 2012 | 36.3 |
| 2013 | 164.4 |
| 2014 | 143.4 |
| 2015 | 102.8 |
| 2016 | 105.0 |
| 2017 | 84.7 |
| 2018 | - |
| 2019 | 29.2 |
| 2020 | 95.7 |

3. If DOE determines that it shall be unable to meet the above Removal Allocation, DOE and the Purchaser shall meet as soon as possible to negotiate a revised Removal Allocation.

4. The SNF/HLW shall be removed from the Peach Bottom spent fuel pools or the Peach Bottom ISFSI, whichever location is, on balance, most beneficial to the parties.

14

## ARTICLE XI.    REMEDIES

Article XI is amended by inserting the letter "B" before the existing Section in that Article and inserting before that Section B the following Section A:

A.  Release of Claims Related to the January 31, 1998 Date.

1.  The Purchaser hereby releases and discharges DOE from any and all claims it may have arising out of the 44405 Contract relating to DOE's delay in performance of its disposal obligations for Peach Bottom SNF/HLW; provided, however, that nothing herein shall release DOE from claims arising from failure to perform or the breach of any other obligation not directly related to the delays in removing SNF/HLW from Peach Bottom Atomic Power Station under the 44405 Contract, or for failure to perform or the breach of any obligation under this Amendment.

2.  The Purchaser agrees that in exchange for reimbursements, adjustments to charges, schedule modifications, payments and any other valuable consideration to be provided by DOE as described in this Amendment, the Purchaser waives any right it may have to submit a claim or file suit for any remedy, either legal or equitable, based upon DOE's delay in performance of its January 31, 1998 disposal obligation.

3.  Nothing in this Amendment shall be construed to affect or abrogate any rights that the Purchaser or DOE may have to seek judicial or other relief regarding any other breach, claim, demand, dispute or any other contractual issue in controversy relating to the 44405 Contract, this Amendment, or any subsequent amendments, nor shall this Amendment be construed to affect or abrogate DOE's and the Purchaser's rights under Article XVI, Disputes, of the 44405 Contract.

## ARTICLE XIII.   REPRESENTATION CONCERNING NUCLEAR HAZARDS INDEMNITY

Article XIII is amended by adding at the end of Section B the following:

C.  DOE shall provide the Purchaser with full and complete coverage and indemnity under the Price Anderson Act, as amended, 42 U.S.C. 2210, et seq. (Section 170(d) of the Atomic Energy Act of 1954, as amended), for activities the Purchaser carries out for DOE under this Amendment if Price Anderson coverage is not provided by the Commission under subsections (b), (c), or (k) of the Act;

15

D. In consideration of DOE's providing indemnification to the Purchaser under the Price Anderson Act, the Purchaser shall take steps necessary to ensure that DOE is provided copies of all correspondence between the Purchaser and the Commission regarding the ISFSI. In addition, the Purchaser shall notify DOE immediately (in accordance with the time frames required by the Commission) of any situation which the Purchaser determines could trigger an indemnification liability to DOE under the Price Anderson Act.

## ARTICLE XVI.    DISPUTES

Article XVI is amended by re-lettering Section "A" as Section "C", re-lettering subsequent sections accordingly, and inserting before Section C the following:

A. Consistent with the goals set forth in the Administrative Dispute Resolution Act (5 U.S.C. 571, et seq.), DOE and the Purchaser agree to make reasonable efforts to resolve by mutual agreement all contractual issues in controversy, whether such issues are of law or of fact.

B. Alternative Methods of Dispute Resolution.  In the event that the parties to this Amendment disagree about the interpretation of this Amendment, including but not limited to whether costs are Allowable and Reasonable, the parties agree to make a good faith effort to resolve their differences informally through non-binding mediation, non-binding arbitration or other non-binding alternative dispute resolution method. Any such facilitation shall be conducted by third party non-governmental mediator(s) or neutral(s) who shall be selected and mutually agreed to by both parties. The facilitation process shall be agreed to by both Parties. Written notice by either party to the other of any such alternative method of dispute resolution process shall toll any applicable appeal periods relating to this Amendment and the 44405 Contract. DOE and the Purchaser shall equally share all alternative dispute resolution costs.

