

Received
FILED
HARRISBURG
JUL - 2 2001
MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC J. EPSTEIN | : | CIVIL ACTION NO. CV-010682 |
| Plaintiff, | : | **FILED** HARRISBURG, PA |
| v. | : | (JUDGE YVETTE KANE)   JUL 2 6 2001 |
| SPENCER ABRAHAM, et al. | : | MARY E. D'ANDREA, CLERK Per _____ Deputy Clerk |
| Defendants. | : | |

**PROPOSED INTERVENOR'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

Exelon Generation Company, LLC, by and through its attorneys, hereby submits this Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint.

**I.     PROCEDURAL HISTORY**

On April 19, 2001, plaintiff, Eric J. Epstein, filed a two-count complaint against Spencer Abraham, the Secretary of Energy, and Herbert D. Watkins, a contracting officer of the United States Department of Energy (DOE) asserting

claims under the National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA). The complaint alleges that DOE failed to comply with the procedures prescribed by NEPA and the APA before entering into an agreement with Exelon to settle certain breach of contract claims.[1] On June 18, the defendants filed a Motion to Dismiss pursuant to Federal Rule Civil Procedure 12(b). In order to protect its interest in the settlement agreement, Exelon filed a motion to intervene as a defendant. Exelon supports the defendants' motion to dismiss because (1) NEPA is not implicated because the challenged settlement agreement will not affect the environment in any way and (2) the APA was not violated because there is an exemption for public contracts such as the one at issue in this case.

## II.  STATEMENT OF FACTS

Exelon owns and operates a number of nuclear power plants, including the Peach Bottom Atomic Power Station. In 1982, Congress passed the Nuclear Waste Policy Act ("NWPA") to address the permanent disposal of nuclear waste accumulating at commercial nuclear power plants. 42 U.S.C. 10101, *et seq.* The

---

[1]  Philadelphia Electric Company, predecessor of PECO Energy Company, entered into the original contract with DOE. PECO entered into the settlement amendment that is challenged in this lawsuit. PECO itself is a predecessor of proposed intervenor Exelon Generation Company, LLC. The complaint makes reference to both "PECO" and "Exelon". *E.g.*, Complaint,¶ 16. For the sake of convenience, all of these entities will be referred to here as "Exelon."

NWPA provided for the study, siting, and eventual construction and operation of a permanent federal storage facility for high-level radioactive waste. The NWPA authorized the Secretary of the Energy to enter into contracts with utilities for the disposal of spent nuclear fuel (SNF) and/or high-level waste (HLW). The statute required the contracts to provide that, in return for the payment of fees, DOE would begin disposing of the waste "beginning not later than January 31, 1998." 42 U.S.C. § 10222(a)(5)(b).

### A. Exelon's Original Standard Contract With DOE

In order to implement the NWPA, DOE developed a standard contract to be used as a model for the individual contracts that DOE would enter into with each owner or generator of spent fuel or high-level waste. In early 1983, DOE published its proposed standard contract in the Federal Register and invited comments from interested parties. DOE explained that it decided to use this informal rulemaking procedure because it "presents the best opportunity for interested persons, particularly the affected parties, to participate in developing the standard contract which will be used in DOE's nuclear waste disposal activities." 48 Fed. Reg. 5,458, 5,459. The agency noted, however, that "some situations may require special contract provisions." *Id.*

DOE did not prepare an Environmental Impact Statement (EIS) in connection with the proposed standard contract because it concluded that "[e]xecution of the standard contract . . . will not commit DOE to any specific activities not already prescribed by the Nuclear Waste Policy Act," and that "[a]ctivities allowed under the Act will receive appropriate environmental review at the proper time." 48 Fed. Reg. at 5,461. Thus, DOE explained, no EIS was required because: the proposed rulemaking was "not a proposal for a major Federal action significantly affecting the quality of the human environment *Id.* A similar statement accompanied the final rule, published in April of 1983. 48 Fed. Reg. 16,590, 16,598-99; *see* Complaint, ¶29.

On June 1, 1983, DOE and Exelon executed a contract for the disposal of spent nuclear fuel generated at the Peach Bottom Atomic Power Station. *See generally* Complaint, Attachment 1. The contract recites that DOE shall begin accepting spent fuel "not later than January 31, 1998," *id.* at 6 (Article II), and incorporates the per kilowatt hour fee provided for in the statute, *id.* at 17-18 (Article VIII.A.1, 2).