Article XVI is also amended by adding after new Section F the following new sections:

G. Unless otherwise agreed to by both Purchaser and DOE, the Contracting Officer will render a final decision on any dispute associated with this Amendment within one hundred eighty (180) days from the receipt of written notice of such dispute from the Purchaser.

H. This Amendment prevails over any prior communications, written or otherwise, regarding the matters contained herein between the Purchaser and DOE or their representatives. This Amendment is an integrated

16

document that amends the 44405 Contract.  No representations, warranties, or promises have been made or relied upon by either party other than those set forth herein and in the 44405 Contract.  This Amendment may not be altered, supplemented or modified except by a written instrument signed by the duly authorized representatives of the Purchaser and DOE.

I.  Should any portion, or portions, of this Amendment be found or declared unenforceable or void by any court or competent tribunal for any reason, DOE and the Purchaser agree to negotiate in good faith and attempt to reach an enforceable agreement consistent with the spirit and purpose of this Amendment. Should a court or competent tribunal declare a major term or condition of this Amendment void and unenforceable, and DOE and the Purchaser cannot reach a subsequent agreement, this entire Amendment is rendered null and void, the original 44405 Contract remains in effect and the Parties shall return to pre-Amendment status.

## ARTICLE XXII.  ENTIRE CONTRACT

Article XXII is amended by adding at the end the following:

C. DOE and the Purchaser agree that the aforementioned provisions constitute the entire terms and conditions of this Contract Amendment.

17

# APPENDICES

## Appendix E – General Specifications

Appendix E, Section B.2, Nonfuel Components, is amended by inserting "control blades," after the phrase "control rod elements".

**IN WITNESS WHEREOF,** DOE and PECO Energy have executed this Agreement by each of their duly authorized respective representatives.

By: _Herbert D. Watkins_ (signature)

     Herbert D. Watkins

Title: Contracting Officer
      Office of Headquarters, Procurement Services
      United States Department of Energy


By: _John Doering_ (signature)

     John Doering, Jr.

Title: Vice President, Peach Bottom Atomic Power Station


Sworn to and subscribed
before me this  19th  day
of July, 2000.

_Janet L. Wiley_ (signature)
Notary Public

**19**

STATE OF PENNSYLVANIA     :
                               : SS

COUNTY OF YORK            :

       On this the 19th day of July, 2000, before me, the undersigned Notary Public, personally appeared Herbert D. Watkins, who, acknowledged himself to be a Contracting Officer for the U.S. Department of Energy, the government agency named in the foregoing instrument, and that he as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing his name.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*Janet L. Wiley*
_____
Notary Public

```
NOTARIAL SEAL
JANET L. WILEY, NOTARY PUBLIC
PEACH BOTTOM TWP., YORK COUNTY, PA
MY COMMISSION EXPIRES JUNE 17, 2002
```

160927



Exhibit C

# U.S. Department of Energy
### Washington, D.C.

# ORDER

| DOE O 451.1A |
| --- |

Approved:  06-05-97
Review Date:  06-05-99

**SUBJECT:** NATIONAL ENVIRONMENTAL POLICY ACT COMPLIANCE PROGRAM

1.   **OBJECTIVE**.

The purpose of this Order is to establish DOE internal requirements and responsibilities for implementing the National Environmental Policy Act of 1969 (NEPA), the Council on Environmental Quality Regulations Implementing the Procedural Provisions of NEPA (40 CFR Parts 1500-1508), and the DOE NEPA Implementing Procedures (10 CFR Part 1021). (Hereinafter, the latter two will be referred to as "the Regulations.") The goal of establishing the requirements and responsibilities presented here is to ensure efficient and effective implementation of DOE's NEPA responsibilities through teamwork. A key responsibility for all participants is to control the cost and time for the NEPA process while maintaining its quality.