B.  DOE's Performance Failures

Despite its statutory and contractual obligations, DOE announced in 1994 that it would not complete construction of a repository for spent fuel and high-level waste until at least 2010, and, for that reason, it would not begin accepting spent

fuel from utilities by the January 31, 1998 deadline. *See* Complaint, ¶ 31;59 Fed. Reg. 27,007, 27,007-08. Since then, there has been extensive litigation regarding the consequences of DOE's performance failures, including rulings that DOE had an unconditional obligation to begin accepting spent fuel by January 31, 1998, and ongoing damages actions for breach of contract brought by a number of utilities before the Court of Federal Claims.[2] DOE undertook negotiations with several utilities, including Exelon, in response to those rulings and potential claims. Those negotiations ultimately led to the Peach Bottom settlement, which is the subject of this action.

    C.    <u>The Peach Bottom Settlement</u>

After extensive negotiations, Exelon and the DOE executed the Peach Bottom settlement agreement on July 19, 2000, in the form of an amendment to the Peach Bottom standard contract (the "Amendment").[3] The Amendment provides a

---

[2] *See, e.g., Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000); *Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000); *Northern States Power Co. v. DOE* 128 F.3d 754, 757 (D.C. Cir. 1997), *cert. denied*, 525 U.S. 1016, 119 S. Ct. 540 (1998); *Indiana Michigan Power Co. v. DOE,* 88 F.3d 1272 (D.C. Cir. 1996).

[3] Exelon is also pursuing a breach of contract action in the Court of Federal Claims against the government, related to the Government's failure to meet its obligations under the standard contract with respect to certain other nuclear generating units formerly owned by the Commonwealth Edison Company. *See Commonwealth Edison Co. v. United States*, No. 98-621C (Fed. Cl., filed July 30, 1998).

mechanism for resolution of Exelon's potential claims against DOE with regard to the Peach Bottom plant. Complaint, Attachment 2 at 2.

The settlement alters financial responsibility as between the parties, but does *not* alter Exelon's, or DOE's, actual or contemplated actions with respect to SNF. In particular, the settlement takes certain prior published DOE acceptance schedules and affords Exelon compensation for reasonable actual incurred costs that would not have been incurred but for DOE's delay in complying with these schedules, assuming DOE had started accepting spent fuel on January 31, 1998. *Id.* at 5-6, 9-11, 12-14 (Articles IV.6, VIII, and IX.C.1). The compensation is provided in the form of credits for future payments that Exelon would otherwise have been obligated to make to DOE under Article VIII of the standard contract. *Id.* at 10 (Article VIII.F.1). In return, Exelon released claims based on DOE's failure to commence taking fuel on January 31, 1998, and gave up any legal claim for damages in court arising from DOE's performance failures. *Id.* at 15 (Article XI.A).

Beyond these core terms, the Exelon settlement contains a number of additional provisions. For example, as it had in the standard contract, DOE agreed to take title to the spent fuel for which it was assuming responsibility (subject to various conditions). Complaint, Attachment 2 at 6-8 (Article VII.B); *see* 10 C.F.R. § 961.11, art. IV.B. In addition, beyond the pick-up schedule upon which

compensation is based, a separate "removal allocation" reflecting DOE's expected targets for actual pick-up of SNF is included in the amendment. *Id.* at 13-14 (Article IX.C.2). Like the "delivery commitment schedules" in the original standard contract, these removal allocations can be exchanged with other utilities. *Id.* at 6 (Article V.E).

### D. Prior Amendments to the Standard Contract

The standard contract has been amended twice in response to prior court decisions regarding the appropriate method of calculating the fee paid by the utilities.[4] Because these amendments were applicable to all standard contract holders, they, like the initial standard contract, were first proposed in the Federal Register and later published in final form after DOE received comments from interested parties.[5] However, DOE concluded, just as it had in developing the initial standard contract, that the amendments did not warrant preparation of an EIS. This decision was based upon DOE's determination that execution of the

---

[4] *See Consolidated Edison Co. of New York, Inc. v. DOE*, 870 F.2d 694 (D.C. Cir. 1989) (holding that Congress intended to include in the fee only electricity that is both generated and actually sold); *Wisconsin Elec. Power Co. v. DOE*, 778 F.2d 1 (D.C. Cir. 1985) (holding that the 1 mil per kilowatt hour fee in the standard contract should be based on net generation rather than gross generation).