2.   **CANCELLATION**.  DOE 451.1, NATIONAL ENVIRONMENTAL POLICY ACT COMPLIANCE PROGRAM, of September 11, 1995.

3.   **APPLICABILITY**.  This Order applies to DOE Elements.  Although contractors may assist in the Department's NEPA implementation, the legal obligation to comply with NEPA belongs to DOE.  This Order does not apply to operations conducted under the authority of the Director, Naval Nuclear Propulsion Program, as described in Public Law 98-525.

4.   **REQUIREMENTS**.

In addition to requirements established in NEPA and the Regulations, DOE's NEPA Compliance Program shall include:

a.   A system of DOE NEPA Compliance Officers.

b.   Internal scoping procedures for environmental assessments and environmental impact statements that include development of a schedule.  For an environmental

---

**Distribution:**
All Departmental Elements

**Initiated By:**
Office of Environment Safety and Health

impact statement, the schedule, absent extraordinary circumstances, will provide for completion of a final environmental impact statement within 15 months of the issuance of the Notice of Intent.

c.  NEPA quality assurance plans and public participation plans.

d.  Annual NEPA planning summaries.  An annual NEPA planning summary will describe briefly: (1) the status of ongoing NEPA compliance activities, (2) any environmental assessments expected to be prepared in the next 12 months, (3) any environmental impact statements expected to be prepared in the next 24 months, and (4) the planned cost and schedule for completion of each NEPA review identified.  Every three years starting with 1995, the annual NEPA planning summary for each Field Organization will include an evaluation of whether a site-wide environmental impact statement would facilitate future NEPA compliance efforts.

e.  A DOE NEPA Document Manager for each environmental impact statement and environmental assessment.

f.  A system for reporting lessons learned and encouraging continuous improvement.

g.  Tracking and annually reporting progress in implementing a commitment for environmental impact mitigation that is essential to render the impacts of a proposed action not significant, or that is made in a record of decision.

5.  **RESPONSIBILITIES.**

a.  Each Secretarial Officer and Head of a Field Organization shall, for matters under the office's purview:

(1)  Establish a NEPA compliance program and use the NEPA process early in project and program planning to consider environmental factors along with other relevant information.

(2)  Maintain a DOE NEPA Compliance Officer for the office and designate a DOE NEPA Document Manager at the start of each environmental assessment and environmental impact statement.

(3)  Ensure that internal scoping procedures, a quality assurance plan and a public participation plan are prepared for the office.

DOE O 451.1A                                                                    3
06-05-97

(4)     Include in new contracts and grants a provision that the awardee may not
        undertake on DOE's behalf an action that is subject to NEPA until DOE
        has notified the awardee that DOE has satisfied applicable NEPA
        requirements.

(5)     Incorporate NEPA milestones in project planning documents.

(6)     Incorporate NEPA compliance status information in internal budget review
        documents.

(7)     Submit an annual NEPA planning summary to the Assistant Secretary for
        Environment, Safety and Health by January 31 of each year and make it
        available to the public.

(8)     Determine that an environmental assessment or an environmental impact
        statement is appropriate or required.

(9)     After an environmental assessment determination, prepare and issue an
        environmental assessment.  Responsibilities for approving and adopting
        environmental assessments and issuing findings of no significant impact
        may not be delegated except as provided in this Order.  In addition to
        meeting requirements established in the Regulations, responsibilities
        include:

        (a)     When another agency is involved in preparation, determining
                whether DOE shall be a lead or cooperating agency.

        (b)     Obtaining concurrence of DOE counsel in the legal adequacy of an
                environmental assessment before it is approved and in any finding
                of no significant impact before it is issued.

        (c)     Determining, based on an environmental assessment, that the
                impacts of a proposed action are significant and that an
                environmental impact statement is required, or issuing a finding of
                no significant impact when appropriate.

        (d)     Adopting another agency's environmental assessment.