[5] *See* 56 Fed. Reg. 67,648; 55 Fed. Reg. 37,152; 52 Fed. Reg. 35,356; 51 Fed. Reg. 40,684.

amendments, which involved the calculation of fees, would "not result in any activities which could cause environmental impacts."[6]

### III.    STATEMENT OF QUESTIONS INVOLVED

1. Whether NEPA's procedural requirements apply to a settlement agreement between DOE and a private party where the agreement does not require or allow any activity that would alter the physical environment.

2. Whether DOE was required to comply with APA notice-and-comment rulemaking procedures in developing an amendment to a public contract between DOE and an individual private party.

### IV.    ARGUMENT

#### A. NEPA IS INAPPLICABLE TO THE PEACH BOTTOM SETTLEMENT BECAUSE THE AMENDMENT WILL DO NOTHING TO ALTER THE NATURAL PHYSICAL ENVIRONMENT

Count I of the complaint alleges that DOE was required under NEPA to prepare an EIS prior to the execution of the Amendment. Because the Amendment will not have any physical effect on the environment, and because the complaint does not (and cannot) so allege, the complaint fails to state a claim under NEPA.[7]

---

[6] *See* 56 Fed. Reg. at 67,658; 55 Fed. Reg. at 37,158; 52 Fed. Reg. at 35,359; 51 Fed. Reg. at 40,685.

[7] A court should consider not only the allegations contained in the complaint itself but also the exhibits attached to it. *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (citing Fed.R.Civ.P. 10(c) ("A copy of any written instrument

NEPA directs federal agencies to prepare an EIS before commencing a major federal action having a significant impact on the human environment. 42 U.S.C. § 4332(2)(C); *Northcoast Envt'l Center v. Glickman*, 136 F.3d 660, 666 (9th Cir. 1998). In the NEPA context, the term "human environment" refers to the "physical environment." *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772-73, 103 S. Ct. 1556 (1983).

Significantly for these purposes, where an agency proposal will not result in a specific activity having a direct impact on the physical environment, NEPA's procedural requirements are not triggered. *E.g., Northcoast Envt'l Center*, 136 F.3d at 670; *see Metropolitan Edison Co.* 460 U.S. at 774, 103 S. Ct. at 1561 (NEPA requires consideration of a particular effect only if there is a "reasonably close causal relationship between a change in the physical environment and the effect at issue."); *County of Seneca v. Cheney*, 12 F.3d 8, 12 (2d Cir. 1993) ("Under NEPA, an EIS or EA is not required unless the contemplated action will affect the environment 'in a significant manner or to a significant extent' . . .").

---

which is an exhibit to a pleading is a part thereof for all purposes.")). It is a well-settled rule that when such a written instrument contradicts allegations in the complaint, "the exhibit trumps the allegations." *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998) (citing *ALA, Inc.*, 29 F.3d at 859 n.8). Thus, to the extent that the complaint in this case contains allegations that misstate the provisions of the Peach Bottom settlement agreement, the terms of the Amendment control and the Court need not accept the allegations in the complaint as true.

In this case, the complaint fails to state a claim under NEPA because it does not, and cannot, allege any environmental impact resulting from the Amendment. As a review of the Amendment itself confirms, the implementation of that agreement will have no effect whatsoever on the physical environment. Rather, the Amendment re-allocates financial responsibility in light of DOE's breach of its obligations, but contemplates no physical activity that was not already allowed or contemplated by the original NWPA itself. Even taking the allegations of the complaint as true, they do not implicate the type of environmental concerns that NEPA was intended to address.