        (e)     When a commitment to mitigation is essential to render the impacts
                of a proposed action not significant, preparing a mitigation action
                plan for any such commitment before issuing the finding of no
                significant impact.

4

(f)    Tracking and annually reporting progress made in implementing, and the effectiveness of, any commitment for environmental impact mitigation that is essential to render the impacts of a proposed action not significant.

(10)    Request from the Assistant Secretary for Environment, Safety and Health delegation of approval or adoption authority for a specific environmental impact statement when appropriate to expedite the review and approval process.

(11)    When required by the Regulations, prepare a supplement analysis and with the concurrence of DOE counsel, determine whether a supplemental or a new environmental impact statement is required for a proposed action, or whether no further documentation is required.

(12)    Determine that a proposed action that may be an interim action is clearly allowable under the Regulations. For a proposed action that may be an interim action not clearly allowable under the Regulations, provide the Assistant Secretary for Environment, Safety and Health with a recommendation for a determination whether the proposed action may proceed.

(13)    Incorporate NEPA values, such as analysis of cumulative, off-site, ecological, and socioeconomic impacts, to the extent practicable, in DOE documents prepared under the Comprehensive Environmental Response, Compensation, and Liability Act.

(14)    When appropriate, request from the Assistant Secretary for Environment, Safety and Health a variance from the DOE NEPA Regulations or from this Order.

b.    In addition to provisions in paragraph 5.a above, for a proposed action under the office's purview, after an environmental impact statement determination, each Secretarial Officer shall prepare an environmental impact statement and forward it to the Assistant Secretary for Environment, Safety and Health for approval. Responsibilities for issuing records of decision may not be delegated except as provided in this Order. In addition to meeting requirements established in the Regulations, responsibilities include:

(1)    Submitting a notice of intent to prepare an environmental impact statement to the Assistant Secretary for Environment, Safety and Health for issuance.

(2)    [Removed and reserved]

DOE O 451.1A                                                                 5
06-05-97

(3)     Issuing a record of decision for an environmental impact statement, after obtaining the concurrence of the Assistant Secretary for Environment, Safety and Health in its environmental content and ensuring that DOE counsel concurs in its legal adequacy.

(4)     Preparing any mitigation action plan required under the DOE Regulations before taking an action that is the subject of a mitigation commitment made in a record of decision.

(5)     Tracking and annually reporting progress made in implementing, and the effectiveness of, any mitigation commitment made in a record of decision.

c.      A Head of a Field Organization may delegate environmental assessment responsibilities to a Head of a subsidiary Field Organization (Area or Project Office) after confirming that the subsidiary organization has prepared adequate internal scoping procedures, a quality assurance plan and a public participation plan; has designated a NEPA Compliance Officer; and has adequate DOE legal resources available. (By such delegation, the authority to make categorical exclusion determinations would transfer to the NEPA Compliance Officer of the subsidiary Field Organization.)  A Head of a subsidiary Field Organization may not redelegate responsibilities for approving and adopting environmental assessments and issuing findings of no significant impact except as provided in this Order.

d.      A NEPA Compliance Officer shall:

(1)     Develop office NEPA procedures and information management requirements, and document the office's compliance with those procedures and requirements.

(2)     For actions specifically listed in Appendix A or B to Subpart D of the DOE Regulations, make categorical exclusion determinations and approve and issue any required associated floodplain and wetland documents.  These responsibilities may not be delegated except as provided in this Order. Categorical exclusion determinations need not be documented.

(3)     Report to the Office of NEPA Policy and Assistance on lessons learned after completing each environmental impact statement and environmental assessment.

(4)     Coordinate NEPA compliance strategies for matters within the office's purview.

6

(5) Advise on NEPA-related matters, including the provisions of the Regulations, the DOE NEPA Compliance Guide, this Order, and any other related requirements and guidance.