This conclusion is not altered by the assertion that the Amendment enables "exchanges of PECO's Peach Bottom removal allocation credits with other nuclear units or other Purchasers," thereby establishing "a complete trading regime of removal allocation rights." Complaint, ¶ 45. No change to the physical environment arising from such a "trading regime" is alleged but, more importantly (and even if such a "regime" would have an effect on the environment), it is the original standard contract under the NWPA, *not the Amendment*, that made such a "trading regime" possible. *See* Complaint, Attachment 4. It is well settled that NEPA does not require review of activities that merely preserve the *status quo* or that have already occurred. *See Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990) ("[W]here a proposed federal action

would not change the status quo, an EIS is not necessary."); *see Metropolitan Edison*, 460 U.S. at 779, 103 S. Ct. at 1563 (NEPA relates solely to future agency actions).

Similarly, the allegation that the Amendment allows Exelon "to store SNF/HLW produced at plants other than Peach Bottom . . . at Peach Bottom," (Complaint, ¶ 46) is not sufficient to state a NEPA claim in these circumstances. The Amendment does nothing to allow or facilitate such transfers. Article VII.B.11 merely provides that "[n]othing in this Article shall preclude the Purchaser's storage of other SNF/HLW at the Peach Bottom ISFSI *as long as [Exelon] complies with applicable federal, state and local laws and regulations.*" Complaint, Attachment 2 at 8 (Article VII.B.11) (emphasis added). Thus, the Amendment *itself* does not allow or result in any physical activity.

Faced with similar facts, the courts have consistently held that no EIS was required. For instance, in *South Dakota v. Andrus*, 614 F.2d 1190, 1194 (8th Cir.), *cert. denied*, 449 U.S. 822 (1980), the court held that no EIS was required before issuance of a mineral patent because "the issuance of [the] patent is not a precondition which enables a party to begin mining operations," and, indeed, did not "enable the private party . . . to do anything."[8] Similarly, here the Amendment

---

[8] *See also, e.g., Park County Resource Council, Inc. v. U.S. Dep't of Agriculture*, 817 F.2d 609, 622 (10th Cir. 1987) (holding that no EIS was required

does not constitute a legal precondition that enables Exelon to receive waste generated off site at Peach Bottom. It simply clarifies that the Amendment itself does not independently prohibit storage of such waste at Peach Bottom. NEPA does not require environmental analysis of statements such as these that have no physical environmental consequences.

Furthermore, the complaint fails to recognize that Exelon's spent fuel storage activities are regulated exclusively by, and are subject to the licensing authority of, the U.S. Nuclear Regulatory Commission (NRC). Under the NRC's regulations, Exelon has a general license to store spent fuel from the Peach Bottom reactors at its Peach Bottom independent spent fuel storage installation (ISFSI). 10 C.F.R. §§ 72.210, 72.212. Such a general license was granted to all utilities possessing operating licenses (which themselves require preparation of an EIS) only after the NRC determined that there would be no significant effect on the environment that had not already been assessed at the operating license application stage or in the independent certification of spent fuel storage casks. *See* 55 Fed. Reg. 29,181, 29,190. However, if Exelon wished to store waste generated off site

---

prior to issuance of an oil and gas lease where lessee was required to submit site-specific plans for environmental review before commencing drilling), *overruled on other grounds, Village of Los Ranchos de Albuquerque*, 956 F.2d 970 (10th Cir. 1992); *Sierra Club v. FERC*, 754 F.2d 1506, 1510 (9th Cir. 1984) (the grant of a preliminary permit for construction of dam was not subject to NEPA review where further permits were required before any ground-breaking could occur).

at the Peach Bottom ISFSI, it would have to apply for an amendment to its Peach Bottom operating licenses (*see* 10 C.F.R. § 72.212(a)(1); 55 Fed. Reg. at 29,183, comment 4), which would trigger the need for further appropriate environmental review under the NRC regulations. S*ee* 10 C.F.R. §§ 50.90-50.92, 51.20-51.22. Nothing in the Amendment attempts to bypass these *NRC* procedures, which dictate the circumstances under which Exelon would be able to accept non-Peach Bottom fuel at Peach Bottom.