(6) Recommend to the Head of the Office served (i.e., Secretarial Officer, Head of a Field Organization, or Head of a subsidiary Field Organization), whether an environmental assessment or environmental impact statement is appropriate or required.

(7) Assist with the NEPA process and document preparation.

(8) Advise on the adequacy of NEPA documents and other related documents.

(9) Participate in periodic NEPA meetings and workshops conducted by the Office of NEPA Policy and Assistance; provide NEPA training and disseminate NEPA guidance materials and related information.

(10) Notify the Office of NEPA Policy and Assistance promptly -- generally, within two weeks of:

   (a) The designation of a NEPA Document Manager.

   (b) A determination to prepare an environmental assessment.

   (c) A transmittal of an environmental assessment to States, Tribes and, when applicable, members of the public, other Federal agencies, and local governments for preapproval review.

   (d) A determination to prepare an environmental impact statement.

(11) Provide the Office of NEPA Policy and Assistance promptly -- generally, within two weeks of their availability -- five copies and one electronic file of:

   (a) An approved environmental assessment and any finding of no significant impact.

   (b) A proposed finding of no significant impact required under the Council on Environmental Quality Regulations.

   (c) [Removed and reserved]

   (d) An approved draft or final environmental impact statement.

(e)    A record of decision for an environmental impact statement.

(f)    A mitigation action plan and corresponding annual mitigation report. The mitigation report may be submitted on the anniversary of a mitigation action plan or in a combined report (for example, as part of the annual NEPA planning summary) for multiple plans until mitigation is completed.

(g)    An environmental impact statement supplement analysis and any determination based on it.

e.    A NEPA Document Manager shall, for the environmental impact statement or environmental assessment being prepared:

(1)    Establish a team, representing all necessary DOE Elements to plan, assist in preparing, and concurrently review documents.

(2)    Conduct an early internal scoping process.

(3)    Maintain tracking systems to monitor costs of and adherence to the schedule for the NEPA process.

(4)    Manage the document preparation process, including reviewing internal drafts for technical adequacy, controlling cost, and maintaining schedule.

(5)    Encourage and facilitate public participation through the NEPA process.

(6)    [Removed and reserved]

(7)    Evaluate, upon completion of the environmental impact statement or environmental assessment, any support contractor's performance for timeliness, quality, cost-effectiveness, responsiveness, and application of requirements and guidance.

(8)    Report to the Office of NEPA Policy and Assistance on lessons learned after completing the environmental impact statement or environmental assessment.

f.    The Assistant Secretary for Environment, Safety and Health shall:

(1)    Provide DOE policy, guidance, and oversight to ensure adequate and consistent application of NEPA.

8

(2)    For an environmental impact statement:

    (a)    Issue a notice of intent.

    (b)    When another agency is involved in preparation, determine whether DOE shall be a lead or cooperating agency.

    (c)    Evaluate proposed and alternative actions, including alternative mitigation measures, and make any appropriate recommendations to mitigate environmental impacts.

    (d)    (i) Approve an environmental impact statement after the Assistant General Counsel for Environment concurs in its legal adequacy, (ii) identify whether it warrants approval by the Secretary of Energy, or (iii) determine that it may be approved by a Secretarial Officer or Head of a Field Organization.

    (e)    Adopt another agency's environmental impact statement.

    (f)    Concur in the environmental content of a record of decision.

(3)    For a proposed action that may be an interim action not clearly allowable under the Regulations, determine whether the proposed action may proceed.

(4)    When a required NEPA document is not being prepared, direct a Secretarial Officer or Head of a Field Organization to prepare an environmental assessment or environmental impact statement.

(5)    Advise the responsible Secretarial Officer and, if appropriate, the Secretary, of a proposed action believed not to conform with DOE policies or, after consulting with the Assistant General Counsel for Environment, applicable environmental laws and regulations.

(6)    Resolve disagreements among multiple involved offices concerning the assignment of responsibility for conducting the NEPA process for a proposed action.

(7)    Grant appropriate variances from the DOE NEPA Regulations or from this Order.