In short, the Amendment merely alters the fees that Exelon will pay to DOE in light of DOE's failure to perform. Notably, when amendments affecting the amount of fees paid by utilities have been proposed and executed in the past, DOE concluded that no EIS was necessary because the amendments would "not result in any activities which could cause environmental impacts." *See* 56 Fed. Reg. at 67,658; 55 Fed. Reg. at 37,158; 52 Fed. Reg. at 35,359; 51 Fed. Reg. at 40,685. Plaintiff offers no reason to doubt that this conclusion applies equally to the situation presented here.[9]

---

[9] Purported "changed circumstances" did not require DOE to prepare a supplemental EIS before executing the agreement with Exelon. Complaint, ¶¶ 53-54; *see id.* at ¶ 41 (citing 40 C.F.R. 1502.9). On their face, the CEQ regulations requiring preparation of supplements do not apply where, as here, no EIS or draft EIS was prepared in the first instance. 40 C.F.R. §1502.9(c)(1). DOE was thus not required to prepare a supplemental EIS.

### B. THE AMENDMENT IS NOT SUBJECT TO NOTICE-AND-COMMENT RULEMAKING REQUIREMENTS BECAUSE IT IS AN AMENDMENT TO A PUBLIC CONTRACT

Count II of the complaint alleges that DOE was required to follow notice-and-comment rulemaking procedures in developing the Peach Bottom settlement. This count fails to state a claim for which relief can be granted because the APA expressly exempts matters relating to public contracts such as the Amendment from the rulemaking procedures. 5 U.S.C. § 553(a)(2).

In certain circumstances, the APA requires agencies to publish a notice of proposed rulemaking in the Federal Register and to give interested parties an opportunity to be heard. 5 U.S.C. § 553(b). However, agencies are exempted from such requirements when dealing with matters relating to "public property, loans, grants, benefits *or contracts*."[10] In those situations, it is within the agency's discretion to decide "what, if any, public rulemaking procedures it should adopt and follow."[11]

---

[10] 5 U.S.C. § 553(a)(2) (emphasis supplied); *see, e.g., Essex Electro Engineers, Inc. v. United States*, 960 F.2d 1576, 1581 (Fed. Cir.) (holding that, in promulgating the Federal Acquisition Regulation, which implements the Contracts Disputes Act, the government was not required to follow APA procedures because the public contacts exemption applied*), cert. denied*, 506 U.S. 953, 113 S. Ct. 408 (1992); *Munitions Carriers Conference, Inc. v. United States*, 932 F. Supp. 334, 336 (D.D.C. 1996), *rev'd on other grounds*, 147 F.3d 1027 (D.C. Cir. 1998).

[11] *Duke City Lumber Co. v. Butz*, 382 F. Supp. 362, 373 (D.D.C. 1974), *opinion adopted in relevant part*, 539 F.2d 220 (D.C. Cir. 1976), *cert. denied*, 429

In this case, DOE elected to provide notice and an opportunity for comment when developing the original standard contract, as well as two generally applicable amendments to that contract. Plaintiff challenges DOE's decision not to follow similar procedures when developing its individual contract Amendment with Exelon to settle potential litigation. This individual settlement agreement, however, is obviously quite different from an across-the-board, industry-wide proposal. Moreover, prior voluntary publication of notice does not constitute a waiver of APA exemptions.[12] The DOE had discretion in this case not to adopt and follow rule-making procedures. Plaintiff's purported APA challenge fails as a matter of law in these circumstances.

## V.    CONCLUSION

For the foregoing reasons, the complaint should be dismissed in its entirety.

---

U.S. 1039, 97 S. Ct. 737 (1977); *see Thomas v. Network Solutions, Inc.*, 2 F. Supp. 2d 22, 36-37 (D.D.C. 1998), *judgment aff'd*, 176 F.3d 500 (D.C. Cir. 1999), *cert. denied*, 528 U.S. 1115, 120 S. Ct. 934 (2000).

[12]    *E.g., Lewis v. Richardson*, 428 F. Supp. 1164, 1168 n.6 (D. Mass. 1977).

Respectfully submitted,

Of Counsel:
Edward J. Cullen, Jr.
Jeffrey J. Norton
Exelon Corporation
2301 Market Street
Philadelphia, PA 19103

*Vincent Candiello/jpm*
Vincent Candiello
MORGAN, LEWIS & BOCKIUS LLP
One Commerce Square
417 Walnut Street
Harrisburg, PA 17101
(717) 237-4014

Brad Fagg
A. C. Brooke Clagett
MORGAN, LEWIS & BOCKIUS LLP
1800 M Street, N.W.
Washington, D.C. 20009
(202) 467-7191

July 2, 2001